IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

USDC - GREENBELT
'24 NOV 4 PM 3:46

HD

Rcv'd by

| | | |
|---|---|---|
| | : | |
| Allison Brown | : | Complaint for a Civil Case |
| 6405 Chew Road | : | |
| Upper Marlboro, MD 20772 | : | |
| Prince George's County, MD | : | Case Number: TDC 24 CV 3198 |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| Washington University School of Law | : | |
| 1 Brookings Drive | : | |
| St. Louis, MO 63130 | : | |
| | : | |
| AND | : | |
| | : | |
| Elizabeth Walsh | : | |
| Anheuser-Busch Hall Room 213E | : | |
| 1 Brookings Drive | : | |

1

St. Louis, MO 63130                          :

                                             :

AND                                          :

                                             :

Adrienne Davis                               :

Anheuser-Busch Hall Room 548                 :

1 Brookings Drive                            :

St. Louis, MO 63130                          :

                                             :

AND                                          :

                                             :

Carrie Burns                                 :

Anheuser-Busch Room 210D                     :

1 Brookings Drive                            :

St. Louis, MO 63130                          :

                                             :

AND                                          :

                                             :

Russell Osgood                               :

1 Brookings Drive                            :

St. Louis, MO 63130                          :

                                             :

AND                                          :

2

:

Robert Wild                                :

MSC 1167-226-200                           :

Washington University in St. Louis         :

1 Brookings Drive                          :

St. Louis, MO 63130                        :

                                           :

AND                                        :

                                           :

Darrell Hudson                             :

1415 Washington Heights                    :

Ann Arbor, MI 48109                        :

                                           :

AND                                        :

                                           :

Deanna Wendler-Modde                       :

1 Brookings Drive                          :

St. Louis, MO 63130                        :

                                           :

AND                                        :

                                           :

Nicole Gore                                :

1 Brookings Drive                          :

St. Louis, Mo 63130                              :

                                                 :

AND                                              :

                                                 :

Peggie Smith                                     :

Anheuser-Busch Hall Room 548                     :

1 Brookings Drive                                :

St. Louis, MO 63130                              :

                                                 :

AND                                              :

                                                 :

Mark Kamimura-Jiménez                            :

MSC 1083-226-330                                 :

Washington University in St. Louis               :

1 Brookings Drive                                :

St. Louis, MO 63130                              :

                                                 :

AND                                              :

                                                 :

Elizabeth Katz                                   :

Anheuser-Busch Hall Room 548                     :

1 Brookings Drive                                :

St. Louis, MO 63130                              :

|                              | :   |
| ---------------------------- | --- |
| AND                          | :   |
| Angela Smith                 | :   |
| Room 325D-2                  | :   |
| 1 Brookings Drive            | :   |
| St. Louis, MO 63130          | :   |
|                              | :   |
| INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY; | |
|                              | :   |
| DEFENDANTS.                  | :   |
| _____ | :   |

## **COMPLAINT**

### I.    **INTRODUCTION**

Plaintiff, Allison S. Brown ("Plaintiff") brings claims against her former law school and employer, Washington University in St. Louis School of Law ("Defendant.") Defendant discriminated against Plaintiff, including but not limited to by treating her worse than her white counterparts and classmates, subjecting her to a hostile work environment because of her race (Black), and further discriminated and retaliated against her by suspending her with no probable cause after she engaged in protected activity by complaining about racial and sex discrimination.

Defendant now is initiating garnishment proceedings and the collections process against Plaintiff after Defendant wrongfully suspended Plaintiff for 6 months. On May 2nd, 2023, the Student Conduct Board at Defendant Law School found Plaintiff not guilty on all alleged violations of the Student Conduct Code. On August 2nd, 2023, Plaintiff paid $17,455.02 cash for

the 2023-2024 tuition, and took out $30,000 in FAFSA loans - all of which were paid to

Defendant Law School. On August 15th, 2023, Defendant unilaterally revoked Plaintiff's

$37,000 annual scholarship via e-mail after Plaintiff was forced, due to the racial and sexual

discrimination by Defendant, to relocate for her third and final year of law school to Georgetown

University Law Center. Plaintiff has made numerous (over 10) requests to Defendant's counsel to

resolve this matter outside of litigation with no success. On October 14th, 2024, Lisa M. Wood,

Associate Vice Chancellor and Deputy General Counsel of Wash U sent an email to Plaintiff

stating "While the University will waive any late fees that may have been charged to your

account, it is otherwise unwilling to enter into negotiations. If you have questions with respect to

the collection process, please contact Student Billing at (314) 935-5274."

      Plaintiff brings claims pursuant to Title VI of the Civil Rights Act of 1964, as amended,

42 U.S.C. §2000d, et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000e, et seq. ("Title VII"),  the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981

("Section 1981"),  42 U.S.C.A. § 1985 ("Section 1985"), the 14th Amendment (U.S. Const.

amend. XIV, § 2), 18 U.S.C. Section 241 (Conspiracy Against Rights statute) and Maryland

Code Section 13A.01.07.03 ("Maryland Non-Discrimination in Education"). Plaintiff brings

claims of racial and sex discrimination and retaliation, malicious abuse of process, disparate

treatment, hostile work environment, conspiracy to commit discrimination, defamation, libel,

slander, breach of contract, bad-faith negotiation, fraud, fraudulent misrepresentation,

negligence, tortious interference, and intentional infliction of emotional distress. Plaintiff also

seeks a refund for tuition paid during her 6 month suspension where Defendant (e.g. Elizabeth

Walsh) substantially (and wrongfully) interfered with Plaintiff's law school education when she

had not been found guilty of any violation of any code, Student Conduct, Honor Code, or

otherwise. Plaintiff seeks all damages allowable by law, including but not limited to injunctive

relief regarding garnishee processes and collections actions in response to the racially

discriminatory and retaliatory billing practices of Defendant. Plaintiff also seeks all other

damages, including but not limited to economic loss, compensatory, liquidated, special and

punitive damages, costs and attorney's fees and all other relief that this Court deems appropriate.


II.    **PARTIES**

    **A. The Plaintiff**

1.  Plaintiff, Allison Brown ("Plaintiff"), is an individual and a citizen of the State of
    Maryland. Plaintiff attended high school at Old Mill High School in Millersville,
    Maryland, considers herself from Maryland, and currently resides in Upper Marlboro,
    Maryland 20772.

2.  Plaintiff is female and Black/African-American.

3.  Plaintiff has resided permanently in Maryland since the second semester of her second
    year of law school, and the entirety of the third year of law school while enrolled as a
    visiting student at Georgetown University Law Center for her safety.


    **B. The Defendants**

4.   Defendant, Washington University in St. Louis School of Law, is a Missouri institution
    of higher education with a principal place of business at 1 Brookings Drive St. Louis,
    Missouri 63130.Defendant recruits students to attend their undergraduate and graduate
    programs from the state of Maryland and the other 49 states comprising the United States
    of America.

5.  At all times material hereto, Defendant was acting as an institution of higher education that receives federal funding and within the meaning of the statutes (including 42 U.S.C. §2000d-1) which form the basis of this matter.

6.  At all times material hereto, Defendant was acting as a "program or activity" of higher education that receives federal funding and within the meaning of the statute (including 42 U.S.C. § 2000d-4a.)

7.  At all times material hereto, Defendant employed fifty (50) or more employees.

8.  At all times material hereto, Defendants were employers within the meaning of the statutes (including 42 U.S.C. § 2000e)  which forms the basis of this matter.

9.  At all times material hereto, Defendants acted by and through authorized agents, servants, workmen, and/or employees acting within the course and scope of employment with Defendants and in furtherance of their business.

10. At all times material hereto, Defendants at times acted in concert with each other and authorized agents, servants, workmen, and/or employees acting within the course and scope of employment with Defendants and in furtherance of a conspiracy to commit discrimination under 42 U.S. Code § 1985.

11. Elizabeth Walsh is the Associate Dean of Student Life at Washington University in St. Louis.

12. Russell Osgood is the former Dean of Washington University in St. Louis School of Law.

13. Adrienne Davis is the William M. Van Cleve Professor in the School of Law and Professor of Organizational Behavior in Olin Business School at Washington University in St. Louis. Defendants Adrienne Davis and Peggie Smith are former Yale Law School classmates.

14. Carrie Burns is the Vice President of Financial Aid at Washington University in St. Louis School of Law. Defendants Elizabeth Walsh and Carrie Burns are close friends - not just colleagues.

15. Robert Wild is the Associate Vice Chancellor, and Dean of Students at Washington University in St. Louis.

16. Darrell Hudson is the Chair of the University Student Conduct Board at Washington University in St. Louis.

17. Deanna Wendler-Modde is the Assistant Vice Chancellor and Associate General Counsel at Washington University in St. Louis.

18. Nicole Gore is the Associate Dean in the Office of Student Conduct and Community Standards at Washington University in St. Louis.

19. Peggie Smith is the Vice Dean for Academic Affairs, Charles F. Nagel Professor of Employment and Labor Law at Washington University in St. Louis, and a fellow classmate of Defendant Adrienne Davis at Yale Law School.Mark Kamimura-Jiménez is the Associate Vice Chancellor for Student Affairs at Washington University in St. Louis.

20. Elizabeth Katz was a Professor of Law at Washington University in St. Louis, and is now a Professor of Law at the University of Florida Levin School of Law.

III. **JURISDICTION AND VENUE**

21. The causes of action which form the basis of this matter arise under federal law: the Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d, et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. ("Title VII"),  the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981"),  42

U.S.C.A. § 1985 ("Section 1985"), and the 14th Amendment (U.S. Const. amend. XIV, § 2.)

22. This District Court has jurisdiction over Count I (Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d, et seq. "Title VI",) Count II (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. "Title VII"), Count III (the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 "Section 1981"), and Count IV (42 U.S.C.A. § 1985 ("Section 1985"), and the 14th Amendment (U.S. Const. amend. XIV, § 2 ) pursuant to 28 U.S.C. §1331.

23. The District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred within this District.

25. The causes of action of malicious abuse of process, defamation, libel, slander, breach of contract, bad-faith negotiation, fraud, fraudulent misrepresentation, negligence, tortious interference, and intentional infliction of emotional distress arise under the common law of the State of Maryland.

26. Plaintiff experienced a significant amount of adverse and discriminatory actions by Defendant and through Defendant's agents while residing in the state of Maryland.

27. The only address that Defendant has access to in order to contact Plaintiff is located is in Maryland.

28. Plaintiff maintained a permanent residence in Maryland, and worked out of her home office in Maryland.

29. Plaintiff lived in Maryland while attending Georgetown University for her third year of law school while still enrolled at Defendant law school.

30. Defendants are engaged in an industry affecting interstate commerce and regularly do business in the state of Maryland.

31. At all times material hereto, Defendant were employers within the meaning of the statutes which form the basis of this matter.

32. Plaintiff was an employee of Defendant within the meaning of the statutes which form the basis of this matter.

33. Defendant committed a substantial part of the discriminatory acts against Plaintiff within this District.

34. Defendant sent their retaliatory billing documents to Plaintiff's address in Maryland.

35. Plaintiff maintained a permanent residence of Maryland at all times of her discriminatory and illegal temporary suspension from Defendant Law School.

36. Plaintiff reported Defendants Elizabeth Walsh and Adrienne Davis to the Office of Chief Disciplinary Counsel of the Supreme Court of Missouri in or about February 2024; Staff Counsel, Cecilia E. Young, sent Plaintiff a letter on April 17th, 2024, stating "based upon the information provided in your letter, it would not be appropriate for this office to take action. The matter you raise in your correspondence involves legal issues which are within the jurisdiction of the courts to resolve. This office has no jurisdiction in such matters. You should consult with an attorney for any legal advice or assistance that you may need."

37. The District Court has supplemental jurisdiction regarding the following state claims: abuse of process, defamation, libel, slander, breach of contract, bad-faith negotiation,

fraud, fraudulent misrepresentation, negligence, tortious interference, intentional

infliction of emotional distress, and Maryland Code Section 13A.01.07.03 ("Maryland

Non-Discrimination in Education") pursuant to 28 U.S.C. § 1367.

38. Plaintiff has fully exhausted her administrative remedies, and complied with all

administrative prerequisites for the commencement of this action.


IV.        **FACTUAL ALLEGATIONS**

**February 2021**

39. On February 24, 2021, Plaintiff applied for admission to Defendant's law school.

40. Plaintiff disclosed her race to Defendant: Black/African-American.

41. Plaintiff disclosed her birthday to Defendant: December 14th, 1996.

42. Plaintiff also submitted her undergraduate transcript from University of Michigan, Ann

Arbor to WUSTL for consideration in support of her application to law school.

43. Plaintiff's personal statement submitted to WUSTL explained that she was an "Angell

Scholar" at the University of Michigan's Ford School of Public Policy, an award given to

students receiving straight A's for more than 2 semesters.

44. Plaintiff's personal statement submitted to WUSTL explained that she was a descendant

of enslaved African people brought to the United States.

45. Plaintiff's application stated that she "hope[d] to pursue a career dedicated to answering

questions about meaningful definitions of justice, the politics of race and desegregation,

and American federalism."

46. Plaintiff also stated that she had "a desire to study anti-Black racism and white supremacy" while in law school and in the legal profession in her application to Defendant law school.

47. While at the University of Michigan, Plaintiff wrote many articles on race, and won the "Most Read Columnist" award for several months while at the University of Michigan. Defendant was aware and notified of the same.

48. Plaintiff stated in her application to Defendant law school that "I hope to be a part of a coalition that changes the legal system for the better - those who cannot get seduced by the appeal of 'Partner', or a few hundred thousand dollars. With my light skin privilege, and talented-tenth family, I understand that I have a responsibility to dismantle white supremacy. Customarily, I also understand that this responsibility has bigger repercussions on society than the size of my dream boat, a house in the Hamptons, or an incredible pair of breast implants."

49.  Plaintiff's personal statement also stated "for the past two years, my voice has been stifled as a practice group assistant in the Food and Drug practice at a BigLaw firm. Having a degree from the University of Michigan's Ford School of Public Policy, I desperately wanted to write and engage in policy debate. But I quickly realized this was inappropriate for the "help" at a BigLaw firm - especially being Black. My degree qualified me to shuffle papers, fetch coffee, and the occasional research project, if I was lucky."

50. Plaintiff posed the following questions in her diversity statement submitted to Defendant law school in her application: "I was raised to be the 'right' type of Black woman and do the 'right' type of things, socially, culturally, and politically like straighten my hair, go to

college, and talk softly. But how does it benefit a Black person to be the 'right' type of Black? And do these performances truly protect and insulate Black people from negative attitudes and adverse political behavior from both white and non-Black people?"

51. Plaintiff's diversity statement submitted to Defendant law school in her application package continued to say: "My personal experiences with respectability politics and norms drive me to ask questions about the efficacy of respectability politics as a tool against political oppression, unfair laws, and public policy. I lament that my most meaningful work experiences with Black empowerment projects rarely confronted how non-Black people act, think, and feel towards Black people. Although the projects I have worked on acknowledge the reality of racism in their instruction, they primarily work as a band-aid to mitigate the broken leg that is anti-Black racism. I hope to utilize the law to contribute to these conversations about which standards foster anti-Blackness at Washington University in St. Louis and beyond, as I eventually hope to pursue a PhD in addition to a JD. "

52. Plaintiff's diversity statement submitted to WUSTL in her application package continued further to say: "Currently as a dilettante, I am a spectator of legal research and scholarship that impacts millions of people's lives every day. But at the Washington University in St. Louis School of Law, I would no longer be a spectator. I would become a scholar, and an effective agent of change. I hope that at the Washington University in St. Louis School of Law, I will be able to investigate the root of anti-Black racism, and interrogate the law through different lenses in the multitude of different research and clinic opportunities, such as the Criminal Justice Clinic, the Post-Conviction Relief Clinical Practicum, and the Civil Rights, Community Justice and Mediation Clinic.

Washington University in St. Louis is home to a faculty devoted to teaching and researching topics with the purpose of creating valuable scholarship and viable solutions. I just hope I have the opportunity to learn from them."

**March 2021**

53. Plaintiff was accepted to Defendant Law School via e-mail from applylaw@wustl.edu on Monday, March 22, 2021 at 3:33pm EST.

54. On June 15, 2021 at 11:00AM EST, Defendant accepted Plaintiff for admission to Defendant Law School with a scholarship of $37,000/year ($18,500 per semester) for each year with the only condition as follows: "Your award is based on full-time student status."

55. Defendant Law School Law's website states "At WashULaw, all of our JD scholarships are guaranteed for three years. Not only is this unusual but many schools make scholarship awards conditional on maintaining a certain GPA or class rank. By contrast, WashULaw scholarships are given with no strings attached as long as you remain a student at the law school." This statement from Defendant can be found here: https://law.washu.edu/consumer-information-aba-required-disclosures/

56. As an American Bar Association (ABA) accredited law school, Defendant Law School is subject to the ABA Standards for Approval of Law Schools. The ABA Standards that Defendant is required to abide by may be found at americanbar.org and here: https://law.washu.edu/consumer-information-aba-required-disclosures/.

57. ABA Standard 509 requires that accredited law schools are required to fully disclose requirements of "conditional scholarships."

58. ABA Standard 205, Non-Discrimination and Equality of Opportunity, states that "A law school shall adopt, publish, and adhere to policies that foster and maintain equality of opportunity for students, faculty, and staff, without discrimination or segregation on the basis of race, color, ethnicity, religion, national origin, gender, gender identity or expression, sexual orientation, age, disability, or military status."

59. Defendant has not complied with the requirements of the ABA Standards. Accordingly, a private investigation has been initiated by the ABA's 12 member council under Rule 42 of the ABA Standards. Under Rule 43 of the ABA Standards, this is the final disposition of Plaintiff's complaint with the ABA.

60. There is no other condition of scholarship aside from "maintain full time student status" stated on the scholarship letter document sent to Plaintiff.

61. Plaintiff's status, according to her transcript, never wavered from "full time student status" but Defendant chose to unilaterally revoke her scholarship anyways because Plaintiff is Black and complained of racial and sex discrimination in connection with being a student at Defendant Law School and her employment at Defendant Law School.

62. Plaintiff's scholarship, issued in June 2021, was unilaterally revoked by Defendant in retaliation for winning the Student Conduct Board hearing against Defendant Walsh and her agents (Defendant Walsh, Defendant Wild, and Defendant Gore.)

63. Defendant's decision in 2024 to unilaterally revoke Plaintiff's scholarship was discriminatory and retaliatory, rooted in Defendant Elizabeth Walsh's hatred of Plaintiff because of her race and sex, and the fact that Plaintiff complained of racial and sex discrimination.

64. Defendant's decisions that cause irreparable harm stem from Plaintiff's beliefs originally espoused in her 2021 application to Defendant's law school, Plaintiff's success against Defendant Walsh's racist accusations in the September 2022 through May 2023 Student Conduct Board Hearing, Plaintiff's race, and Plaintiff's complaints of racial and sex discrimination which were perpetrated by Defendants and their agents.

**August 2021**

65. Plaintiff meets Richard Omoniyi-Shooyola (hereafter, "Richard O") in Summer 2021 after both being placed in the "Happiness: 101" Summer Seminar. Unbeknownst to Plaintiff until Richard O disclosed this to her, Defendant exposed Plaintiff to a sexual predator, Richard O, who had a history of sexual violence.

66. Richard O tells Plaintiff that he was awarded the Chancellor's Fellowship at Defendant Law School, consisting of many benefits including full tuition scholarship and a stipend.

67. Richard O tells Plaintiff that he had been accused of, and found liable for, sexual harassment and assault during his undergraduate studies at the University of Chicago.

68. Defendant exposed Plaintiff to a sexual predator, Richard O, who had a history of sexual violence.

69. Richard O, through messages and phone conversations, begins to harass Plaintiff about "posting her body" and certain jokes on social media, and states that Plaintiff must not be a "real" or "good" "Christian Woman." Plaintiff assures Richard O that he does not need to worry as she is not interested in his approval, and does not seek a romantic relationship with him or any man who wishes to try to control her. Plaintiff also reminds Richard O that she has a boyfriend and only insecure men try to control women by what they wear.

70. Defendant Law School as an ABA accredited and prestigious institution, has a duty to protect their students from dangerous people and sexual predators who pose a risk to their students. Allowing sexual predators on campus poses a safety threat and risk to everyone who is not a sexual predator on Defendant's campus - including Plaintiff.

71. The risk that sexual predators pose to women at Defendant Law School is foreseeable, and Defendant Law School had a duty to mitigate that risk by not awarding dangerous individuals found responsible for sexual violence, a Chancellor's Scholarship.

72. In or around August 2021, Richard O sends Plaintiff a rape contract before they had ever met one another in person. Richard O calls Plaintiff, and explains that he generally sends contracts "to ensure that his needs are met in his female friendships" that allows him to rape Plaintiff and has odd rituals involving semen and blood. Plaintiff is taken aback because she had never met Richard in person before; she could have smelled like onions - yet Richard O still wanted to be sure that he could have sex with her at his will.

73. In or around August 2021, Plaintiff rebuffs Richard O's advances, and tells him that they should stay cordial because of the small class size and small Black community at Defendant Law School.

**September 2021**

74.  Plaintiff enters Defendant Law School as a 1L.

75.  Plaintiff joins the Black Law Students Association (BLSA.)

76. Plaintiff meets Richard O for the first time in person at BLSA event.

77. On or about September 2nd, Richard O has trouble with using Defendant's printer and asks Plaintiff to help him print off his syllabi and other documents.

78. Trying to be a good Christian woman, Plaintiff allows Richard O to use her computer.

79. Plaintiff and Richard O are cordial until Richard O sees Plaintiff's boyfriend at a campus event.

80. Richard O bumps Plaintiff into a table after a different BLSA event on Defendant Law School campus, and flashes her dirty looks in the hallway.

81. On Monday, September 27, 2021 at 8:13 AM, Plaintiff made a complaint to Defendant Elizabeth Walsh regarding Alexis Templeton, Richard O's friend, concerned that Alexis was touting that they bring a gun to campus regularly because "that's just how the culture of St. Louis is." This violated campus policy, but Defendants did not care nor did they investigate because Alex Templeton, like Richard O, were Chancellor's scholars and male. Plaintiff is female. Accordingly, her complaints regarding guns and campus activities were not taken seriously by Defendants.

82. On Monday, September 27th, 2021 at 12:00pm, Plaintiff met with Defendant Walsh about Plaintiff's complaint regarding Alexis Templeton. During the meeting, despite possessing guns being against Defendant Law School policy, Defendant Walsh told Plaintiff "too bad, so sad" with regards to Alexis Templeton and there was nothing that she could do. Defendant Walsh said this to Plaintiff because Plaintiff is Black, and Defendant Walsh said that she was uninterested in explaining the "culture of St. Louis" to Plaintiff. Defendant Walsh suggested that Plaintiff try to "get over it" and "make other friends."

83. This is one of the first times that Plaintiff's complaints regarding serious issues like gun violence in schools and racial discrimination are ignored by Defendant Law School and specifically, Defendant Walsh, because Plaintiff is Black and unworthy of protection by civil rights laws or university policy.

**October 2021 - December 2021**

84. On or about October 8, 2021, Plaintiff tells Richard O that he shouldn't be talking about her negatively in the BLSA group chat because he's not as good of a person as he's pretending to be in front of the group chat members. This exchange in October 2021 is the last time that Richard O and Plaintiff ever correspond outside of a legal or formal university proceeding

85. On or about October 9, 2021, after Plaintiff and Richard O have an open disagreement in the BLSA groupchat, Richard O files a Title IX Action against Plaintiff alleging sexual harassment, alleging that Plaintiff is "harassing Richard O because he rebuffed her sexual advances."

86. In October 2021, Richard O tells Defendant Title IX Office that Plaintiff was retaliating against Richard O in a group chat by calling him a name for not having sex with her.

87. Richard O filed a no contact order in Defendant's Title IX Office against Plaintiff. Plaintiff filed a no contact order against Richard O in Defendant's Title IX Office, detailing the rape contract, history of harassment, and assault. Both reciprocal no contact orders were granted against Richard O and Plaintiff.

88. Plaintiff provides Defendant and their agents with a copy of the "contract" that Richard O sent to Plaintiff where Richard O proposes raping Plaintiff along with rituals involving blood and semen.

89. Plaintiff informs Defendant through Title IX Office that Richard O has been found guilty of sexual assault and harassment at his undergraduate institution.

90. Plaintiff informs Defendant Title IX Office that Richard O bumped her into a table recently at a BLSA event, and has been shooting her dirty looks in the hallway.

91. Defendants (including Elizabeth Walsh) continue to investigate Plaintiff for Title IX violation despite copious evidence (including the sex contract sent earlier to Plaintiff in or about July/August 2021, after paying a seat deposit at Defendant Law School) to the contrary.

92. Defendant investigated Plaintiff and required her to produce over 500 screenshots of conversations between Plaintiff and Richard O, despite seeing the Richard O's rape contract upon Plaintiff's application for a no-contact order.

93. Defendant's production requests took a significant amount of time away from her 1st year law studies - defending against Richard O's claims were essentially a part-time job consisting of over 20 hours a week between in-person interviews and document production requests.

94. Defendant subjected Plaintiff to an unreasonable risk of harm, and harmed Plaintiff by requiring Plaintiff to spend tens of hours participating in a frivolous Title IX proceeding initiated by a known sexual predator that Defendant failed to protect her from. Defendant

did this to Plaintiff because she is Black, and treated similarly situated white women better in other similar circumstances.

95. Plaintiff produced and informed Defendant Title IX Office of documentation and correspondence where she repeatedly requested for Richard O to"leave her alone" at the initial meeting with the Title IX Office in October 2021 before no-contact orders were in place. Defendant ignored this documentation because they did not believe Plaintiff because she is Black and therefore was perceived by Defendants as less credible than similarly situated accused white plaintiffs.

96. All of Plaintiff and Defendant's interactions and interrogations regarding the Title IX proceeding initiated by Richard O were recorded by Defendant's Title IX Office.

97. All of Plaintiff and Defendant's interactions and interrogations regarding the Title IX proceeding with Richard O were handled with a biased investigator who did not investigate nor interrogate several of Plaintiff's claims regarding Richard O's previous history of assault and sexual violence, violence towards Plaintiff herself, or violence towards other members of Defendant's community.

98. Defendant's investigators maliciously and intentionally subjected Plaintiff to multiple days of questioning where exculpatory evidence regarding Richard O's claims were already available and apparent to Defendant.

99. Defendant's investigators and administrators in the Title IX office refused to admit or investigate certain evidence (e.g. the sex-blood-semen contract) or allow Plaintiff to record or view any of the "evidence" Richard O had against her.

100.    Defendant's agents' discriminatory actions in the proceeding were taken because of Plaintiff's sex and/or race.

101.    Defendant allowed Richard O to utilize its bureaucratic instrumentalities to cause immense physical and psychological harm to Plaintiff.

102.    Defendant allowed Richard O to harm Plaintiff because Plaintiff was Black, and therefore unworthy of protection or adequate investigation in Defendant's eyes.

103.    Defendant Law School had a duty to protect Plaintiff from an unreasonable risk of harm from sexual predators on campus. Instead, Defendant Law School promoted, protected and held Richard in high esteem throughout his campaign of torture towards Plaintiff. Richard O's scholarship was not revoked when he studied abroad, but Plaintiff's scholarship was revoked when she visited at Georgetown University Law Center. Defendants retaliated against Plaintiff for complaining about racial and sexual discrimination and harassment at Defendant Law School.

104.    Plaintiff lost 30 pounds through the stress and anxiety due to Richard O's actions and Defendant's inaction and failure to protect Plaintiff.

105.    Plaintiff suffered (and continues to suffer from) anxiety episodes as a result of Defendant's failure to act and discriminatory actions.

106.    Plaintiff's attendance in class suffered as a result of Defendant's actions during the Title IX process.

107. Plaintiff's grades suffered as a result of Defendant's inaction to contain sexual predators, and therefore, Richard O's frivolous Title IX suit.

108. In or around December 2021, Plaintiff undergoes several days of questioning and spends dozens of hours instead of studying for coursework. Plaintiff was blamed for Richard O's actions by Defendant during questioning and the Title IX process.

109. In December 2021, Plaintiff was forced to endure multiple days of questioning where exculpatory evidence regarding Richard O's claims were readily available and apparent to Defendant.

110. Plaintiff would not have endured these multiple days of questioning where exculpatory evidence was already available if Plaintiff were white.

111. Plaintiff's grades were negatively affected by Defendant's negligent and harmful investigation efforts.

112. Plaintiff's 1L summer career opportunities were diminished as a result of the frivolous Title IX suit that spanned the course of three months when the proceeding could've been resolved earlier if Richard O's sexually violent history and lack of evidence would have come to light earlier.

113. Further, Plaintiff's career opportunities were stunted as a result of Defendant's inaction and discriminatory action towards Plaintiff during the Title IX process.

114. Defendant treated Plaintiff worse than other similarly accused individuals of sexual harassment because of her race.

115.    If Plaintiff were a white woman, there is no conceivable way that Wash U's Title IX Office would have allowed Richard O, a Nigerian Black man, to harass, intimidate, and harm Plaintiff for the amount of time that he did and using Defendant's bureaucratic instrumentalities in the way that he did.

116.    Defendant failed to exercise a reasonable level of care to not expose Plaintiff to an unreasonable risk of harm from known sexual predators enrolling in their law school, or retraumatize Plaintiff by making her spend dozens of hours in questioning, producing documents, and writing arguments to defend herself against a known sexual predator.

**January 2022**

117.    Plaintiff is not found to violate Title IX in connection with Richard O's filings on January 12, 2022. The subject of the email sent on January 12, 2022 by Defendant to Plaintiff was "Not Responsible."

118.    Plaintiff was harmed, being under intense scrutiny and investigation for almost 4 months and **Defendant found no evidence of wrongdoing by Plaintiff.**

119.    Plaintiff was irreparably financially and psychologically injured as a result of Defendant's actions and lack thereof during the proceeding: her grades suffered, she became dangerously suicidal, and her career options were negatively impacted and severely limited.

120.    Then, in January 2022, during Plaintiff's second semester of law school, Plaintiff was automatically enrolled into Professor Elizabeth Katz's Criminal Law section.

121.    Professor Elizabeth Katz had a documented history of students of color complaining about her discriminatory practices and racism allegations while teaching another course at Defendant Law School according to other students, and was mentioned during a Women in Color Law Society event as being a "problematic professor to look out for."

122.    Previous students had taken measures to report Defendant Elizabeth Katz, but Defendant Law School did not investigate because most of the complaints were from women of color and not deemed important enough to pursue.

123.    Defendant Elizabeth Katz invites everyone in Plaintiff's "Criminal Law Spring 2022" course to use the CANVAS discussion board online to discuss class issues, ideas, and concepts.

124.    Professor Katz informs her class (via Syllabus, email announcement, and in-class PowerPoint presentation) that every class will be recorded and available for review (in case someone is ill, or unable to attend) if you request the recording in advance.

125.    Early in Professor Katz' class, including on the first day, Plaintiff participates in class to no major objections from Professor Katz regarding her questions about the intersections of race and criminal law. Plaintiff raises issues of race just like her white colleagues in her section with no objection from Professor Katz at first.

126.    Throughout January 2022, Plaintiff attended 2 different "office hour" sessions with Professor Katz with no issues or complaints from Professor Katz. Professor Katz only began to have problems with Plaintiff once she started complaining of racial and/or sex discrimination in connection with Professor Katz's class, Plaintiff's employment, or adverse treatment and/or racial dogwhistles in the classroom because of Plaintiff's race.

**February 2022**

127.    In early February 2022, Professor Katz began to show videos of Black children being
        murdered to "incite empathy" and show police injustice, including the murder tapes of
        Latasha Harlin by Soon Ja Du, a 49 year-old Korean convenience store owner and Tamir
        Rice, by Timothy Loehmann, a 26-year-old white patrolman with the Cleveland Division
        of Police.

128.    Defendant Elizabeth Katz ignored the requests of Black and multiracial students who
        objected to the violent video tapes being shown during class; Professor Katz emphasized
        that it was important to show them.

129.    Defendant Elizabeth Katz did not provide an opportunity for class discussion of the
        violent video tapes; nor did she give subtext or historical contextualization about the
        murders of Black children. Defendant Elizabeth Katz showed the videos as if they were a
        spectacle and marvel - look at how the law works to put Black people in their place and
        kill them.

130.    On Tuesday, February 1st, 2022, Plaintiff and a coalition of other students unionized
        and collaborated to report Professor Elizabeth Katz after one criminal law class that was
        perceived as particularly disturbing and violent to Plaintiff and her classmates; she had
        essentially cosigned and showcased another police murder of a Black person.

131.    Plaintiff, along with several other students, state to Professor Katz after class that
        showing the murder of Black children does not incite empathy, and instead dehumanizes
        Black folks by memorializing their murder with sensationalized videos. Plaintiff, along
        with four classmates, drafts a resolution to the administration objecting to Professor
        Katz's showing videos of Black children being killed, various racially insensitive

comments and inability to denounce racism and regulate racist comments in the classroom. Plaintiff, along with several other students, object, by drafting a memorandum to the Student Bar Association, and schedule meetings with various members of Administration.

132.     Defendant Angela Smith attested to addressing these other students' complaints in the Student Conduct Board in or about February/March 2023, about a year later. Plaintiff organizes with several other students to write a resolution to the Student Bar Association about Professor Katz's way of teaching class, and repeatedly delegitimizing any conversation about the intersections of race, gender, and criminal law in the classroom is harmful.

133.     Further, Professor Katz's teaching style would be summarized by Plaintiff and her colleagues as the following: "Here is a law that was created to incarcerate Black and brown people with lesser means. Thoughts?" without any historical contextualization, scholarship, or honesty with how the current legal system has evolved to exist today.

134.     None of the other students who Plaintiff organizes with in opposition to Katz's racially discriminatory behavior are disciplined or reprimanded for their participation or demonstration of disapproval with Katz's racist, problematic, and violent behavior.

135.     Plaintiff (despite not being the only student who objected and/or complained regarding Defendant Katz's racist class practices) is the only student, and the only Black student reprimanded for participation regarding objection to Professor Katz's display of videos depicting the murder of Black children. Plaintiff was treated this way because she is Black.

136.    Plaintiff is called into the Dean's Office five times over the course of her second

semester in law school regarding her "tone" and professionalism because of her race.

137.    No other similarly situated student in Plaintiff's section is subjected to constant

surveillance of their tone and professionalism in mandatory conversations with several

Deans (namely, Defendant Walsh, Defendant Angela Smith, and Defendant Peggy Smith)

of Defendant Law School over the course of their second semester in law school. Plaintiff

was subjected to this level of surveillance and commentary on her "tone" and

"professionalism" because Plaintiff is Black. Further, Plaintiff refused to abide by the

Black stereotypes that Defendant Angela Smith and Peggy Smith articulated during

meetings with Plaintiff. Defendants Angela Smith and Peggy Smith expected Plaintiff to

conform to a Black stereotype of a grateful and subservient Black person who never

objects to any racist acts of their peers because in their mind, Black people should be

grateful that a white person let them into their law school in the first place.

138.    Further, Defendants Angela Smith and Peggy Smith (both Black administrators) were

selected to harass and inculcate a certain mindsets on Plaintiff in their meeting because

Plaintiff is Black; Defendant Katz recruited Defendant Peggy Smith to chill Plaintiff's

speech and make her stop complaining of racial discrimination; Defendant Katz states in

an email on Saturday, February 26, 2022 at 12:31pm that perhaps "Peggy Smith would be

able to speak to Plaintiff's frame of mind" because they are both Black.

139.    Plaintiff's classmates wrote notes to Plaintiff, stating that Defendant Katz's decisions

were racist and problematic, and that they stood in solidarity with Plaintiff. Per Defendant

Hudson and Defendant Walsh's actions, these notes from Plaintiff's classmates were not

allowed to be entered into evidence during the Fall 2022-Spring 2023 Student Conduct Board hearing which occurred around a year later.

140.    Plaintiff was coerced into meeting with Defendant Angela Smith regarding her concerns after Defendant Angela Smith is made aware of the racial discrimination problems surfacing in Professor Katz's class.

141.    Plaintiff discloses to Defendant Angela Smith that the entirety of the first semester, Richard O tortured her with sexual harassment and violence.

142.    Defendant Angela Smith makes a comment to Plaintiff about her office formerly being in the basement of Anheuser-Busch Hall as a reflection of Defendant Law School's prioritization and valuation of her role as Assistant Dean of Diversity, Equity & Inclusion.

143.    Defendant Angela Smith ignores Plaintiff's email regarding Plaintiff's concerns with Professor Katz's class.

144.    Plaintiff does not realize until later that the reason why Defendant Angela Smith, the Assistant Dean of Diversity, Equity and Inclusion, ignored Plaintiff's complaints of racial and sexual discrimination, is because she is cc'd on the e-mail chains with Professor Katz. Defendant Angela Smith simultaneously conspired with Defendant Elizabeth Walsh and Defendant Russell Osgood to get Plaintiff expelled from law school for complaining of racial discrimination on and around February 26th, 2022.

145.    Defendant Angela Smith was hired for the role of Assistant Dean of Diversity Equity and Inclusion because she is Black, to provide a veneer of plausible deniability for the administration to obfuscate issues of racial and/or sex discrimination and other legal issues.

146.   From January to April, Professor Katz sends a series of long-worded and racially-charged emails to Defendant Elizabeth Walsh, Defendant Peggy Smith, and Defendant Angela Smith in regards to Plaintiff's "tone", her demeanor, and her questions and comments during class.

147.   Professor Katz complains via e-mail that Plaintiff's points in Criminal Law are "not directly related to the course material" and notes that Plaintiff "keeps bringing up race."

148.   In an email thread dated Feb 25, 2022, at 2:40 PM EST, Smith, Peggie <prsmith@wustl.edu> wrote: Defendant Peggie Smith gives Professor Katz advice on how to discriminate against Plaintiff:

> "Even if the meeting did not go as expected, you will soon discover if she continues to disrupt the class. If she does, lean on some of the strategies discussed earlier:
>
> "I see your hand, please put it down. I want to hear from other voices." Look to frame your questions in terms of forcing students to express views that aren't their own personal views. If she starts with her personal views, promptly get her back on track.
>
> When appropriate, tell her that her comments are "unhelpful to fostering class discussion." When she asks what you mean, ask her to see you after class or in office hours. Don't allow her to give long answers that aren't on point. Feel free to interject and get the conversation back on track.
>
> In the meantime, please keep us abreast and the investigation by the University will continue."

149.    The "investigation" by the University that Peggy Smith was actually referring to a plot by Defendant Walsh and her friends to try to get Plaintiff expelled for engaging in protected activity, and complaining about racial and/or sexual discrimination in her Criminal Law course and on Defendant's campus.

150.    The true concern of these Defendants was not that Plaintiff was being disruptive; but that Plaintiff was observing Defendants act racist towards her and other students, and then complaining about it. Defendants resolved to punish Plaintiff instead of rectifying the racial discrimination seen through Defendant Law School's classes, namely in Professor Katz's criminal law class, which now had years of consecutive complaints regarding Defendant Katz's problematic and allegedly racist previous behavior in the classroom.

151.    On Friday, February 25, 2022 2:26 PM CST, Defendant Katz wrote Defendants Angela Smith, Peggy Smith and Russell Osgood regarding the meeting with Plaintiff:

> "The conversation with Allie was not very productive in my view. She was unwilling to acknowledge that it was inappropriate or chilling to dismiss another student's comment by saying he held that perspective because he was white. Her general reaction to the conversation was that I was attempting to police her because she's a Black woman and that my course is "violent" in not addressing race in the manner she thinks it should. Elizabeth and I did not have an opportunity to discuss this because I had to go straight into another office hours appointment, so I'm not sure if her reading of the meeting is the same."

152.    Another student, Yehoshua Watkin, who is Jewish and white, in Plaintiff's section, is regularly seen on the course recordings derailing class time for over 30 minutes (around ⅓ of the class period) to ask hypotheticals unrelated to the course material.

153.    Plaintiff never spoke continuously off topic for longer than 1 minute in criminal law course, or any class at Defendant Law School. Plaintiff attended class for 2 weeks without contributing to class discussion because she was afraid that Defendant Katz was going to retaliate against her for complaining of racial and/or sex discrimination, and if Defendant Elizabeth Walsh's "too bad so sad" assertions regarding Plaintiff's concerns of being discriminated against because of her race and sex.

154.    In March 2023, Professor Katz memorialized Plaintiff's change in behavior by characterizing Plaintiff's new "on topic" and 'brief' comments in an email sent to Defendant Elizabeth Walsh, Defendant Peggy Smith, and Defendant Russell Osgood.

155.    This March 2023 email thread was tampered with from its original presentation during an evidence review session with Defendant Nicole Gore in November 2022, and has not been recovered by Plaintiff. Defendant's actions of tampering with e-mails is and was fraud. Yet, Plaintiff was the individual punished by Defendant - not Yehoshua. Plaintiff was punished by Defendant because she is Black.

156.    Defendant Elizabeth Walsh and Professor Elizabeth Katz punished Plaintiff for speaking in class because she was Black, and complained of racial discrimination.

157.    Other similarly situated white complaining classmates were not punished by Defendant.

158.    Shane Gregoire, a white classmate in Plaintiff's criminal law course who took a leave of absence because of controversial and allegedly racist past commentary in his section

(he was a year older than Plaintiff, yet placed in her criminal law course) states that the First Nations folks' genocide is irrelevant to a case about a First Nations' couple who were hesitant to take their child to the doctor because of the US and Canada's legacy of taking indigenous children and murdering them.

159.    Shane Gregoire further states that it is unreasonable for any family to not want to take their child to the doctor, and that it should constitute child abuse.

160.    Plaintiff raises her hand, and states that a Native American family may be wary of going to a Western/allopathic doctor in light of the fear of their child being placed in a "re-education" school, and killed.

161.    Plaintiff asserts in class that Shane Gregoire's perspective is racially insensitive and that he should think about how our race impacts how we interact with the world around us.

162.    Professor Katz shuts down the interaction, blames Plaintiff for Shane Gregoire's racially insensitive and historically inaccurate comments, and is flustered for the rest of the class.

163.    Professor Katz sends a series of e-mails conspiring to commit discrimination with Dean OsGood and Dean Walsh about her problems with Plaintiff's class comments in violation of Section 1985.

164.    Professor Katz sends an email concerned that Plaintiff "may see her as a racist or naïve white woman."

165.    Around the same time, in March 2022, an anonymous 80-person survey was distributed by Professor Katz to Plaintiff's criminal law section to gauge what was going

wrong in her class because several people began to make complaints to the administration regarding Katz's class.

166.   None of the students named Plaintiff as the cause of Professor Katz's poor classroom management.

167.   Several e-mails from white women colleagues in Plaintiff's Criminal Law class, like Brooke Behler (who wrote an e-mail on January 26th, 2022 titled 'Criminal Law Concern') , Mackenzie Purvis (who wrote an email on February 22, 2022 at 2:32pm titled 'Class Today'), and Abigail Melbaum (who wrote an email on February 23, 2022 at 7:13pm titled 'Criminal Law Classroom Environment') all wrote emails to Defendant Elizabeth Katz regarding the contentious and uncomfortable classroom environment. Yet, no white female students named Plaintiff as the reason why the classroom was a "toxic environment."

168.   Plaintiff's white female classmates referenced in number 167 of this complaint were also complaining about Katz's class being an uncomfortable classroom environment.

169.   None of Plaintiff's white female classmates had their scholarship revoked by Defendant Law School.

170.   None of Plaintiff's white female classmates were suspended for 6 months by Defendant Robert Wild, or Defendant Law School.

171.   None of Plaintiff's white female classmates were branded as a threat and harassing students by Defendant Walsh or Defendant Law School. Plaintiff was branded as a threat and harassing students and alleged to have violated the student conduct code because Plaintiff is Black and complained of racial and/or sex discrimination before, during, and

after her employment at Defendant Law School and as a student at Defendant Law School.

172.   None of Plaintiff's white female classmates suffered the level of racial and sexual harassment from Defendant that Plaintiff faced.

173.   Yet, Defendant Katz attributed several of their comments and other people's comments regarding the uncomfortable classroom nature to Plaintiff, as they "seemed related to her" despite no evidence in the surveys or the email text themselves to support such an inference.

174.   Defendant Katz blamed Plaintiff because Plaintiff is Black and engaged in complaining about racial discrimination.

175.   These comments from students could have easily been attributed to Yehoshua Watkin, who repeatedly interrupted class with unrelated questions and hypotheticals to the course material. Yet, Defendant Katz chose to attribute the comments to Plaintiff.

176.   Defendant Katz attributed several of the comments in the survey to Plaintiff because Plaintiff is Black.

177.   Defendant Katz shared the results of her survey with Defendant Elizabeth Walsh, along with her assertions that the comments regarding her classroom management should be attributed to Plaintiff of her eighty-person anonymous survey with Defendant Elizabeth Walsh in an e-mail later disclosed to Plaintiff via a pre-hearing conference with Defendant Nicole Gore.

**March 2022**

178.    On February 25th, 2022, Defendant Walsh and Professor Katz tone police and complain about Plaintiff's "tone" and "professionalism" in a zoom call.

179.    On February 25th, 2022, Defendant Walsh and Defendant Katz make racialized comments regarding Allison's "tone," saying that she needs to "act more professionally" without naming any particular action or activity of Plaintiff. Defendants did this because Plaintiff is Black.

180.    After the call, the same day, on February 25th, 2022 at 4:47PM CST, Plaintiff sends a follow-up message with scholarly articles and research papers from Harvard, Stanford, Cambridge about why the discussion they just had was inappropriate, and why what Defendant Walsh and Professor Katz had said to Plaintiff was racist.

181.    On Monday, February 28th at 9:03AM CST, Defendant Walsh thanked Plaintiff for compiling the resources "as it must have taken much time and energy, and I will certainly read them."

182.    Defendant Walsh did not read the materials that Plaintiff sent her. In fact, Defendant Walsh was embarrassed and insulted by this exchange. This exchange was the motivation behind her discriminatory behavior which culminated in Plaintiff's erroneous suspension later in November 2022. Dean Walsh would continue her campaign of racist tone-policing by falsely accusing Plaintiff of violating sections 2 and 4 of the Student Conduct Board because of her "tone" and outspokenness about complaining about racial and sexual discrimination at Defendant Law School. Defendants did this because Plaintiff is Black.

183.    On Saturday, February 26, 2022 7:39 AM CST, Defendant Walsh lauded the ABA's

new standard that "require law schools to educate students about bias, racism and

cross-cultural competency, possibly as soon as the next academic year."

184.    Plaintiff replied to Defendant Walsh, cc'ing Professor Katz, on Mon, Feb 28, 2022 at

9:03 AM CST stating " I hope that you all know that I have immense respect for you all

as members of the staff and faculty. I hope you all have a great week."

185.    Defendant Katz responded to Plaintiff on Monday, February 28, 2022 at 11:03 AM

stating "I hope you all have a great week. I appreciate your follow up reflections and

suggested reading. I will review some of these materials as well. See you in class soon."

186.    Defendant Katz asks Defendant Peggy Smith (a Black professor) via e-mail if she

would be able to "speak to Plaintiff's frame of mind" because both Defendant Peggy

Smith and Plaintiff are Black. Defendant Katz felt as though her talk with Plaintiff along

with Defendant Walsh didn't send the right message, and that Plaintiff would only

understand the importance of not complaining about racial discrimination and being a

good Black person who does not notice or object to racist policy or law if another Black

person were to explain it to her.

187.    Defendants Peggy Smith and Angela Smith are requested by administration to meet

with Plaintiff because they are all Black and could better speak to Plaintiff's "frame of

mind" to get her to stop complaining of racial discrimination regarding the tone policing

and professionalism conversations that Plaintiff is being thrust into because she is Black.

188.    On Tuesday, April 5, 2022 at 7:42 PM, Defendant Peggy Smith e-mails Plaintiff to

meet with her.

189.    On  Wednesday, April 6, 2022 12:42 AM, Plaintiff replies with her availability and
        says "I look forward to speaking with you."

190.    Plaintiff arrives at Defendant Peggy Smith's office at 4pm on Thursday, April 7th,
        2022 with two of her white friends for moral support.

191.    Defendant Peggy Smith tries to persuade Plaintiff's two white friends to leave
        Plaintiff alone with her, and then sternly tells them (and does not ask them) to leave.

192.    Plaintiff reluctantly assures her white friends that she will be okay, and goes into
        Defendant Peggy Smith's office.

193.    Professor Peggy Smith tells Plaintiff that "if [Plaintiff] were to say that a policy or
        law were "racist" in her classroom, [Plaintiff] would be suspended." Defendant Peggy
        Smith said this to Defendant because she is Black - she never relayed this to Plaintiff's
        white classmates who spoke about their opinions regarding racial discrimination in
        Plaintiff's criminal law class.

194.    Plaintiff asks Defendant Peggy Smith if this is a disciplinary warning.

195.    Defendant Peggy Smith declines that "no it is not a warning," and states that she is
        "just giving advice that may make life and law school easier."

196.    Defendant Peggy Smith has no disciplinary authority of students as part of her role as
        Dean, and attests to this in the Student Conduct Board Hearing in or around March 2023.

197.    Defendant Peggy Smith gives Plaintiff a book called "The Blind Spot", a book with a
        featuring Dinesh D'Souza, who, according to Newsweek.com, "Blames Blacks for White
        Nationalism."

198.    Defendant Peggy Smith discriminated against Plaintiff by trying to teach and
        inculcate Plaintiff with a lesson on how to be Black properly at Defendant Law School,

and to refrain from calling any law, policy, or opinion "racist" because Plaintiff is Black and she should not be the one talking about such issues. Defendant Peggy Smith was contacted by Defendants Elizabeth Walsh and Elizabeth Katz to try to use her Blackness to be persuasive to Plaintiff.

199. Plaintiff would not have been called in to meet with Defendant Peggy Smith or any other Dean if she were white, because none of her white classmates (especially Yehoshua Watkin, a white Jewish man who disrupted class at least five times more than Plaintiff and for a much longer disruption) were called into the Dean's office to have their tone and professionalism criticized as a result of Defendant Katz's poor classroom management.

200. Plaintiff asked Defendant Peggy Smith if she had met with Shane Gregoire or Graeme Harcourt, two white male students who had said their opinions in class about how the First Nations people genocide was inconsequential in a case about First Nations people, how Plaintiff doesn't belong in the field of law but instead belongs in a discipline like sociology, how Black Lives Matter protestors should be able to shot and killed in defense of property, or how "when the looting starts, the shooting starts." Because of Shane Gregoire and Graeme Harcourt's comments, one of Plaintiff's classmates had to walk out of class to collect themselves. Plaintiff asked Defendant Peggy Smith if she had met with Shane Gregoire or Graeme Harcourt. Defendant Peggy Smith did not meet with Shane Gregoire or Graeme Harcourt, two white male students who also shared their opinions during class. Defendant Peggy Smith met with Plaintiff because she is Black and shared her opinions about race just like her white classmates in her criminal law class.

201. Yet, despite saying such objectionable comments in class, neither Shane Gregoire nor Graeme Harcourt were disciplined by Defendant Law School nor any of Defendant's agents.

202. Instead, Defendant Law School targeted and disciplined Plaintiff for objecting to their comments through incessant requests to Plaintiff to meet with Defendant Angela Smith, Defendant Peggy Smith, or Defendant Elizabeth Walsh throughout the entirety of her second semester of law school because Plaintiff is Black and openly complained of racial discrimination by her classmates and Professors.

203. Defendant Peggy Smith did not meet with Shane Gregoire or Graeme Harcourt, two white male students who also shared their opinions during class.

204. Defendant Peggy Smith does not call white students (including Shane into her office to lambast them that they cannot say that policies or laws are "racist" or racially discriminatory.

205. Defendant Peggy Smith tells Professor Katz that in order to address her classroom concerns, she would forbid the discussion or labeling of any law or concept as "racist" because it could have a "chilling effect."

206. Defendant Peggy Smith tells Plaintiff that in order to address her classroom concerns, she would expel Plaintiff if she were to engage in any discussion or labeling of any law or concept as "racist" because it could have a "chilling effect."

207. Plaintiff retorts to Defendant Peggy Smith: "Well, it's good that I'm not in your class."

208. Defendant Peggy Smith writes Professor Elizabeth Katz , and also reiterates this same principle of not mentioning "race" and forbidding the conversation of "racism."

209.    Defendant Peggy Smith reiterates the same points of not mentioning race and expelling anyone from class who uses the word "racist" during the Student Conduct Board hearing in Spring 2023, a year later.

210.    In or around March 2022, Professor Katz sends an email to Peggy Smith, Angela Smith, and Elizabeth Walsh informing them that Plaintiff had stopped speaking so often in class, and that her remarks were "on topic, short and to the point."

211.    Plaintiff did not speak for two weeks in criminal law class and this was documented by the class recordings after meeting with Defendants Angela Smith and Defendant Peggy Smith.

212.    On Monday, March 28th, 2022, Professor Katz lambasts Plaintiff, on tape, in the middle of Criminal Law class after a student missed a cold call, yelling "Is it on topic?" to Plaintiff's raised hand. Plaintiff paused, stunned. Plaintiff then states on the class recording that "Yes it is on topic" but that "she doesn't have to answer the question if [Professor Katz] doesn't want her to." Defendant Katz said this to Plaintiff because she was still angry about Plaintiff calling her out for tone-policing her roughly a month earlier, in the zoom meeting with Defendant Elizabeth Walsh on February 25th, 2022. Defendant Katz did not want Plaintiff to speak in class because she is Black and had a pattern of complaining of racial discrimination in connection with Defendant Katz's actions.

213.    Plaintiff answers Defendant Katz's question correctly as seen by the recording.

214.    Defendant Katz, despite being wrong about Plaintiff and her intentions behind raising her hand for the first time to participate in class in weeks, does not apologize. Defendant Katz notices Plaintiff tearing up during class after Defendant Katz embarasses her, and

says nothing. Defendant Katz did this because Plaintiff is Black and complained of racial

discrimination by complaining of tone policing and allegations of not being professional

enough to join the legal profession.

215.    Plaintiff e-mails Defendants Angela Smith and Elizabeth Walsh on Tuesday March

29th, 2022 at 6:40pm detailing this interaction as follows:

"I am writing to inform you all about an incident in class on

Monday where my Crim Law professor, Elizabeth Katz, attempted

to embarrass me.

After another student answered a cold-call question incorrectly, I

raised my hand to answer the question to move the discussion

along. But instead of being allowed to respond, Elizabeth Katz

immediately chided, "Is it on topic? Because we need to move on,

Allie."

There was an awkward pause after she said this. A few students

looked confused. I then said "Oh, never-mind. Someone else can

answer the question." I only wanted to contribute to moving the

class discussion along. I then answered the question correctly, to

Elizabeth's Katz's audible surprise "Oh, that is exactly correct.

Perfect."

Why did this professor, Elizabeth Katz, automatically assume that what I had to say was "off-topic", when virtually nothing that I have ever said in class was off-topic?

Everything that I have ever said in class either was a question directed at understanding our material, or a critical piece of historical context that our professor omitted from our readings/her lecture.

A few students came up to me afterwards, and asked me if I was alright. I am not.

I refuse to be continually disrespected as if I am a braggadocious dilettante who comes to class unprepared. I deserve better treatment. And I deserve respect.

Just because this professor is a proponent of white supremacist pedagogy, and doesn't think that understanding the historical contextualization/racial implications of our cases are important as I do, does not mean that my comments are not on-point or relevant to the class discussion. Criminal law, race, and gender are inextricably linked. To pretend otherwise is not only intellectually dishonest, but also white supremacy in action.

I do not know what you all can do with this information. I do not wish to meet in person to clarify and further devote myself to time away from my studies to process another of the many racist interactions I have had while at this institution. I am simply writing

to tell you all that this professor has some serious issues (both

personal and professional, it seems like) that need to be rectified.

The next Black student that this professor might not be like me,

and blow off the ensuing steam from this violent interaction by

posting a diatribe on instagram.

The next Black student might feel as though they need to drop out

of law school.

The next Black student might be driven to suicide.

Or, worse for you all as the administration, the next Black student

might have the institutional power to contact someone who could

negatively harm the reputation of Wash U Law. The world is

changing. This is not an "Allie Brown problem."

There is no need for me, or future Black students, to suffer under

the misguided and myopic instruction of this professor. I hope you

all can take the appropriate actions to ensure this negative

treatment of a student does not occur again.

Thank you.

216.    Defendant Angela Smith responds to Plaintiff with two words: "Thanks Allie."

217.    No further action to investigate this incident is taken by Defendant. Defendant did not

        take any further action to investigate this incident because Plaintiff is Black.

218.    Defendant Law School, along with Defendant's agents, fail to investigate Professor

        Katz's racist actions towards Plaintiff because Plaintiff is Black.

219.    Instead, Defendant Elizabeth Walsh blames Plaintiff for Professor Katz's racism.

220.    Through participating in the Diverse Attorney Pipeline Program, Plaintiff is offered a summer associate position with Norton Rose Fulbright in New York in March of 2022.

221.    Plaintiff notified Hilary Von Rohr, a Lecturer in Law at the Law School who had been helping Plaintiff potentially "semester in DC" for the next semester, that she had been offered a summer associate position with Norton Rose Fulbright in New York April 2022. Hilary Von Rohr congratulated her, and said that she had noted Plaintiff's summer employment in Defendant Law School's database where they track information about law students matriculating into BigLaw firms. This database and central tracking system regarding jobs is how Defendant Elizabeth Walsh would eventually slander Plaintiff to her prospective employer through discriminating against her, and issuing her an erroneous suspension.

222.    Professor Katz does not apologize for accusing Plaintiff of "not being on topic" despite, by virtue of reviewing the taped class recordings, not one of Plaintiff's in class commentaries was off-topic.

**April 2022**

223.    On or about March 30th, 2023, after nine months of not speaking to Plaintiff, Richard O filed a restraining order in St. Louis County District Court against Plaintiff during the final exam period in order to interfere with Plaintiff's first year exams.

224.    The St. Louis police call Plaintiff on her cell phone several times and circle outside the apartment complex next door to get her to come out of the building and receive the notice of hearing for a restraining order scheduled for the same day as Plaintiff's property exam.

46

225.    Richard O did not possess the correct address for Plaintiff per the restraining order

paperwork, despite claiming that Plaintiff was harassing and threatening him.

226.    Richard O does not allege any actionable claims against Plaintiff in his petition for a

restraining order. Instead, Richard O lists insults that Plaintiff called him nine months ago

after he threatened to rape her, and assaulted her. Instead, Richard O alleged in his

restraining order paperwork that Plaintiff "called him a bitch ass nigga" in a groupchat

which caused him immense psychological pain.

227.    On or about April 17th, 2022, Defendant Walsh complains to Plaintiff that she cannot

open the attachment that Plaintiff sent her regarding the restraining order hearing, and

needs another picture to be taken. On April 18th, 2022 at 9:34AM Plaintiff sent another

email to Defendant Walsh, with a picture of the restraining order that Richard O sent

Plaintiff.

228.    All 1Ls at Defendant Law School took their final exams on the same designated day

as other 1Ls. These days were designated "1L Exam Days."

229.    Defendant Walsh is responsible for Plaintiff rescheduling her property final because

she knew that Richard O had no intention of going to court because Richard O never

reached out to Defendant Walsh to reschedule his property final.

230.    Plaintiff is forced to reschedule her Property Final in order to attend the restraining

order hearing filed from a sexual predator that Defendant had a duty to protect her from,

and didn't because Defendant didn't find Plaintiff worthy of protecting because she is

Black.

47

231.    Plaintiff goes to St. Louis County Court and the restraining order petition is dismissed without prejudice.

232.    Richard O posts a selfie on social media, exclaiming that he is done with his finals, while Plaintiff still must take her last final.

233.    From the fact that Richard O was gloating about his final exams being over, Richard O never planned on attending the restraining order hearing in the first place, and filed a restraining order petition with the sole purpose of harming Plaintiff.

234.    Plaintiff countersues Richard O for Title IX violation.

235.    Plaintiff gives Title IX Officer Cynthia Copeland a large binder detailing all of the harm that Richard O had perpetrated against her.

236.    Defendant's Title IX Officer Cynthia Copeland throws the binder away because Plaintiff is Black and her claims are unworthy of investigation because Plaintiff is branded a troublemaker in the University's eyes - she has complained of racial and sex discrimination and Defendant Law School is running out of ways to discriminate against Plaintiff so she will stop talking about discrimination.

237.    Defendant does not investigate Plaintiff's claim because it deems "insufficient evidence" on its face despite the facts that Plaintiff has given Defendant Law School and Title IX Office copious amounts of evidence of Richard O's abuse including a copy of the contract that giving Richard O the right to rape Plaintiff and perform odd rituals involving semen and blood, and the pictures of Richard O gloating on social media after he required Plaintiff to miss her property final.

238.    Defendant dismissed Plaintiff's claims in the Title IX Office without investigation

because Plaintiff is Black and complained of racial and sex discrimination at Plaintiff

Law School.

239.    Plaintiff decides to try to to transfer to other schools and submits around or over ten

different transfer applications throughout the Summer because she is afraid of further

racial and sexual discrimination and harassment at Defendant Law School.

**May 2022 - August 2022**

240.    In or around June 2022, Professor Katz received the " 2021-2022 Haub Law

Emerging Scholar" award from Washington University in St. Louis for "outstanding civil

rights work," and teaches at Harvard Law School for the following fall.

241.    In or around June 2022, Plaintiff applied to around 10 other law schools in the

summer after her 1st year, explaining to them that she fears returning to Washington

University in St. Louis for her safety due to sexual harassment and racial discrimination.

242.    In early June 2022, Plaintiff requests for Dean Walsh to send a letter of good standing

to the schools that she wishes to transfer to in late May and early June.

243.    Dean Walsh refuses to send a letter of good standing in a timely manner to Plaintiff's

prospective transfer schools until the deadline in late July because Plaintiff is Black and

previously complained about racial discrimination at Defendant Law School.

244.    Georgetown and Columbia contact Plaintiff telling her that they have not received a

letter of good standing from Defendant Law School.

245.    Only after Plaintiff's mother contacted Defendant Walsh in late July, asking her to send the letter of good standing, did Defendant Walsh send the letter of good standing to Georgetown and Columbia.

246.    Plaintiff gets glowing reviews at Norton Rose Fulbright, is told by the director of HR that she is "one of the most professional summers that he has ever seen" and is offered a return position for Summer 2023.


**August 2022**

247.    Plaintiff receives notice from Georgetown and Columbia that she has not been accepted for transfer on her way to St. Louis in late August and returns to Defendant Law School for her 2nd year of law school.

248.    Plaintiff was awarded her full $38,000 scholarship for her 2nd year of law school.

249.    Plaintiff is elected as Vice President of the Black Graduate Students Association.

250.    Plaintiff is elected as Advocacy Chair for the Black Law Students Association.

251.    Plaintiff matriculated into her 2nd year (2L) at Washington University in St. Louis School of Law in August of 2022.

252.     Plaintiff takes 2 classes from Defendant Adrienne D. Davis, Trusts and Estates, and Race in American Law, in her 1st semester of her 2nd year of law school.

253.    Plaintiff makes a post on social media in the beginning of August that she does not feel safe returning to Defendant Law School because of the sexual harassment and racial violence that she faced at the hands of the administration her first year of law school.

254.    Defendant Angela Smith contacts Plaintiff about the instagram post that Plaintiff made regarding not feeling safe at Defendant Law School.

255.    Plaintiff reiterates that she already told Angela Smith in a meeting prior that year about being sexually harassed by a classmate, and nothing being done by the administration. Plaintiff said that she is uninterested in talking about the racial discrimination and sexual discrimination that she has faced to Defendant Angela Smith, because she has continually been retraumatized by telling different administrators at Defendant Law School that she has faced sexual and racial discrimination and nothing has been done.

256.    Plaintiff reiterated to Defendant Angela Smith that Richard O sent Plaintiff a contract containing conditions under which she had to have sexual intercourse with him and undergo odd rituals involving blood and semen. Plaintiff refused to sign the contract, and reported him to the Title IX office for sexual harassment. Plaintiff

257.    Plaintiff also stated in the email to Defendant Angela Smith in September 2022 that the Title IX Office also refused to investigate Plaintiff's complaint against Richard O, and refused to take action regarding Defendant Katz's racism towards her. In fact, Defendant Law School gave Professor Katz an award for her advocacy and scholarship.

258.    Defendant Angela Smith does not reply to Plaintiff or her concerns regarding racial discrimination and sexual harassment because Plaintiff is Black and previously complained of racial discrimination.

259.    Defendant Angela Smith ignores Plaintiff's pleas for protection from racial and sexual discrimination because Plaintiff is Black.

260.    Defendants Smith and Walsh conspire to forcibly remove Plaintiff, a Black student

for her comments about being scared to return to Defendant Law School because of the

racial and sexual violence that she experienced there because she is Black and

complained of racial discrimination at Defendant Law School.

261.    Defendant Walsh asks Defendant Smith to testify for her at a Student Conduct Board

hearing in the future to illegally remove Plaintiff from the classroom because Defendant

Smith is Black. Defendant Smith never had a class with Plaintiff, and is used as a veneer

of legitimacy so that Defendant Walsh does not look as racist as she is. Subsequently,

Defendant Smith agrees to further Defendant Walsh's conspiracy against Plaintiff.

Defendant Smith does this through a series of emails that Plaintiff reads in or around

November 2022 while being watched by Defendant Nicole Gore's assistant Lora Clark.

262.    However, both Defendant Smith and Defendant Walsh realize that conspiracy has to

be undertaken by someone Black and teaching the subjects that Plaintiff is likely to take

in Spring 2021; namely one doctrinal course that most 1Ls take, and one course regarding

Race and the Law because Plaintiff said that she really wanted to study white supremacy

in the law in her application to law school. Defendant Walsh chose Defendant Davis to be

the one to ultimately get Plaintiff expelled so that it wouldn't look racist. Further,

Defendant Walsh needed someone on the ground to hatch the plot and someone with

access to students in the classroom. This is where Defendant Adrienne Davis comes in -

because Defendant Adrienne Davis and Plaintiff are both Black, Defendant Davis would

agree to participate in furtherance of Defendant Walsh's conspiracy to commit

discrimination in violation of Section 1985 and 18 U.S.C. Section 241.

**September 2022 - October 2022**

263.     Defendant and Professor Adrienne Davis sends out an invitation to the students enrolled in her courses to apply to be her research assistant in September 2022.

264.    On September 2nd, 2022, Plaintiff has to leave class early and sends Defendant Adrienne Davis a note regarding her upcoming absence.

265.    On September 9th, 2022, Plaintiff missed one of Defendant Adrienne Davis's classes due to illness. Defendant Davis writes Plaintiff, asking if Plaintiff has withdrawn from Davis's "Race and the Law" class.

266.    Plaintiff declined that she had dropped the class; instead, she explained that she was ill after taking both the flu and COVID shots at the same time.

267.    On September 9th, 2022, Defendant Adrienne Davis wrote an email to Plaintiff saying "glad to know that you haven't given up on the class."

268.    Plaintiff applies to Defendant Adrienne Davis's email advertisement that she is hiring research assistants with her resume and her transcript. Plaintiff apologizes for her lower than average grades during her first semester of law school and explains to Defendant Davis that she had a stalker during her first semester of law school.

269.    Defendant Davis emails

270.    Plaintiff, while discussing her offer of employment with Defendant Adrienne Davis, tells Defendant Davis more details about Richard O's behavior, including his name and the current disposition of Plaintiff's complaint against him - it was not even investigated.

271.    Defendant Adrienne Davis apologizes in person in her office for the University's response, but tries to comfort Plaintiff and by telling her that "it's over now" and that she

shouldn't let Richard O's actions color the rest of her law school experience." Defendant Davis tells Plaintiff that she has new opportunities to look forward to.

272.    Plaintiff was hired by Professor Adrienne Davis to perform research on how to integrate critical race theory into the 1L Curriculum at Defendant Law School.

273.    Plaintiff was given access to Workday, an Employee Self Service platform in connection with her employment by Defendant Adrienne Davis.

274.    Plaintiff was hired by Professor Adrienne Davis, a purported scholar of critical race theory from the school of thought of Derrick Bell to perform research on how to integrate critical race theory into the 1L Curriculum at Defendant Law School.

275.    Plaintiff was given a tour around Professor Davis's office (Professor Davis spent a few minutes telling stories about Derrick Bell and how much she loved his scholarship while a student at Yale Law School) and gives Plaintiff a few textbooks to complete her research that she has been tasked to complete by Defendant Adrienne Davis.

276.    Defendant Adrienne Davis was listed as Plaintiff's supervisor on Workday up until November 3rd, 2024.

277.    Plaintiff was awarded a $1000 CREE2 Grant from the Center for Race, Ethnicity, and Equity in order to perform research for Professor Adrienne Davis on implementing critical race theory into the 1L Curriculum.

278.    Defendant Davis writes Plaintiff an email, stating that she "liked" (both physically and metaphorically, as Defendant Davis specified in her email) Plaintiff's instagram page.

279.    Defendant Davis writes Plaintiff a different email, stating that she "liked" (both physically on the social media platform and metaphorically, as Defendant Davis specified

in her email) Plaintiff's "write-up" of cases that conjure critical race theory principles on her instagram page.

280.    Defendant Davis often starts the recordings for her class at the beginning on the screen so that it is visible to the class, so that they know that she is recording so that the class will be uploaded to Canvas later.

281.    Defendant Davis starts to act oddly in the middle of the semester, sending Plaintiff messages outside of business hours at odd hours of the night, and asking her to meet in her office regarding unrelated and inappropriate discussions.

282.    In a one-on-one meeting in Professor Davis's class, Professor Davis tells Plaintiff that she cannot use the words "coon" or "Uncle Tom" in her classroom.

283.    Shortly after this meeting, Defendant Davis sends another email to Plaintiff stating that she is memorializing her discussion that Plaintiff must raise her hand before talking in class.  The issue of Plaintiff raising her hand before talking in class was not discussed at the meeting, and Defendant Davis incorrectly recalls the conversation. Not wanting to argue, Plaintiff says that she understands, and will refrain from participating in class.

284.    Plaintiff was always called on by Defendant Davis before speaking during class, and the course recordings of Defendant Davis's support this assertion.

285.    Professor Davis, a scholar of critical race theory, states during class that she does not believe in "white supremacy" and that the term is not appropriate in a "Race in the Law" class.

286.    Professor Davis shares her scholarship in class, stating that the enslaved had autonomy and could consent to sexual relations with their captors. Professor Davis also states that enslaved people had rights to contract, and were full members of society with

enumerated rights, privileges, and freedoms as white folks. Plaintiff disagrees with Defendant Davis on the issue of the enslaved relative autonomy and, consequently, Defendant Davis is offended that Plaintiff disagrees with her. Defendant Davis thinks that Plaintiff should agree with her because they are both Black, and Plaintiff is being "threatening" and "harassing" by merely disagreeing with Defendant Davis. Defendant Law School has no evidence to back up the claim that any of Defendant Davis and Plaintiff's in-class or outside disagreements are heated or contentious. In fact, the email exchanges between Defendant Davis and Plaintiff throughout September and October 2022 unequivocally prove that the discussions were playful and lighthearted. Defendant Davis even sends an email to Plaintiff stating that Defendant Davis "liked" several of Plaintiff's instagram posts, and espoused in a one-on-one meeting that Defendant Davis thought that Plaintiff was visually and intellectually gifted. This civil disagreement between Plaintiff and Defendant Davis on radical Black praxis provides more motivation to commit racial discrimination i.e. for Defendant Davis to get Plaintiff expelled in a creative way - by feigning dramatic objection to Plaintiff because she is Black, and possesses ideological classroom commentary that does not agree with Defendant Davis's perspective - rights that Plaintiff has by virtue of attending Defendant Law School to receive an education as any other student does. But Plaintiff doesn't have these rights to talk in class, because she is Black and being targeted and reprimanded for complaining or racial and sex discrimination at Plaintiff law school.

287.    Professor Davis states that "racial supremacy" should be used in the classroom instead of "white supremacy" to refer to anti-Black racism.

288.    Plaintiff's mother tells Plaintiff to not speak in Professor Davis's class, because of her odd and off-putting behavior.

289.    On October 3rd, 2022 at 6:18pm, Defendant Davis sends Plaintiff an email regarding class, saying "I hope that you don't mind that I teased you a bit today."

290.    Shortly after this meeting, Professor Davis sends Plaintiff another email asking her if she raised her hand to talk in class, as Professor Davis thought Plaintiff might have but was not sure. Professor Davis was looking for an opportunity to harm Plaintiff in class, like she eventually would on November 2, 2022. Defendant Davis conspired with Defendant Walsh, Defendant Gore, and Defendant Wild to have Plaintiff expelled from Defendant Law School after Defendant Davis feigned objection to one of Plaintiff's innocuous classroom contributions about race or white supremacy. Defendants wanted to harm Plaintiff because Plaintiff is Black and complained of racial and/or sex discrimination at Defendant Law School.

291.    Plaintiff relays to her mother, an attorney, the email that Professor Davis sent her, and remarked that this was strange behavior.

292.    Plaintiff's mother agrees that it is strange for a Professor with almost ninety students to be concerned about whether or not a student raised her hand enough to email the student about the same. Defendant Davis was up to something, and Plaintiff's mother was onto their plot.

293.    Plaintiff's mother instructs Plaintiff not to talk in class because she believes that Professor Davis is going to try to harm her, or potentially expel her if she is to participate in class.

294.    Plaintiff does not speak in either her Trusts and Estates or her Race in the Law class

for the next two weeks. During this period, Professor Davis tries to entice Plaintiff to

speak by gesticulating and stating "Counselor Brown would say" and various musings

regarding Plaintiff's anti-white supremacist praxis, but Plaintiff would not speak. Plaintiff

only spoke after being solicited by a classmate and fellow coworker under Defendant

Davis of Plaintiff's, Ja'Brae Faulk, and then Profesor Davis called on Plaintiff herself.

Defendant Davis conspired with Defendant Walsh, Defendant Gore, and Defendant Wild

to have Plaintiff expelled from Defendant Law School after Defendant Davis feigned

objection to one of Plaintiff's innocuous classroom contributions about race or white

supremacy. Defendants wanted to harm Plaintiff because Plaintiff is Black and

complained of racial and/or sex discrimination at Defendant Law School.

**November 2, 2022**

295.    On November 2, 2022, Plaintiff attended "Race in the Law" class with Defendant

Adrienne Davis.

296.    Plaintiff is seen not speaking for 2 weeks on the classroom recordings. Plaintiff's

mother instructed Plaintiff to not speak because Defendant Davis had been acting weird.

297.    Professor Davis started the classroom recording at approximately 10:30AM CST on

November 2, 2022. This recording would never be uploaded to Canvas, but every single

other class of Professor Davis's, whether in Trusts and Estates or Race in the Law, would

be uploaded to Canvas. The tape of Professor Davis's November 2nd class was requested

to be shown during the student conduct board to exonerate and support Plaintiff's allegations of racial discrimination and the fact that Professor Davis tried to stage a performance to get Plaintiff expelled.

298.    Professor Davis started the classroom discussion on November 2, 2022, by walking around and disseminating an article about Rishi Sunak to the entire class.

299.    Professor Davis before beginning the classroom discussion about Rishi Sunak) takes a quick detour, and proposes an arguably insensitive paper topic title about gender dysphoria for her new writing.

300.    Several other students (**not including Plaintiff**) object to Professor Davis's paper topic title about gender dysphoria, and assert that the title may be considered transphobic by some members of the LGBTQIA community.

301.    Professor Davis starts to get visibly upset after several students disagree with the ideas for her article title. Professor Davis stops the conversation abruptly, states that the conversation is over, and states she has another activity for the class.

302.    Professor Davis states that there will be classroom discussion on Rishi Sunak, on whether or not he is a "diversity success story" or a "diversity failure."

303.    Professor Davis assigns the students into groups. Professor Davis walks around, monitoring different student's contributions. Plaintiff speaks to her group members, but never to Professor Davis. Professor Davis began to call on different students, and ridicules them for saying that "Rishi Sunak sucks" because it is "unprofessional."

304.    Professor Davis calls on a fellow research assistant of hers (and coworker of Plaintiff's) who was in Plaintiff's small group discussion from earlier.

305.    This co-worker objects to Professor Davis's assertion that to say something "sucks" is

        not professional; instead he says that "policing language is utilizing the same white

        supremacy that we are supposed to be trying to dismantle."

306.    Professor Davis's other research assistant states and gestures with his hands

        "Counselor Brown articulated this much more eloquently than me."

307.    Plaintiff looks at her coworker, and reluctantly raises her hand. Professor Davis calls

        on Plaintiff. Plaintiff states, "the classroom is the safest place for us to have conversations

        about linguistic racism." Plaintiff continues to state, "Professor, I do not mean to

        disparage you as I greatly admire you as my professor."

308.    Professor Davis feigns that Plaintiff called her "Bull Connor" and a white

        supremacist, defaming Plaintiff, and storms out of the classroom.Professor Davis starts to

        have an emotional meltdown, crying and yelling. Professor Davis yells on the tape "I am

        a white supremacist. I am Bull Connor. I am the KKK."

309.    Professor Davis says on the tape "I am going to go to the Dean's Office to get you the

        Professor that you deserve."

310.    Professor Davis leaves the tape recording rolling for around a minute while the class

        looks around, confused, while she sobs dramatically into the microphone in front of the

        Dean's Office.

311.    Professor Davis comes back into the room in tears, and dramatically sets her

        microphone down on the podium, causing a ricochet of microphone feedback across the

        room.

312.    Plaintiff stands up, turns around, and looks into the camera stating "I do not want to be held responsible for this. I did not make her get up and storm out of the classroom. I'm not taking responsibility for any of this."

313.    Plaintiff and another classmate, who ends up serving as a witness on behalf of Plaintiff, have a discussion about what just occurred as class was dismissed approximately 30 minutes early.

314.    Professor Davis then cancels classes for the next week, and assigns a busy-work assignment where students watch a youtube video and provide commentary in response to several questions.

315.    Plaintiff attends office hours with Professor Hollander-Blumoff, her Civil Procedure, Federal Courts and Negotiation professor, and tells her about Professor Davis's meltdown.

316.    Professor Hollander-Blumoff says that it is bizarre, but not to worry because "sometimes Professors have things going on in their personal life and it has little to do with the students."

317.    Professor Adrienne Davis cancels all of her classes for over a week.

**November 4th, 2022**

318.    On November 4th 2022, Dean Robert Wild called Plaintiff regarding "a very important matter" while she was driving to tell Plaintiff that she was banned from campus indefinitely.

319.    Plaintiff was temporarily suspended on November 4th, 2022, after Professor Davis's performance on November 2nd, 2022 because Plaintiff is Black and complained of racial

discrimination at Defendant Law School both as a student at an institution receiving federal funds under Title , during the course of her employment, and prior.

320.    Defendant Wild sends a letter to Plaintiff stating that Plaintiff was engaged in a pattern of "threatening" and "harassing" other professors and students in violation of Sections 2 and 4 of the Student Conduct Code.

321.    On or about November 9th, 2022, Robert Wild told Plaintiff that she was temporarily indefinitely suspended from Washington University in St. Louis  without due process, and lying that he had "many reports" from Students, Faculty, and Staff, stating that she had been "harassing and threatening" people on campus because Plaintiff is Black and complained of racial discrimination.

322.    Defendant Robert Wild's letter to Plaintiff sent on November 4th, 2022, stated that she did not pose a "physical threat" to campus.

323.    Defendant's Law's community consists of over 1000 people. Plaintiff's class, the Class of 2024, consisted of over 250 people. Defendant Robert Wild knew that there you could count on two hands the number of people in Defendant's Law School community who allegedly complained about Plaintiff's behavior, but decided to suspend Plaintiff because she is Black and complained of racial discrimination in connection with her employer, Defendant Law School. Defendant Law School had a duty to ensure that Defendant Elizabeth Walsh would not abuse her power as Dean of Defendant Law School and pursue malicious abuse of process against Plaintiff. Defendant Law School breached this duty when they allowed Defendant Elizabeth Walsh to bring a hodge-podge, half-ass thrown together case to try to get Plaintiff thrown out of law school because Plaintiff is Black and complained of racial and sex discrimination at Defendant Law School.

Defendant Walsh, Defendant Wild, and Defendant Wild all knew that Defendant Walsh's case wasn't strong enough and did not contain enough evidence to actually remove Plaintiff from Defendant Law School, but they wanted to try, resulting in harm to Plaintiff and causing irreparable harm to her reputation, mental health, and job prospects in the process.

324.    Defendant Robert Wild knew that there was no evidence against Plaintiff regarding Dean Walsh's assertion that Plaintiff had been harassing and threatening students, but Robert Wild suspended Plaintiff anyways because she is Black and engaged in protected activity by complaining of racial discrimination at Defendant Law School.

325.    On November 10th, 2022 at 8:22AM, Defendant Robert Wild sent Plaintiff Brown and cc'd Nicole Gore an email denying Plaintiff's request to end her temporary suspension.

326.    Defendant Plaintiff was concerned about the credibility of the "witnesses" and that there were not many people who were complaining specific complaints and you felt the complaints were coming from a small number of people."

327.    **Not even one professor that Plaintiff had actually had a class with testified against Plaintiff at the hearing.**

328.    Plaintiff was right that the witnesses were not credible, because Plaintiff was later found not responsible for any violations of the Student Conduct Board.

329.    Defendant Robert Wild knew that Defendant Walsh could have never proven her case or met her burden of preponderance of the evidence in the Student Conduct Board hearing based on the paucity of evidence that both he and Defendant Walsh possessed.

330.     Defendant Robert Wild reiterated in his recollection of the meeting that Plaintiff had "stated in our meeting that you [Plaintiff] did not feel that the information provided by the School of Law is reliable because you have not seen the evidence."

331.     Defendant Robert Wild gave Plaintiff 40 minutes to go grab her books and possessions from her locker in the law school.

332.     Defendant Robert Wild told Plaintiff that she was temporarily indefinitely suspended from Washington University in St. Louis without due process, and lying that he had "many reports" from Students, Faculty, and Staff, stating that she had been "harassing and threatening" people on campus. Defendant Robert Wild did this to Plaintiff because she is Black and complained of racial discrimination. Defendant Robert Wild, Defendant Elizabeth Walsh and Defendant Carrie Burns conspired to discriminate against Plaintiff by temporarily suspending her without due process for six months, and then engaging in retaliatory billing measures when they could not successfully kick Plaintiff out of law school for being Black and complaining of racial discrimination.

333.      On November 9th, 2022, Defendant Walsh and Wild meet with Plaintiff at 4pm CST via zoom and tell her that she is "temporarily suspended" in huge trouble and that she is "not to step foot on campus" and if she does, "[Plaintiff] will be arrested."

334.     Defendant Walsh and Wild use harsh language to talk to Plaintiff that would be offensive if seen used with a dog - Defendant Wild's language and tone was unnecessary towards Plaintiff, especially because Plaintiff was never found guilty of any violation of the Student Conduct Code or any other university policy.

335.     Defendant Walsh and Wild use this harsh and discriminatory language and acts towards Plaintiff because Plaintiff is Black and engaged in protected activity of

complaining of racial and sex discrimination during the course of Plaintiff's employment and prior.

336.    Defendant Wild told Plaintiff that the police would be called, and that she would be arrested if she were caught on campus because she posed "not a physical threat" but a "threat" to campus because she is Black and engaged in protected activity complaining of racial and sex discrimination during the course of Plaintiff's employment and prior.

337.    Defendant Walsh and Wild tell Plaintiff she is not to participate in any activities related to Defendant Law School because she is a threat to the entire WUSTL community, despite not posing a physical threat, according to Defendant Wild because Plaintiff is Black and engaged in protected activity. Further, Dean Wild stated that Plaintiff can only come on campus to seek mental health treatment because he is racist and did not want Plaintiff, a Black person, to enjoy rights reserved by the 14th Amendment of the US Constitution.

338.    Plaintiff, elected as Vice President of the Black Graduate Students Association, is forbidden from seeing "Black Panther" at a local movie theater off campus or attending any other campus events because Plaintiff is Black and complained of racial and sex discrimination during the course of Plaintiff's employment and prior.

339.    Dean Wild and Dean Walsh tell her if she attends the viewing (which is off campus at a local AMC theater in St. Louis), Plaintiff would be in violation of the temporary suspension and subject to more sanctions.

340.    Dean Walsh and Nicole Gore show Plaintiff the evidence against her, and include several Professors and students on the potential witness list.

341.    As early as November 28, 2022, less than a month after Plaintiff's temporary

suspension took place, in emails from Defendant Nicole Gore to Plaintiff, Defendant

Gore expresses that Defendant Law School does not want Plaintiff to return to campus

ever. Specifically, Defendant Law School proposed the following term of settlement:

"Allie may not return to WashU Law, if Allie enrolls at another law school for her third

year. WashU Law will grant her a one-year leave, if needed. Allie will write a single

letter of regret to those impacted by her behavior, and the law school will share that letter

with the affected persons if they are willing to receive it. Allie will sign a release of any

claims and a non-disparagement agreement. Upon final signed agreement, the law school

will withdraw the pending complaint. Allie will not attend university sponsored events

and will not be permitted on the Washington University campus (or any university

owned, leased, managed or rented property) without advance permission. As always, the

law school will be honest if contacted with questions from other schools or bar

authorities. Future contact with the school shall be through a designated contact person."

Defendants Nicole Gore and Elizabeth Walsh ask for concessions here that even the

Student Conduct Board cannot award. Defendant Elizabeth Walsh knows that she cannot

win this case, but she conspires to commit discrimination and malicious abuse of process

by drawing out "negotiations" for as long as possible to keep Plaintiff out of the

classroom, deprive her of her civil rights and a legal education, and punish Plaintiff for

speaking out about race and sex discrimination while employed at Defendant Law School

and prior.

342.    Among the evidence against Plaintiff are copies of Plaintiff's social media postings

about Cardi B and Drake, Black musicians that Plaintiff enjoys. Defendant submitted this

evidence in support of their argument that Plaintiff was unfit, as a Black person who enjoys Black music, to continue attending Defendant Law School.

343.    Plaintiff learns in a pre-hearing conference with Defendant Nicole Gore that Professor Katz (in e-mails to colleagues and supervisors, Walsh, Osgood, and Smith) had complained that Plaintiff's enjoyment of rap music as "inappropriate" for a law student. They did this because Plaintiff is Black and there is no evidence that Defendant Law School objected to white students listening to Cardi B, Drake, or any other Black musician.


**December 2022**

344.    Plaintiff pays $15,000 to retain Lento Law Firm in connection with legal representation in this hearing. Plaintiff's case is assigned to Stacy T. Forchetti, whose title is "Senior Litigation Counsel."

345.    Plaintiff is scheduled, on her 26th Birthday, by Elizabeth Walsh and Nicole Gore to appear before the Student Conduct Board to determine if she violated the student code.

346.    On December 13th, 2022, Plaintiff wrote objections to Breia Maddox serving on the board of this matter as she was a proponent of Richard Omoniyi-Shooyola, the man who wrote a contract to rape me. Plaintiff had told Defendants Gore, Wild, and Hudson that Breia Maddox enabled and fed Richard O Plaintiff's social media content since Plaintiff blocked him.

347.    Additionally, Plaintiff had objection to Nicholas Armstrong, who held Plaintiff's BLSA position of advocacy chair directly before Plaintiff. I am not confident that he

would be a fair or neutral arbiter of the facts and case set before him, as he was close

friends with Cara Hunt and Dinora Orozco, two of Defendant Walsh's witnesses.

348.    Defendant Hudson removed Breia Maddox from the Student Conduct Board but not

Nicholas Armstrong, breaching Plaintiff's rights to a fair hearing with neutral arbiters.

349.    On December 13th, 2022 at 11:58AM, the day before Plaintiff's 26th birthday,

Plaintiff wrote Defendants Nicole Gore and Elizabeth Walsh stating:

> "Had Professor Davis's dramatic performance on November 2nd in
>
> class not occurred, I would not be suspended. This class is the sole
>
> event that precipitated my suspension, and is why Professor Davis was
>
> initially a witness to the complaint.
>
> Now, she is not a witness because she was caught framing me for
>
> allegedly being disruptive. That is why you all need the tape. That is
>
> why Dean Walsh will not give you the tape. It is imperative to this case
>
> that the Student Conduct Board view this tape to secure my innocence.
>
> Dean Walsh doesn't want the Student Conduct Board to know Professor
>
> Davis and her antics are the real reason why I am before them.
>
> Please do not continue to let her mislead you."

350.    Defendant refused to produce the tape of November 2, 2022 class for the Student

Conduct Board hearing because they wanted as least resistance as possible to suspend

and hopefully expel Plaintiff from law school because she is Black and engaged in

protected activity.

351.    Plaintiff's mother, Harvard Law Class of 1992, emails a handwritten letter to Dean

Walsh and Dean Wild telling them that she believes that Professor Davis feigned her

objection to Plaintiff's innocuous comment to get her suspended because they have different ideologies. She explains that she told Plaintiff not to speak in her class because Professor Davis was going to try to harm Plaintiff. Plaintiff's mother attaches Professor Davis' bizarre emails to her letter, and urges Defendant to stop discriminating against her daughter for being Black and participating in class like her white counterparts.

352.    Plaintiff has two of her white colleagues in her Race and American Law class write statements that Plaintiff should not be suspended.

353.    Plaintiff's mother sends a second email to Dean Walsh and Dean Wild explaining that Professor Davis' behavior is setting Plaintiff up is typical of a "coon" or "Uncle Tom" - a black person who acts to harm other Blacks for personal benefit. Plaintiff's mother says that Plaintiff is being uniquely targeted because she is Black and unafraid to complain of racial discrimination at Defendant Law School.

354.    Plaintiff's mother sends a third email containing the statements of the students in the Race and American Law class, showing that statements of the students support the conclusion that Professor Davis feigned objection to Plaintiff's innocuous statement to get her suspended. Professor Davis did this to Plaintiff because Plaintiff is Black and engaged in protected activity during the course of her employment with Defendant Law School and prior.

355.    In preparation for the Student Conduct Board Proceeding, Defendant Hudson rules that no videos of any class (regardless of whether a class referenced was taught by Defendant Katz or Defendant Davis) are allowed to be entered into evidence, even though Plaintiff's behavior at several classes is contested and argued as a violation of the Student Conduct Code. The material and videos not allowed to be admitted included the

class in which Professor Davis feigned objection, no statements regarding Professor Davis' conduct are allowed, Plaintiff's mother is not allowed to testify, and nothing regarding the Title IX proceedings between Richard O and Plaintiff are allowed to be admitted. This evidence was not allowed to be admitted because it would have demonstrated that Plaintiff was discriminated against because she is Black and complained of racial discrimination in violation of federal laws at Defendant Law School.

356.    An exorbitant number of discriminatory, bogus and kangaroo-court-like restrictions in violation of Plaintiff's 5th and 14th amendment rights are made on the evidence that Plaintiff is allowed to produce by Defendants (namely, Darrell Hudson and Defendant Nicole Gore) Plaintiff tells Defendants that her 5th and 14th amendment rights are being infringed upon, and that the law is being violated with these decisions to arbitrarily punish Plaintiff for speaking about racial and sex discrimination at Defendant Law School in the course of her employment, prior, and after. Defendant ignores and does not acknowledge the same.

357.    On December 9th, 2022, Defendants Adrienne Davis and Professor Andrea Katz were dropped from being called as witnesses at the hearing. Defendant Nicole Gore informs Plaintiff of the same.

358.    As a result, the only folks left to testify in the Student Conduct Board are 5 students who disliked Plaintiff after the Title IX proceeding falling out involving Richard O, and two professors that Plaintiff has never had a class with.

359.    Dean Elizabeth Walsh argued in the suspension letter that Plaintiff was a "threat" and "harassing" students because Plaintiff is Black, and contributed ideas about race during

her "race and the law" class, a protected activity guaranteed by the 14th amendment and Section 1981.

360.    Dean Elizabeth Walsh argued in bad faith in the Student Conduct Board hearing that Plaintiff was a "threat" and "harassing" students because Plaintiff is Black and contributed ideas during classroom discussion regarding race during her criminal law class, a protected activity guaranteed by the 14th amendment and Section 1981.

361.    Dean Elizabeth Walsh knowingly and Student Conduct Board hearing that Plaintiff was a "threat" and "harassing" students because Plaintiff is Black, contributed ideas during classroom discussion regarding race during her criminal law class which is protected activity under Section 1981. White students were able to engage in classroom discussion about race without issue or objection; Plaintiff was targeted because she is Black and had previously complained of racial discrimination in connection with her employment, prior, and after.

362.    Elizabeth Walsh defamed Plaintiff by erroneously accusing Plaintiff of lying during the Student Conduct Board Hearing.

363.    Dean Elizabeth Walsh did not meet her burden in the Student Conduct Board hearing, and lost. Defendant Walsh took her anger out on Plaintiff because she is Black in the form of the retaliatory billing practices and the unilateral revocation of her scholarship that start on or around August/September 2023, the Fall where Plaintiff relocates for her safety to Georgetown University Law Center.

**February 2023 - May 2023 - The Actual Student Conduct Board Hearing Proceedings**

364.    Defendant (e.g. Elizabeth Walsh) required Plaintiff to write a paper instead of an

in-person classroom seminar, prohibited her from communicating directly with professors, restricted her from all on-campus activities, banned her from participating in classroom discussion, banned her from contacting classmates, and lost over 20% of the tapes of class recordings for the semester because Plaintiff is Black and engaged in protected activity of complaining of racial discrimination in connection with her employment and being a student at Defendant Law School, a recipient of federal funds under Section 1981.

365.    Defendant Elizabeth Walsh "lost" several class recordings from several of Plaintiff's classes, including Plaintiff's first amendment class regarding free speech in public and private schools.

366.    Plaintiff contacted Elizabeth Walsh regarding over a month of class recordings that she had not (and to this day, has not) received.

367.    Plaintiff was forced to withdraw from the War Crimes Tribunal seminar with Professor Leila Sadat due to the terms of Defendant's suspension.

368.    Plaintiff was accused by Professor Leila Sadat of being negligent with her course performance and attendance during her temporary suspension, when it was really Defendant Elizabeth Walsh's negligence that caused Plaintiff to not be able to participate in class to the fullest extent like her white classmates.

369.    On Wednesday, February 8th, 2023, at 9:02pm, Professor Sadat sent Plaintiff an email, stating the following: "I have not seen you on the class zoom link; it was open today and last week. If you are going to stay in the class, you really do have to come to the classes, even remotely.  According to my records, you have not attended any classes so far this semester; please let me know if that is an error. Happy to set up a zoom

meeting at your convenience to talk about the paper; you might want to do a bit of research prior to coming to the discussion session just to be on top of the legal issues involved."

370.    Plaintiff replied to Professor Sadat on Wednesday, February 8th, 2023 at 11:00pm with the following message:

"Dear Professor Sadat,

As a term of my "temporary suspension," I am not allowed to attend the zoom links with the other students as I stand accused of being an "ideological threat" to my classroom peers. I currently conduct research as a law clerk for the United Nations on critical race theory, reparations, and the Black diaspora. I sincerely hoped that your course would be a helpful international criminal lens companion to my internship and previous work experience at the Australian Embassy.

Your course recordings are supposed to be sent to me asynchronously. None of these have been sent to me. So yes, I have viewed only one recording of the first class, which was located in my Kaltura media gallery. Please understand per the written agreement that was provided to me and my attorney (cc'd here) that I am only allowed to view the recordings. At times, I am afraid to contact Dean Walsh for the recordings because 1) she hates me and will stop at nothing to hurt me,  2) she hates several other students of color who share a similar ideological viewpoint to myself, and 3) I don't want to make my situation worse. Several times I have tried to sign into the live zoom meetings, and I am

unable to hear or see the zoom. I can only assume that this is because of my temporary suspension.

Respectfully, in the future, instead of accusing me of being negligent with my studies, please understand I am doing my best to comply with the terms of my temporary suspension (of which the charges against me are unfounded and racially motivated) and earn my law degree. I am more than happy to review any materials that you believe would help me succeed in your class and write a better paper. Additionally, I would be very grateful to meet with you regarding my paper proposal. I am available at your earliest convenience from 9-5pm CST either tomorrow or Friday or next week."

371.    Plaintiff was instead required to complete an independent study self-guided paper instead of being able to participate in the War Crimes Tribunal seminar because Plaintiff was banned from campus, and guest speakers of the course were not able to be recorded.

372.    Additionally, Defendant Elizabeth Walsh, in an email to Plaintiff's "Workplace Discrimination" professor, instructs the professor to lock the Canvas discussion board in fear that Plaintiff will be able to communicate with her classmates.

373.    Defendant Elizabeth Walsh discriminated against Plaintiff by banning her from communicating with her professors or other students.

374.    Defendant Elizabeth Walsh does not instruct Plaintiff's white classmates to be banned from the discussion board in "Workplace Discrimination" class.

375.    Plaintiff complained that Defendant Elizabeth Walsh was violating the terms of Plaintiff's temporary suspension, and substantially interfering with the rights of Plaintiff because she is Black.

376.    In documents provided to Defendants Nicole Gore and Darrell Hudson, on

Wednesday, February 22, 2023 at 2:14 AM, Plaintiff provided Defendants with "Walsh –

Sadat Conversations 1, 2, 3, and 4" - Correspondence with Dean Walsh that proves that

she knew that I was enrolled in the War Crimes seminar with Prof. Sadat; yet she failed to

ensure and verify with Prof. Sadat that this was a course I would be able to complete

remotely. Defendant Walsh had a duty to ensure that the terms of Plaintiff's temporary

suspension regarding her coursework were met on the University's end - meaning,

Defendant Walsh was supposed to ensure the collection of classroom recordings for

Plaintiff's review asynchronously. However, Defendant Walsh breached this duty when

Plaintiff was already a month behind schedule in her coursework, and Defendant Walsh

had not sent Plaintiff about 12 85 minute classes. Further, Defendant Walsh did not even

care to exercise a reasonable level of care by ensuring that Plaintiff was enrolled in a

class that was allowed to be recorded. Under the terms of Plaintiff's temporary

suspension, Plaintiff was forbidden from contacting professors directly. The only way

that Plaintiff could request recordings from her professors was through Defendant Walsh.

Defendant Walsh failed to contact Plaintiff's professor, Professor Sadat, until a month

after classes had already started, and then, once Professor Sadat contacted Plaintiff

377.    Plaintiff continued, "Further, as of 6:07pm, an hour after Walsh emailed me to offer

me the research seminar with Sadat, Sadat emailed me and said there were no updates.

Why wouldn't Sadat just offer it then, if there was consensus between Walsh and Sadat

on the matter? If I am such an ideological threat to Wash U campus, why is Dean Walsh

offering me three credits, pass fail, to work with a professor one-on-one, without even

consulting with the Professor first? Why would a Dean, concerned with a student's

'threatening and harassing behavior', personally facilitate a private opportunity between that student and a professor? Seems like I am not the threat she is making me out to be." From this, it is clear that Defendant Elizabeth Walsh was never really concerned about Plaintiff being threatening and harassing to students. Defendant Elizabeth Walsh did this to be racially discriminatory towards Plaintiff, and punish Plaintiff for complaining of racial discrimination a year earlier when Plaintiff was enrolled in Defendant Katz's criminal law class where she would show solely Black children being massacred state actors during class.

378.    Plaintiff also provided the following document: "Walsh – Bent" Conversations - Correspondence from Dean Walsh to Professor Bent abridging my rights by forbidding me from participating on a discussion board in my Workplace Discrimination Course - yet none of the folks who participated in Professor Katz's Criminal Law discussion board (which is admitted into evidence for many of Dean Walsh's harassment claims) who came to my defense have been banned from participating in their course's discussion boards." Plaintiff asked Defendants to admit this evidence. Defendants declined, stating it was not relevant. Defendants declined to admit this evidence because it showed the bias of Defendant Walsh towards Plaintiff when she had not even been found guilty of any university policy. yet she took additional steps to restrict Plaintiff's contact unnecessarily and arbitrarily with her classmates and professor for no legitimate educational purpose. Plaintiff was innocent the entire time, and the "evidence" that Defendant Walsh proposed in defense of Plaintiff's expulsion was Plaintiff's individual commentary on racial and sexual discrimination that she faced at the hands of the Defendants. Defendants only

treated Plaintiff in this discriminatory way because Plaintiff is Black and complained of racial discrimination.

379.    "Corporations TA" - Correspondence from Chancellor Wild telling me I would have access to the recording of the Corporations' TA's (teacher's assistant) office hours, and then Dean Walsh rescinding and admitting that she lied; I wouldn't have access to the TA's office hours, as every other student but me had the option to attend. Defendants only treated Plaintiff in this discriminatory way because Plaintiff is Black and complained of racial discrimination.

380.    Defendant Dean Walsh assigned Plaintiff to a class with Professor Jeff Drobish, a friend, colleague, and mutual mock trial coach with Professor Finneran who had learned of Plaintiff through Defendant Elizabeth Walsh's defamatory statements characterizing Plaintiff as disruptive and a problematic student to have in class. Defendant Dean Walsh maligned Plaintiff to Professor Drobish, as evidenced by the one and only email that Professor Drobish sent to Plaintiff in an attempt to "welcome" her to his class. Professor Drobish took an aggressive and offensive approach to Plaintiff, despite Plaintiff not being found guilty of any violation of the Student Conduct Code or any University policy. Professor Drobish discriminated against Plaintiff based on the racially discriminatory and false statements made by Defendant Walsh. Professor Drobish certainly didn't send his white students, who had also, like Plaintiff, not been found guilty of violating the Student Conduct Code aggressive warnings telling them to behave in his class.

381.    Professor Drobish's friend, Professor Finneran, had matched with Plaintiff on a dating website and sent her three messages to which Plaintiff did not respond. Professor Finneran also issued several contradictory and questionably racist comments and dog

whistles to Plaintiff while taking his mock trial course like "you often use too casual language but you have a great command of vocabulary" and "you seem disinterested" while also saying "[Plaintiff's] speech is too emotional."

382.    Professor Drobish sent an email on January 19th, 2023 at 3:35pm emphasizing that "disrespectful behavior" will not be tolerated. Professor Drobish never would have sent this e-mail to Plaintiff if he were not conspiring with Defendant Elizabeth to commit racial discrimination against Plaintiff because she is Black, was unfairly characterized as pugnacious and combative. Defendant Walsh encouraged and facilitated Professor Drobish's robbery of a meaningful opportunity from Plaintiff to learn and participate in her legal writing class. No reasonable person, regardless of race, would want to participate in class when on the first day their Professor sent only them an email telling them to behave. Professor Drobish did not send this message white students who, like Plaintiff, had not been found guilty of violating the Student Conduct Code. Professor Drobish sent this to Plaintiff because she is Black, and he wanted to further punish her for whatever lies and defamatory statements regarding Plaintiff that Defendant Walsh told Professor Drobish prior to e-mailing Plaintiff on January 19th, 2023. Defendant Walsh also wanted to punish Plaintiff after she complained of racial and sex discrimination in connection with her employment and role as a student and before and after while at Defendant Law School.

383.    Plaintiff had reason to believe that this was a personalized email to Plaintiff because it specified Plaintiff's temporary suspension and being temporarily suspended from law school for no reason is considered unusual and extreme circumstances for a law student at Defendant Law School. Plaintiff was singled out by Professor Drobish because Plaintiff

is BlackProfessor Drobish unfairly characterized Plaintiff as guilty of threatening and harassing students before she was exonerated of all charges of violating the student conduct code.

384.    Professor Drobish continued in this email stating that he wanted to: "call particular attention to Syllabus & Policies § XII, which explains that students are 'strictly prohibited from downloading, duplicating, or sharing any course recording or part thereof,' as well as prohibited from 'making their own recording of any part of any class or course meeting.' Please also note that students in my course 'are expected to adhere to standards of professionalism that govern the legal profession,' which includes avoiding disrespectful behavior. *Id.* § IX."

385.    Professor Drobish's remarks regarding professionalism were made to Plaintiff because she is Black, and complained of racial discrimination in connection with her employment and prior.

386.    This was not the first time that "professionalism" was used by Defendant Law School's agents as a racial dog whistle to assert that Plaintiff was unfit for the practice of law. Defendants continued to assert Plaintiff's lack of professionalism as the reasoning for why Defendant was justified in discriminating against Plaintiff because she was Black and complained of racial discrimination. Further, Defendants justified restricting Plaintiff's rights because of her race and her engagement in protected activity in connection with her employment and prior even though she had never been found responsible for violating any professional code of conduct, Honor Code, student conduct code, or University policy.

387.    Professor Drobish utilized the same racially discriminatory language in this email that
        Defendant Walsh used in her call with Plaintiff with Professor Katz earlier almost a year
        prior, on or around February 29th, 2022.

388.    Plaintiff had never been found responsible for threatening or harassing behavior as of
        Professor Drobish's email on January 19, 2023, yet her behavior was being characterized
        as such before she had ever met Professor Drobish in the classroom (zoom or in person.)

389.    Professor Drobish intimated that Plaintiff was disruptive to be in class and needed
        additional warnings in order to comply with classroom policies.

390.    Professor Drobish did this because Plaintiff is Black, and Defendant Walsh's
        defamatory and discriminatory statements colored Professor Drobish's perception of her.

391.    Plaintiff sent this e-mail to her attorney, Stacy Forchetti, to give more context to how
        unsafe Plaintiff felt at Defendant Law School; she was already guilty in the minds of
        Defendant administration and faculty before the Student Conduct Board hearing had
        ended. Stacy Forchetti did not relay this information to Defendant, nor did she provide
        zealous advocacy for Defendant's rights while being suspended.

392.    Plaintiff asked, for the above reasons, to be moved to a different class.

393.    Defendant Walsh initially objected to Plaintiff's request to be moved to a different
        section of the course not taught by Professor Drobish.

394.    Plaintiff was eventually removed from the course and placed in a course with a
        female instructor.

395.    Lastly, Plaintiff said that she wanted the "First Amendment" Correspondence - Dean
        Walsh" to be admitted into the Student Conduct Board Hearing. Defendant Walsh told
        Plaintiff that her first amendment course recordings were mysteriously "not recorded" or

"vanished" from the canvas page. Plaintiff remarked to Defendant Darrell Hudson: "Is it not ironic (and weird) that in this case about ideological difference, I have been precluded from viewing my course recordings of my class on the First Amendment? Why is Dean Walsh allowed to violate the terms of my temporary suspension?" Plaintiff witnessed Defendant Walsh repeatedly violate the terms of her temporary suspension, and was grossly negligent with the handling of recordings that were supposed to be provided to Plaintiff during her temporary suspension. Defendant Walsh was negligent with these recordings because Plaintiff is Black and previously complained of racial and sex discrimination in connection with her employment at Defendant Law School and prior.

396.    Defendant Darrell Hudson denied admitting any evidence of Defendant Elizabeth Walsh's discriminatory behavior during Plaintiff's student conduct board hearing because Defendant Darrell Hudson was conspiring with Defendant Elizabeth Walsh to harm Plaintiff for being Black and complaining of racial and sex discrimination in connection with her employment and prior.

397.    None of this evidence was investigated or acknowledged by Gillian in the Office of Institutional Equity, either, despite being provided by Plaintiff. It wasn't investigated by Defendant Law School or anyone else because Plaintiff is Black and had previously complained of racial and sex discrimination in connection with her employment and prior.

398.    Plaintiff's grades suffered as a result of Defendant's agents' discriminatory actions and inability to provide her the recordings and coursework to be successful.

399.    Defendant Elizabeth Walsh's discriminatory actions towards Plaintiff caused Plaintiff to have the worst grades on her transcript during this semester in law school because of

her intentional acts to try to get Plaintiff expelled from law school after complaining of racial and sex discrimination.

400.    Plaintiff did not choose to study at Georgetown – she did not have a choice after Defendants Professor Adrienne Davis and Dean Elizabeth Walsh successfully suspended Plaintiff for six months after their illegal campaign of racialized harassment.

401.    The tuition policy does not state that Plaintiff would have their scholarship revoked **if Plaintiff were forced to visit another institution.**

402.    **Defendants were aware and knew that no reasonable person would return to an institution that wrongfully suspended them for an entire semester, and threatened them with police arrest for complaining of racial and sex discrimination. They suspended Plaintiff anyways because Defendants wanted to entice Plaintiff to drop out of law school, kill herself, or both.**

403.    Plaintiff's complaints of racial and/or sex discrimination were continuously ignored and not addressed by Defendant.

404.    Plaintiff's own mother wrote a handwritten letter explaining Defendant Adrienne Davis's actions, and was ignored by Defendant administration.

405.    To this day of filing this complaint neither Plaintiff nor Plaintiff's mother have received a response from sending the letter to Defendants Elizabeth Walsh, Nicole Gore, Robert Wild, and Deanna Wendler-Modde.

406.    Defendant would have never ignored the pleas from a white student and her mother if she had graduated from Harvard Law School.

407.    Defendant ignored both Plaintiff and her mother's  pleas because they are both Black and female.

408.    Another student, the President of the Federalist Society, Asa Winsaer, wrote a letter to Dean Walsh falsely stating that Plaintiff used a "slur" towards a judge.

409.    What Plaintiff actually said was "Wow, there are no Black people in this room" when she attended a Federalist society event with a local St. Louis judge who had previously served as the defense attorney for the police who beat Rodney King. This event was recorded by the Federalist Society and Plaintiff herself.

410.    Defendant Elizabeth Walsh did not call a single professor to testify who had Plaintiff as a student in the classroom at the Student Conduct Board hearing.

411.    Defendant Elizabeth Walsh continued with the hearing because she hoped that the stress from trying to complete law school online without class recordings would cause Plaintiff to either kill herself, break the terms of her temporary suspension, withdraw from law school, and/or all of the above.

412.    Defendant Elizabeth Walsh did not want the tape of Adrienne Davis's November 2nd class to be admitted into evidence for the Student Conduct Board Hearing, so she insisted that Chair of the Student Conduct Board, Darrell Hudson, and General Counsel, Deanna Wendler-Modde, restrict all inquiry/questioning and evidence regarding the class. Adrienne Davis's November 2nd class where she flew off the handle declaring herself a white supremacist and feigning that it was Plaintiff who did so, was unable to be admitted in the course of the Student Conduct Board hearing.

413.    Only one of the students that testified against Plaintiff during the Student Conduct Board hearing testified that Plaintiff may have exhibited harassing behavior towards her.

414.    This student, Cara Hunt, testified against Plaintiff and said that Plaintiff was harassing her, yet Cara Hunt had another classmate peeing on her.  Cara Hunt had told

Plaintiff and several other witnesses (one of whom was forbidden from testifying by Defendants Elizabeth Walsh and Darrell Hudson) this information during a party on the rooftop in the hot tub of one of her mutual classmates.

415.    Cara Hunt never complained or made a report to Defendant Law School that the law student peeing on her was harassing her.

416.    When Plaintiff raised the fact that another classmate was peeing on her, Ms. Hunt began to cry in the Student Conduct Board Hearing and said "See, this is why I didn't even want to do this."

417.    Defendant Elizabeth Walsh attempted to have her witnesses testify about Defendant Adrienne Davis's November 2nd class, yet did not allow Plaintiff to testify about Defendant Davis's November 2nd class.

418.    Defendant Deanna Wendler-Modde nor Defendant Darrell Hudson did not intervene as general counsel even though she said she would at the start of the hearing if a witness began to testify about Defendant Davis's November 2nd, 2022 class.

419.    Plaintiff had to object to testimony being introduced regarding Defendant Davis's November 2nd, 2022 class with witness Graeme Harcourt because neither Defendant Deanna Wendler-Modde nor Defendant Darrell Hudson did not catch it in time.

420.    Defendant Deanna Wendler-Modde had a dismissive attitude towards Plaintiff when Plaintiff objected to this testimony.

421.    Defendant Elizabeth Walsh had an undocumented student, Dinora Orozco (hereafter, Dinora) testify on her behalf who emphasized that Plaintiff's critiques of Professor Katz were valid, and that she did not like it when white students associated her with Plaintiff because they were both people of color.

422.    Plaintiff asked Dinora about text messages when they were friends in Defendant's

Student Conduct Board Hearing.

423.    Plaintiff asked Dinora if she felt that Plaintiff was threatening and harassing her, even

though Dinora had asked Plaintiff to mail her a vibrator and/or give her vibrator

recommendations because of her sexual frustration in law school.

424.    Dinora Orozco declined to answer these questions, stating that they weren't relevant.

425.    Defendant Darrell Hudson shut down this line of questioning, even though Plaintiff

objected it was relevant to the charge of "threatening and harassing students"; Plaintiff

said "I just want to know how I was harassing and threatening someone who was

comfortable enough to ask me for vibrator recommendations."

426.    Defendant Darrell Hudson, again denied Plaintiff's objection stating that "it wasn't

relevant."

427.    Plaintiff asked Dinora if Walsh was threatening her regarding her immigration status

so that she would testify.

428.    Defendant Walsh looked into the camera, with tight lips, mortified as a result of that

question.

429.    Dinora testified for Defendant Elizabeth Walsh that she felt harassed and threatened

by her white non-Hispanic classmates (in her words: "the white kids come up to me and

ask if I think like Allie because we are both women of color.)"

430.    Because Plaintiff was unafraid of talking about and confronting the racist and violent

acts perpetrated by her white classmates, Dinora reported Plaintiff to the Dean stating that

she felt uncomfortable in class.

431.    Through Dinora's direct questioning, Defendant Walsh blamed Plaintiff for Dinora's

uncomfortable interactions with white students who thought that because both Dinora and

Plaintiff were people of color, they thought alike.

432.    Defendant Walsh unfairly blamed Plaintiff for issues outside of her control; Plaintiff

could not control white students' comfort in the classroom or white students' comfort

with speaking to Dinora yet both of these were cited as rationale for Plaintiff's temporary

indefinite suspension.

433.    Defendant Darrell Hudson and Defendant Wendler-Modde omitted these facts and

this entire exchange from the Student Conduct Board hearing determination letter where

Plaintiff was found not responsible for all violations of the Student Conduct Code in May

2023.

434.    Another white student, Graeme Harcourt, who testified on Elizabeth Walsh's behalf,

also espoused that conversations regarding race made him "generally uncomfortable," but

that Plaintiff had never threatened him or harassed him. Elizabeth Walsh still attributed

Graeme Harcourt's discomfort to Plaintiff because Plaintiff is Black and complained of

racial and sex discrimination, even though Graeme Harcourt's actions signaled that he did

not feel threatened by Plaintiff at all. Graeme Harcourt even explicitly testified that

Plaintiff never threatened or harassed him during the Student Conduct Board hearing, but

Defendant Walsh decided to blame Plaintiff for Graeme Harcourt;s discomfort to Plaintiff

because Plaintiff is Black and complained of racial and sex discrimination.

435.    Graeme Harcourt had invited Plaintiff to an Easter dinner in Spring 2022, right after

he wrote a 1500 word diatribe about Plaintiff's tone and professionalism, unprovoked and

unsolicited, on the classroom-wide Canvas course page for all of Plaintiff's classmates to

read and digest. Graeme Harcourt's Canvas post on April 6, 2022 contained several racial dog whistles and racially motivated comments, like saying that Plaintiff was unfit for the practice of law, but more fit for a discipline like sociology. Graeme Harcourt also unfairly labeled Plaintiff as "aggressive" and lambasted her "way" and "manner" of confronting her classmate, Shane Gregoire's, comments. Graeme and Shane, both white men, had their racially discriminatory beliefs validated by Defendant Walsh and Defendant Katz's prior and subsequent conspiracy, pursuit and punishment of Plaintiff for being Black and complaining of racial and sex discrimination.

436.    Plaintiff, during the Student Conduct Board hearing, asked Graeme Harcourt why he was testifying against her for the Dean, to which he replied "Dean Walsh contacted me to testify; I thought this issue in Professor Katz's class should have been resolved months ago." Graeme Harcourt was confused as to why he was testifying as to classes that happened over a year ago - he was much more interested in talking about how Plaintiff "made Professor Davis cry" on November 2, 2022.

437.    Plaintiff asked Graeme Harcourt if he would invite a "harassing or threatening" person to have dinner with him and his pregnant wife. Plaintiff had been accused by Defendant Walsh of being threatening and harassing because Plaintiff is Black, and complained of racial and sex discrimination, so Plaintiff asked Harcourt if she had harassed or threatened him.

438.    Harcourt responded "No." Plaintiff had not harassed or threatened Harcourt, despite Defendant Walsh's assertions to the contrary. This exemplified Defendant Walsh's discriminatory intent towards Plaintiff, and conspiracy to get students like Harcourt to testify that Plaintiff was a threat. On the contrary, Defendant Walsh thought Plaintiff was

a "threat" and "harassing" because she is Black and complained of racial and sex

discrimination in connection with her employment and prior.

439.    Plaintiff asked Graeme Harcourt if he had ever been harassed or threatened by her.

440.    Harcourt responded "No."

441.    Grame Harcourt began to testify about Professor Davis's class, and Plaintiff objected,

saying that Defendant Hudson's pretrial orders precluded Graeme Harcourt from

testifying about anything related to Professor Davis's Race in the Law class, or her class

on November 2nd, 2024, which was the class that precipitated Defendant's racially

motivated suspension of Plaintiff.

442.    On Friday, February 24th, 2023 at 6:03pm, after the conclusion of the Student

Conduct Board Hearing, Plaintiff sends a letter to her attorney from the Lento Law Firm,

urging "[Defendant] also needs to admit the tapes of ALL of Professor Katz's classes and

Professor Davis's classes. Graeme Harcourt and I had both Criminal Law and Trusts and

Estates. If Graeme can say "there was one comment per class," and "She made Professor

Davis cry." all of this evidence needs to be in the record. All of my screenshots, all of the

class recordings. Everything.

> The damage has already been done to the Student Conduct Board. You cannot
>
> unhear things and he's tainted the Student Conduct Board. They must let this
>
> evidence in."

443.    Stacy Forchetti ignores Plaintiff's e-mail. Plaintiff never receives a response.

444.    Another white student, Ridge Hughbanks, who testified on Elizabeth Walsh's behalf,

who also espoused that conversations regarding race made him "generally

uncomfortable," but that Plaintiff had never threatened him or harassed him.

445.    At the hearing, Plaintiff established that Ridge Hughbanks and Plaintiff had briefly been members of a study group together, and shared jokes about Vincent Van Gogh.

446.    Plaintiff asked Ridge Hughbanks if she had ever threatened or harassed him.

447.    Ridge Hughbanks responded "No, but the mention of race in class was uncomfortable."

448.    Plaintiff asked Ridge Hughbanks why he was testifying against her for the Dean, to which he replied "Dean Walsh contacted me to testify; I thought I was just going to speak about my experiences in class."

449.    Ridge testified that he thought the mention of race was "inappropriate" in a criminal law class, and made him uncomfortable.

450.    Defendant Walsh blamed Plaintiff for Ridge's discomfort with race.

451.    Defendant Walsh in her direct examination of Ridge, tried to get Ridge to say that Plaintiff was harassing and threatening other students but he would not.

452.    Defendant Darrell Hudson asked a series of questions to be answered by both Defendant Elizabeth Walsh and Plaintiff.

453.    On March 2nd, 2023, approximately 36 minutes before the deadline set by Defendant Darrell Hudson - Plaintiff sends Defendant Nicole Gore the answers to Defendant Darrell Hudson's questions. The email text is below; and Defendant Dean Walsh's answers are in Orange.

Is Complainant planning to rely on statements Respondent made or allegedly made regarding Richard O-S. as part of Complainant's evidence to establish a violation under the Code?

I do not plan to rely on statements Respondent made or allegedly made regarding Richard O-S as part of my evidence. As previously stated, I do not plan to refer to the Title IX violation at all. While I can instruct my witnesses not to refer to the Title IX matter, they may not even be aware of the Title IX investigation.

[Plaintiff's response is below]

Although Complainant claims that she does not plan to rely on statements that Respondent made or allegedly made regarding R.O.S., the reality is that the Title IX matter is the elephant in the room. Every single witness has knowledge of the Title IX matter. Complainant's packet, Evidence 22, Page 66 references the Title IX matter. Complainant's packet, Evidence 19, page 56 references the Title IX matter. Lastly, in the Complainant's packet, Evidence 19, page 57 discusses the Title IX matter.

Additionally, the Respondent's exhibits reference the Title IX matter in the following exhibits: Evidence 2, Page 6 of Packet 1, Evidence 24, Page 83 of Packet 1, Evidence 27, Page 91 of Packet 1, Evidence 38, Page 36 of Packet 2, Evidence 47, Page 7 of Packet 3, and Evidence 56, Pages 52-55 of Packet 4.

1 out of the 2 times that Allison met with Ms. Angela Smith, one of the Complainant's witnesses, was about the Title IX matter, and Richard's

threats to rape Allison. The post that Ms. Smith says was "harassing" that
Allison made about not feeling safe at Wash U concerned the Title IX
matter. Dean Walsh Cara Hunt and R.O.S. were close friends. Graeme
Harcourt, another of Complainant's witnesses, mentioned the Title IX
action and Richard in the beginning of his questioning, that Allison
"ruined a rapist's reputation." Sydney Everett, another of Complainant's
witnesses, and Richard O.S. were friends. Dinora Orozco, another of
Complainant's witnesses and Richard O.S. were friends. They were *all*
friends at the beginning of law school, until Allison exposed that Richard
threatened to rape her, and subsequently, lost friends in the process. Every
individual involved in this proceeding has had their perception of Allison
Brown impacted by the Title IX matter, and the subsequent posts. The
Title IX matter is inextricably intertwined with this case. Evidence
regarding the Title IX matter should be admitted.

It is well-settled law that "the interest or bias of a witness and his relation
to or feeling toward a party are never irrelevant matters." Mitchell v.
Milton (2010), quoting State v. Johnson, 700 S.W.2d 815, 817 (Mo. banc
1985), quoting, State v. Edwards, 637 S.W.2d 27 (Mo. banc 1982).

Cross-examination about any issue, regardless of its materiality to the
substantive issues at trial, is permissible if it shows the bias or interest of

the witness because a witness's bias or interest could affect the reliability
of the witness's testimony on any issue. ld.

While we are not in a court of law, we are also not in a kangaroo court in
the Soviet Union. We are in the state of Missouri in the United States.
Therefore, the 6th Amendment in the U.S. Constitution and the Missouri
rules of Evidence should be considered at a minimum.

454.    Defendant Darrell Hudson in his request also stated "*I also invite the parties* to
submit any additional argument they wish for me to consider with regard to Respondent's
renewed request regarding the admission of evidence related to the Title IX matter or
R.O-S."

455.    Dean Walsh responded: "The Title IX matter was handled through the appropriate
Title IX process. It should not be re-litigated in this separate, non-related student conduct
proceeding."

456.    Plaintiff retorted: "While the Title IX matter was litigated in the Title IX office, it was
not resolved in the minds of the WUSTL community. Many in the community still felt
that Respondent was a sexual harasser. Allison posted screenshots of the rape contract
written by R.O.S. not to harass Richard, but to clear her name amongst the community
and students who felt that she was a sexual harasser."

457.    Plaintiff continued in the March 2, 2023 email, "Many in the Wash U community
disagreed with Allison's decision to post the rape contract, even though R.O.S. was not
mentioned by name. That is why Graeme said, "[Respondent] Allie destroyed Richard's
reputation." Further, Allison was unable to question Angela Smith or Cara Hunt on their

knowledge of the Title IX situation, even though 1) Angela Smith knew of and did
nothing about Richard's abuse of Allison and 2) The first time Allison visited Cara's
house was to discuss the fact that Richard had made "inappropriate" advances towards
Cara. Cara approached Allison for a dinner invitation on the 3rd floor of the law school,
after Torts class (where they sat next to each other), and had heard rumors that Allison
and Richard had been "talking." Over dinner, when Allison disclosed that Richard had
threatened to rape her, Cara said "Well he [Richard] is young and doesn't deserve to lose
his seat in law school over that." Cara disagreed with Allison's decision to protect herself
from being labeled a sexual harasser in the WUSTL community, because it was at the
expense of Richard's reputation. None of this could have been discovered in cross
examination because Allison was forbidden from talking about Richard, or the Title IX
proceeding."

458.    Defendant Darrell Hudson also stated the following: " I also note that during the
hearing, Respondent made at least two references suggesting the Panel review recordings
of Professor Elizabeth Katz's Spring 2022 Criminal Law Class in response to testimony
from witness Graeme Harcourt. If Complainant is relying on specific interactions from
this class to establish a violation under the Code, *I ask Complainant to identify those
specific classes by date. I also ask Complainant to notify me as to whether recordings of
those classes are available.*"

459.    Defendant Walsh stated as a response to Defendant Darrell Hudson: "I am not relying
on the specific interactions of any particular Criminal Law class. The witness may talk
about an interaction that occurred in class, but the interaction itself will not be used to
establish a violation under the Code. I am including testimony from students in the

Respondent's Criminal Law class (and other classes) to show the Respondent's pattern of taking what students say in class, editorializing those statements, and posting the editorialized statements to social media. This pattern made students fearful to participate in class which interfered with their education.

460.    Plaintiff submitted the following in her March 2, 2023 e-mail in response to Defendant Walsh's assertions: "Complainant's entire case depends on the hearsay testimony of five students who are biased to dislike the Respondent because of the fall-out after the Title IX proceeding. Further, Complainant has failed to furnish even one Professor's testimony or written statement from a student to testify to the Respondent's 'pattern that made students fearful to participate in class which interfered with their education.' If Complainant's allegations were true, why were Professor Katz, Professor Davis, and Professor Shields removed from Complainant's witness list? **Why is there not one Professor who has had Allison as a student willing to testify to her disruptiveness?** Why was Alex Templeton removed from Complainant's witness list? Because the Complainant has only gathered Richard's sympathizers to have Allison expelled from the University."

461.    Plaintiff continued in her March 2, 2023 e-mail: "Further, every Instagram Post that Allison has made was made in response to trauma caused by: 1) Richard OS and the Title IX case, 2) Professor Davis' feigned objection to Allison's behavior in Class resulting in her [then] 4 month suspension, 3) Alex' threats of violence against Allison, 4) being fat shamed, 5) feeling that she would be subject to physical harm in supporting civil rights. 6) Allison's inability to participate in the Classroom like her other classmates, or 7) acknowledging senseless death caused by opposition to mask mandates.

None of Allison's posts were made to harass or demean anyone. Allison posts to process various trauma that befalls her."

462.    Plaintiff summarized her claims in her March 2, 2023 e-mail: by stating "Many entities at WUSTL have denied that Allison has experienced any trauma despite:

- Having Richard O file a Title IX action against her for sexual harassment and obtaining a no contact order against her in response to her statement to him in a group chat that he better not be so hard on her because she knew the skeletons in his closet.

- Having Richard O tell others that he filed a Title IX action against Allison and that Allison is a sexual harasser

- Having WUSTL students believe that she is a sexual harasser

- Having Richard pressure her to sign a contract in which he could rape her under certain conditions, and containing odd rituals regarding semen and blood

- Having Richard file a request for a temporary restraining order in district court with a court date the same day as her Property Exam final and having her reschedule her Property Exam

- Having Richard fail to show up for the District Court hearing and seeing his posts that he is so happy to have completed finals while Allison still has finals to contend with because of Richard's Actions

- WUSTL finding that Allison did not experience any trauma and that Richard did not violate Title IX in his relationship with Allison

- Being told by her mother to not participate in Class because of Professor Davis' bizarre desire to get Allison expelled based on differing ideology

- Having to sit in 2 different classes and do research for a Professor that is obsessed with getting her expelled

- Being suspended for 4 months immediately after Professor Davis feigned objection to Allison's conduct in class despite making a benign comment

- Having Dean Walsh, Dean Wild, Nicole Gore, Chair Darrell Hudson all ignore reports of Professor's Davis' behavior against Allison

- Being deemed a threat to the WUSTL community, unable to attend class or any university function, or even step on campus

- Having Alex Templeton threaten Allison verbally on multiple occasions

- Having Dean Walsh tell Allison that there is nothing she can do about Alex Templeton's behavior against her and "too bad so sad"

- Having Cara tell Alex that is was ok for Alex to bring a gun to an OVERNIGHT university retreat and telling Allison initially that she must attend as a member of the BLSA Board (fortunately, the retreat was later made not mandatory for executive board members)

- Having Dean Walsh drop Alex Templeton as a witness one hour before the hearing so that Allison cannot cross examine her before the hearing board and show how Alex threatens her

- Having Cara tell Allison that BLSA Board meetings were MANDATORY in person, and that no accommodation could be made for her to attend

remotely and failure to attend in person would result in her removal from the Board

- Having to resign as BLSA Advocacy Chair because of Cara's policy

- Having Cara represent to the Board that Allison was trying to usurp Cara's power

- Having Cara represent to the Board that Allison should not be concerned about Alex having a gun in her car at an OVERNIGHT retreat

- Having the Chair deny her right to present evidence regarding the Title IX hearing and Professor Davis' conduct in December 2022 that would exonerate her in this hearing

- Having the Chair interrupt Allison's questioning of Cara regarding a man urinating on Cara for money, denying Allison the ability to show that Cara is unsympathetic to her dealings with Richard, and thus, is motivated to participate in this proceeding to punish Allison for outing Richard

- Having Grame Harcourt write a 1500-word diatribe about how horrible Allison is,

- Having a fellow classmate, Bibiana Schindler, fat shame Allison in a WUSTL group chat

- Having Allison recognize that she could be killed while protesting civil rights because her classmates believe in killing people for looting, and someone might "loot" at a protest she is attending,

- Having Allison recognize that thousands of people needlessly died during Covid because of the lack of mask mandates,

- Having Graeme label Allison as destroying Richard's reputation and making Professor Davis cry at a Hearing Board determining whether Allison should be expelled and being unable to say anything because of Chair Hudson's order that the Title IX hearing relating to Richard and Professor Davis' set-up of Allison to get her expelled cannot be discussed, and

- Dean Walsh's suspension of Allison to allegedly protect classmates that Allison has never posted about yet complete unwillingness to protect Allison from classmates that sexually harass her by filing Title IX complaints and pressuring her to sign sex related contracts, threaten her with violence, tell her that she is not worthy of life, and fat shame her."

463.    Plaintiff continued in her March 2, 2023 e-mail, stating: "What is in the back of everyone's mind, is Walsh is saying that Allison has made posts to harass her peers therefore constitutes a threat to the community. This is a lie, and she is wrong. Allison's purpose of posting is to protect her reputation, which Allison has a right to do. What Allison posts is not harassing or threatening. It is how she protects herself when Wash U has been put on notice to violent interactions inside and outside of the classroom, and routinely fails to protect her." This is evidence that Plaintiff repeatedly told Defendants that the foundation of Defendant Walsh's case alleging that Plaintiff harassed and threatened students were actually documentation of Plaintiff objecting to and complaining of racial discrimination and sex discrimination.

464.    Plaintiff stated to Defendants Gore and Hudson in her March 2, 2023 e-mail: "The bottom line is: does Allison have a right to protect herself when she has informed Dean

Walsh and Angela Smith? Or can people say and do whatever they want to Allison, without any recourse?"

465.    Plaintiff also told Defendants Gore and Hudson in her March 2, 2023 e-mail:

"But for the event of Professor Davis's performance during the Race and the Law November 2nd class, Respondent would not have been temporarily suspended.

Thus, another Elephant in the room is Professor Davis. Without Professor Davis's November 2nd performance, and Professor Davis' actions, Allison would not have been suspended at all.  Yet there is no discussion of Professor Davis's feigned objection to Allison's comments in class resulting in Dean Walsh suspending Allison immediately after Professor Davis stormed out the classroom crying and into the Dean's office.  If Allison had not alerted WUSTL to her knowledge of Professor Davis' devious behavior, Allison would also be facing charges of violating the Student Code of Conduct based on her conduct in the Professor Davis' classroom. Yet still, not a single WUSTL official has acknowledged any wrongdoing by Professor Davis.  Instead, Dean Walsh has placed an Exhibit of Allison's "harassment" (Complainant's Exhibits 25 and 26) where Allison states that she hopes that Professor Davis gets the help she needs. Allison does not say that to harass Professor Davis.  Allison is saying that to acknowledge the "elephant in the room" that Professor Davis must be mentally ill to get Allison suspended based on her feigned objection to Allison's statements in class. She also states this because she does not want people to think that she has any ill will towards Professor Davis, like Graeme

testified that Respondent made her cry. Yet instead of acknowledging Allison's trauma, the WUSTL community believes that Allison harassed Professor Davis in the classroom, yet denies and refuses to admit the tapes of the November 2nd class. Tapes must be admitted to ensure that the allegations that Allison was an unruly class participant can be put to rest.

466.    Plaintiff also requested for Defendants to add Alex Templeton back as a witness in her March 2, 2022 because Alex Templeton had done far more threatening and harassing of other students than Plaintiff. Plaintiff was being discriminated against by Defendants Walsh and Hudson; Plaintiff subsequently wrote an e-mail stating:

"Another smaller elephant in the room was Alex Templeton, who was a witness for Dean Walsh until an hour before the 1st hearing. Allison contacted Dean Walsh, afraid of Alex Templeton's incessant need to talk about carrying guns around St. Louis. Dean Walsh told Allison, "So sad, too bad." Allison posted the BLSA comment based on her fear of Alex Templeton's proclivity towards bringing guns to school events (Alex threatened Allison at a bar review at the end of the Spring 2022 semester, asking her to "step outside"), and Allison's fear of mandatory in-person meetings [because of the high COVID numbers in Missouri.] Allison respectfully requests that Alex be called a witness so that Allison can show Alex's hostility toward her and the reasonableness of Allison fearing Alex having a gun at an OVERNIGHT retreat and writing an Instagram post about the same.  Again, this post is not meant to harass BLSA but to protect Allison's reputation and explain why she resigned from her position.

467.    Plaintiff asked for Defendant to "Please admit the Title IX evidence, the tapes of
Professor E. Katz's and Professor Davis's classes, and reinstate Alex Templeton as a
witness."

468.    Defendant Law School, along with Defendants Hudson and Gore declined to admit
any tapes of any classes because they were conspiring to commit racial and sex
discrimination in violation of 18 U.S.C. § 241, also known as the Conspiracy Against
Rights statute, and wanted to suspend, discipline, and harm Plaintiff because she is Black
and complained of racial and sex discrimination in connection with her employment and
prior.

469.    Defendant Law School, along with Defendants Hudson and Gore declined to re-add
Alex Templeton as a witness in violation of 18 U.S.C. § 241, also known as the
Conspiracy Against Rights statute, and wanted to suspend, discipline, and harm Plaintiff
because she is Black, engaged in protected activity and complained of racial and sex
discrimination in connection with her employment and prior.

470.    Plaintiff sent a copy of the e-mail to Stacy Forchetti earlier in the day on Thursday,
March 2nd so that she would have an opportunity to review and give feedback regarding
the answers to the Chair's questions.

471.    Stacy Forchetti did not respond to Plaintiff's email.

472.    Even though Stacy Forchetti had not contributed counseling or legal advice regarding
the Chair's questions, Stacy Forchetti felt as though Plaintiff was "acting against her self
interest" as relayed to Plaintiff on a call.

473.    Stacy Forchetti sends Plaintiff an angrily worded email regarding how Plaintiff sends
Defendants responses without first consulting her. Stacy Forchetti also calls Plaintiff less

than 10 minutes after she submits her response to Defendant Darrell Hudson's questions regarding Richard, the Title IX process, and Professor Davis's class. Stacy Forchetti is angry that Plaintiff submitted the answers without her assistance.

474.    Plaintiff assured Stacy Forchetti that she had a deadline, and sending her answers was the only way that she could have ensured that she met the deadline. Plaintiff apologizes and says that had Stacy Forchetti provided advice, she would have considered it.

475.    Stacy Forchetti never produced one email nor any work product for the entirety of the Student Conduct Board hearing despite receiving $15,000 in exchange for legal representation of Plaintiff.

476.    Despite Stacy Forchetti having actual knowledge and notice of all previous 480 counts of this complaint and other information, Stacy Forchetti repeatedly tells Plaintiff that she has not suffered any injuries from Defendant Law School, despite Defendant Law School taking numerous actions to get Plaintiff expelled because she is Black and complained of racial and sex discrimination.

477.    Stacy Forchetti declines to inform Plaintiff of a requirement to file with the EEOC for employment related race and sex discrimination claims, and instead, tells Plaintiff that there is a private right of action available to Plaintiff if she would like to sue later.

478.    Stacy Forchetti does not file with the EEOC like a lawyer exercising ordinary care would, despite Plaintiff's repeated assertions that she was harmed by her employer, Defendant Adrienne Davis and Defendant Law School because she is Black, and reported and complained of racial and sex discrimination.

479.    Stacy Forchetti tries to have Plaintiff sign a release of all claims and a non disparagement agreement - the same release of all claims and non disparagement

agreement that Plaintiff told Stacy Forchetti that she refused to sign when first retaining Stacy Forchetti in December 2022.

480.    Stacy Forchetti was collaborating with Defendant Law School and agents, hoping that Plaintiff would miss the deadline to answer Defendant Darrell Hudson's question in order to help them facilitate the harm and racial and/or sex discrimination against Plaintiff.

481.    Stacy Forchetti, despite knowing that Plaintiff was employed by Defendant Law School and Defendant Adrienne Davis, did not inform Plaintiff of her need to file with the EEOC or any other administrative adjudicative body.

482.    Stacy Forchetti breached her duty to Plaintiff as her counsel to inform her of her rights under Title VI, Title VII, and other relevant civil rights statutes because she was conspiring with Defendant Law School to get Plaintiff suspended because she is Black and complained of racial and sex discrimination at Defendant Law School in connection with her employment and prior.

483.    Stacy Forchetti also breached her duty to Plaintiff as her counsel to inform her of the civil rights violations being committed by Defendant Law School. In fact, Stacy Forchetti repeatedly reiterated throughout the hearing that "no harm to Plaintiff had occurred" despite being aware of Plaintiff's interactions with Defendant Elizabeth Walsh, and aware of Defendant Law School's myriad of student conduct hearing decisions regarding the admission of Plaintiff's evidence that were arbitrary, capricious, unrelated to a legitimate school concern, and violating Plaintiff's 5th and 14th amendment rights to a fair hearing before deprivation of her rights.

484.    It is also important to note that the participants in the Student conduct board proceeding were disproportionately black. Defendants Angela Smith and Peggy Smith,

the only two professors that testified against Plaintiff even though neither professor ever had Plaintiff as a student, were black.  Defendant Nicole Gore, who is black, replaced Defendant Rob Wild, a white man, as the primary supporter of Defendant to provide a veneer of non-racist sentiment. Defendants did this to discriminate against Plaintiff who is Black and complained of racial and sex discrimination in connection with her employment and prior.

485.    Plaintiff was temporarily suspended for 6 months, from November 2022 until May 2023, when the student conduct board issued a finding of "no responsibility."

486.    Defendant Darrell Hudson and Defendant Elizabeth Walsh did not allow for four of witnesses to testify on Plaintiff's behalf: (name redacted for privacy, but available at the court's request) a PhD student in Microbiology at Washington University, (name redacted, but available at the court's request), a Medical student at Washington University, (name redacted for privacy, but available at the court's request) a PhD student in Sociology at Washington University in St. Louis, and another person (name redacted for privacy, but available at the court's request), another PhD student in Sociology at Washington University in St. Louis.

487.    Every witness that Defendants Darrell Hudson and Elizabeth Walsh objected to, and barred from participation in the Student Conduct Board Hearing, were Black.

488.    The only witness allowed to testify on behalf of Plaintiff was one white person.

489.    The other witnesses that Plaintiff tried to have introduced were all Black, and they were all forbidden from testifying at the Student Conduct Board hearing.

490.    The one white person that testified on behalf of Plaintiff testified that Plaintiff would not have been suspended if she were white.

491.    Defendant Darrell Hudson interrupted Plaintiff's only witness, and forbade her from reading her full witness statement regarding November 2, 2022, the singular class that precipitated Plaintiff's suspension from Defendant law school.

492.    Defendant Darrell Hudson is not a lawyer and has never gone to law school but was selected to preside over this proceeding because he 1) is Black and 2) his Blackness provided a veneer of non-racist intent and sentiment from Defendant.

493.    In fact, the participants in the student conduct board proceeding were disproportionately black. Defendants Angela Smith and Peggy Smith, the only two professors that testified against Plaintiff even though neither professor ever had Plaintiff as a student, were black.  Defendant Nicole Gore, who is black, replaced Defendant Rob Wild, a white man, as the primary supporter of Defendant to provide a veneer of non-racist sentiment.

494.    Washington University is a predominantly white institution.

495.    **Defendant Elizabeth Walsh asked Plaintiff only one question after being temporarily suspended for 6 months: how were her acts of posting on social media to 'clear [her] name?'**

496.    Plaintiff explained that her Jewish white classmate, Yoshua Watkin, could go on for 45 minutes to an hour on a tangent in the middle of class, badgering the professor with off-topic and unrelated questions to the day's lesson plan.

497.    Plaintiff continued testifying that because she was a  Black student, would ask even one question related to the course material regarding the racialized policy implications of the law we were learning, she would be labeled "disruptive" to the classroom

environment, lambasted about her "tone" being unprofessional, and professors and students alike engaging in the racist act known as tone-policing.

498.    None of the aforementioned exchanges between Plaintiff and Walsh's witnesses were referenced in the Student Conduct Board's determination, nor the University's determination regarding Plaintiff's complaints of racial and sex discrimination to the Bias Reporting System.

499.    Defendant Elizabeth Walsh argued with Plaintiff regarding "lying" during the student conduct board hearing.

500.    Plaintiff, in her final reply to Elizabeth Walsh during the Student Conduct Board hearing stated "You may have not liked the answer to your question, but I answered your question."

501.    Defendants took 3 weeks to deliberate and issue a finding. The most salacious details regarding the Student Conduct Board and Defendant's misconduct were omitted to make the proceeding look legitimate, when Defendant Walsh's presentation was rife with sloppy questioning and haphazard witness preparation. In actuality, despite the even-tone of the Student Conduct Board's determination, Defendant Walsh didn't come close to her burden of a preponderance of the evidence.

502.    Instead, Plaintiff prevailed as the righteous David, and Defendant Walsh was the defeated Goliath.

503.    This reality provided the context for Defendant Walsh and Defendant Burns' conspiracy to commit discrimination, fraud, and retaliation against Plaintiff for winning the Student Conduct Board hearing.

**May 2023 - August 2023**

504.  Plaintiff was found not guilty on all charges by the Student Conduct Board in May 2023.

505.  Plaintiff demanded adequate assurances that the racially discriminatory and hearing would not occur again if Plaintiff were to come back to Defendant Law School campus.

506.  Defendant Law School, and Defendant Nicole Gore refused to give adequate assurances that this would not occur again if Plaintiff were to return to Defendant Law School for her 3L year.

507.  Defendant Law School told Plaintiff that they would prefer if Plaintiff finished her law degree elsewhere during settlement negotiations, and Plaintiff held a reasonable belief that she would be harmed or killed if she were to return to St. Louis to finish her law degree.

508.  Plaintiff sent a spoliation letter, the only piece of work product that she ever received assistance from Lento Law Firm with a new attorney, John Harris.

509.  On April 13, 2023, Attorney John Harris of the Lento Law Firm offers to draft the letter, but says that the spoliation letter must come from Plaintiff.

510.  On Thursday, April 20th, 2023 at 10:06 AM, Plaintiff sent a spoliation to Defendant Gore and Defendant Deanna Wendler-Modde stating that Plaintiff requests for all evidence regarding the hearing and other classes to be preserved for future litigation.

511.  Defendants do not respond so that they can deny that they received such a letter later.

512.  Plaintiff was suspended from law school for over 6 months, from November 2022 to May 2023 for no cause.

513.    Plaintiff was required to start her "Summer Associate" role with Norton Rose
        Fulbright in New York less than 2 weeks after the conclusion of the Student Conduct
        Board.

514.    Plaintiff started her second summer at Norton Rose Fulbright in New York, and
        Defendant was made aware of the same.

515.    While employed at Norton Rose Fulbright, Plaintiff disclosed during a routine
        exit-interview with Human Resources that she was transferring to Georgetown University
        Law Center because of the racial and sexual discrimination that she was facing at
        Washington University, and that her transcript would reflect those changes.

516.    Norton Rose Fulbright told Plaintiff that they would "look out for the transcript
        change when [Plaintiff] started next Fall."

517.    Norton Rose Fulbright, because of Defendant's slanderous and libelous actions
        towards Plaintiff (despite being found not responsible from Defendant's Student Conduct
        Board), decided that Plaintiff was not a good fit for the firm.

518.    Norton Rose Fulbright declined to offer Plaintiff a return offer because of the
        negative implications of being associated with Washington University's suspension of
        Plaintiff.

519.    Plaintiff is not offered a return offer (where the incoming associate salary is
        $235,000) from Norton Rose Fulbright as a result of Defendant's discriminatory conduct
        and tortious interference from Washington University.

520.    Because of Defendant's material interference with Plaintiff's rights throughout her 2L
        year, it harmed Plaintiff's employment outcomes and adversely affected her career
        trajectory.

521.   Plaintiff matriculates for her safety into Georgetown University Law Center for her
       3L year in August 2023, as Defendant Walsh requested during settlement negotiations
       that Plaintiff finish her 3rd year of law school at another institution. Because of
       Defendant Walsh's urging and disdain for Plaintiff, and no text in her scholarship letter to
       denote any terms to the contrary, Plaintiff decided to finish her 3rd year of law school at
       Georgetown University Law Center.

**September 2023**

522.   Plaintiff's complaints of racial and/or sex discrimination are still ignored and not
       addressed by Defendant as Plaintiff matriculates into Georgetown, and now feels safe
       enough to report Alex Templeton to Defendant Gore. Defendant Gore mischaracterizes
       Plaintiff's claims, and Plaintiff reflects: " I never claimed that the intruder in my
       classroom sexually harassed me; it was a classmate, and I overheard the sexual
       harassment. Further, why did you only choose to investigate the one claim about Alex
       Templeton that could be written off as hearsay – not the claim about them wanting to
       bring guns to campus events (which is in writing and they admit to doing), the claim
       about them impeding an active investigation by campus police (which is in writing they
       admit to doing), or the claim about them drinking alcohol in a vehicle at a school event
       (which is in writing and they admit to doing.)"

523.   Defendant Nicole Gore doesn't do anything to address Plaintiff's claims, nor rectify
       her erroneous understandings contained in Plaintiff's complaint.

524.   Defendant Carrie Burns begins to engage in retaliatory billing practices in

525.    The Fall 2023 tuition for Defendant Law School was $67,008. See the tuition

numbers here: https://shorturl.at/fnW56

526.    In Fall of 2023, Plaintiff paid $17,455 cash to Defendant.

527.    Plaintiff borrowed $10,250 from FAFSA in the form of a GRAD-plus loan.

528.    Carrie Burns was the main correspondent and agent of Washington University, with

regards to Plaintiff's specific case involving the FAFSA loans.

529.    Plaintiff sends a series of emails to C. Burns regarding the amount of time.

530.    If Defendant had honored Plaintiff's $18,500 per-semester scholarship, the money

remaining would have been plenty to pay the Fall 2023 tuition bill, and there would have

been approximately $5,000 for Plaintiff to live on.

531.    Plaintiff was not ever issued her refund check of approximately $5,000.

532.    Defendant's retaliatory actions of stealing Plaintiff's FAFSA loan money has made it

very difficult for Plaintiff to survive for the past year.

533.    Defendant unilaterally took away Plaintiff's scholarship (despite the finding of

"no-responsibility" by the student conduct board after Dean Walsh's lazy, sloppy, and

racist campaign of false accusations in May 2023) and did not give me any credit for my

$37,000 scholarship for the Fall 2023 or Spring 2024 semesters.

534.    At the time of this complaint, the scholarship for the Fall 2023 and Spring 2024

semesters have not been applied.

535.    As for the Spring 2024 semester, Plaintiff borrowed another $10,250 and they applied

this amount to my spring 2024 tuition.

536.    If Defendant had honored Plaintiff's $37,000 a year scholarship, (which they told Plaintiff she was awarded in July 2023 for the Fall 2023 - Spring 2024 school year) Plaintiff would not owe them anything.

537.    The Department of Education has issued a statement, and required WashULaw to remit payment to Georgetown Law Center for the Fall 2023 and Spring 2024 semesters.

538.    These financial/billing concerns arise out of the targeted racialized harassment and abuse of power by Dean Elizabeth Walsh, Dean Rob Wild, Professor Adrienne Davis, and Dean Nicole Gore.

539.    Defendant lied to the Department of Education and told them that the Fall 2023-2024 handbook stated that "a student visiting elsewhere would be responsible for two tuitions."

540.    The 2023-2024 Student Handbook says nothing about being required to pay two tuition fees if someone visits another university, or studies abroad.


**October 2023**

541.    On Monday, October 16, 2023 at 2:37 PM, Plaintiff sent a letter to Defendant Nicole Gore  and studentconduct@wustl.edu reporting Alexis Templeton, Richard O's close friend, for harassment arising out of a series of messages and conduct that harmed or threatened to harm Plaintiff.

542.    Nicole Gore does not find any issue with Alexis Templeton's behavior even though Alexis Templeton had, while on campus: 1) Asked to bring a gun to a school-sponsored event (a BLSA retreat) 2) encouraged violating St. Louis open beverage law at a campus event (Halloween party) 3) asking Plaintiff to "step outside" during a bar review 4)

543.    Defendant Nicole Gore mischaracterized several of Plaintiff's assertions.

544. When Plaintiff raised these issues with Defendant Nicole Gore, she was ignored. To this day, she has not received a response from Defendant Gore regarding her erroneous characterization of facts.

545. To this day, in November 2024, Alexis Templeton still periodically sends Plaintiff messages on instagram and tiktok calling her a "dumb little girl" and other derogatory remarks.

**February 2024**

546. Plaintiff filed a complaint with the American Bar Association, alleging Defendant's aforementioned violation of the ABA Standards for Compliance on February 9th, 2024.

547. While a student at Georgetown, Plaintiff followed up on the complaint that she filed in November 2022 on **March 18, 2024 with the newly created Office of Institutional Equity.**

**May 2024**

548. Defendant Adrienne Davis is selected to give the Class of 2024 Commencement Speech despite engaging in a myriad of conspiracies and violations of Plaintiff's rights in connection with her employment of Plaintiff and Plaintiff's complaints of sexual and racial discrimination in the course of her employment and prior.

549. Defendant's agent, Ms. Gillian Boscan from the Office of Institutional Equity concluded the investigation into the complaint that Plaintiff filed in May 2024.

550. Defendant's agent, Ms. Gillian Boscan's letter misstates the date of the filed complaint.

551. Plaintiff stated that these e-mail and secondary complaint to Ms. Boscan, is only a follow-up of the original complaint, and is solely a continuation of events and evidence

of retaliation after the initial November 25, 2022 complaint and actions that ensued thereafter.

552.    Plaintiff's date of complaint was **actually November 25, 2022,** captured by the BRSS (Bias Report and Support System) Report that Plaintiff filed, and was assigned to Defendant Mark Kamimura, the Diversity provost/officer – reflected in an e-mail exchange on April 16 2024 at 4:11pm EST.

553.    Ms. Gillian, nor Defendant Kamimura, nor any other WashU employee never interviewed me or investigated the events regarding Professor Adrienne Davis yelling and calling herself a white supremacist, and defaming Plaintiff, on November 2nd, 2022.

554.    Defendant's Agent Ms. Gillian falsely claimed that she requested to meet with Plaintiff which never happened.

555.    Plaintiff asked Ms. Gillian, Defendant's Agent, in the e-mail chain attached, that if you had reviewed the tape of Professor Davis flying off the handle in the November 2, 2022 Race in the Law class.

556.    Plaintiff's initial complaint, and subsequent follow up complaint made in May 2024, of racial and/or sex discrimination is ignored and not addressed by Defendant.

557.    **But for the racist and discriminatory actions of Professor Davis on November 2 in her race and the law class, Plaintiff would not have had to make an additional follow up complaint regarding the same issues on March 18, 2024.**

558.    Plaintiff attached the 2023-2024 Student Handbook to an email on April 16th, 20240.

559.    The 2023-2024 Handbook was downloaded on April 16, 2024, that Ms. Boscan referenced in her determination letter.

560.    Plaintiff said "Please point me to the page and line where you see that I would have my scholarship revoked **if I were forced to study at another institution.**"

561.    Neither Ms. Gillian, nor any other agent of Defendant's, replied to Plaintiff.

562.    Plaintiff then followed up with an e-mail afterwards that stated "I would be happy to meet with you" and "provide more information after you reviewed the tape."

563.    Plaintiff told Ms. Gillian and the General Counsel's office that her case was dismissed prematurely, as Ms. Gillian didn't reference any of this in Defendant's determination letter.

564.    Every sentence in the University's determination letter was either unfounded, a half-truth, or categorically false.

565.    Ms. Gillian, nor any other agent of Defendant's, gave no indication on whether or not they had viewed the tape of Professor Davis crying and screaming that she was a white supremacist on November 2, 2022.

566.    Defendant and her agents continue, to this day, to try to ignore Plaintiff and her claims of racial and sex discrimination.


**October 2024**

567.    Defendant's website on October 21st, 2024 at 11:17PM EST stated the following: "At WashULaw, all of our JD scholarships are guaranteed for three years. Not only is this unusual but many schools make scholarship awards conditional on maintaining a certain GPA or class rank. By contrast, WashULaw scholarships are given with no strings attached as long as you remain a student at the law school."

https://law.washu.edu/consumer-information-aba-required-disclosures/

568.    Plaintiff was hired by Professor Adrienne Davis to perform research on integrating critical race theory into the 1st year law school (1L) curriculum.

569.    Defendant failed to remedy or prevent the race and sex discrimination to which Plaintiff have been subjected.

570.    Defendant penalized Plaintiff because of her race and her engaging in protected activity by complaining about racial and sex discrimination from her classmates, professors, and members of the administration.

571.    Other employees and students have complained of race and/or sex discrimination at Defendant's law school in connection with Defendant's well-known pattern and practice of protecting white students and the other students at Defendant's law school, in Professor Katz's class.

572.    Other employees and students have complained of race and/or sex discrimination at Defendant in connection with Defendant's well-known pattern and practice of protecting white students and the other research assistants of Professor Davis, who were white.

573.    A non-black student in 2020 vandalized a statue of George Washington and only had to pay $1500 worth of damage to repair the statue. She was never suspended for any period of time, and never lost her scholarship.

574.    By their actions set forth above, Defendants committed fraud upon Plaintiff.

## COUNT I - RACE AND SEX DISCRIMINATION GENERALLY
## (Title VI, Title VII, and MD Non Discrimination in Education)

575.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

576.    By their actions set forth above, Defendants committed race and sex discrimination
upon Plaintiff.

577.    Plaintiff, through the above incorporated paragraphs set forth herein in their entirety,
Plaintiff has evidence, both direct and circumstantial, that prove Defendant's
discriminatory intent.

578.    Plaintiff has also demonstrated Defendant's discriminatory purpose through their
decision making processes and ignoring Plaintiff's complaints regarding racial
discrimination at Defendant Law School. Plaintiff's race and subsequent complaints of
racial and sex discrimination was a clear motivating factor in Defendant's "clear pattern
unexplainable on grounds other than" discriminatory ones.

579.    Plaintiff through the aforementioned incorporated paragraphs and foregoing exhibits
has shown evidence of a "consistent pattern" of actions of decision-makers that have a
much greater harm on minorities than on non- minorities. Under Faith Action for Cmty.
Equity v. Hawai'i, No. CIV. 13-00450 SOM, 2015 WL 751134, at *7 (D. Haw. Feb. 23,
2015) (Title VI case citing Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d
1142, 1158–59 (9th Cir. 2013)); see also Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810,
819 (4th Cir. 1995) (adding to the Arlington Heights factors.)

580.    Defendant applied different procedural processes or substantive standards to requests
of minorities and non-minorities, and preferred the white and not-complaining of racial
classmates of Plaintiff over Plaintiff, a Black student who complained of racial
discrimination at Defendant Law School.

581.     Defendant's race and sex discrimination and retaliatory conduct and comments have caused Plaintiff significant emotional distress.

582.     Defendant's conduct and comments evidence a bias against Black and female and non-white and complaining employees and students.

583.     Plaintiff's sex was a motivating and/or determinative factor in the above discriminatory and retaliatory acts.

584.     Plaintiff's race was a motivating and/or determinative factor in the above discriminatory and retaliatory acts.

585.     Plaintiff's complaints of discrimination and retaliation were a motivating and/or determinative factor(s) in the above retaliatory acts including without limitation in connection with demoting his job responsibilities by removing his direct report(s) and narrowing the scope of his job duties.

586.     The retaliatory actions taken against Plaintiff after he complained of discriminatory conduct would have discouraged a reasonable employee from complaining of discrimination.

587.     Defendant failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective and remedial measures to make the workplace free of discriminatory and retaliatory conduct.

588.     As a direct and proximate result of Defendant's discriminatory conduct and retaliatory conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, reputational harm, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

589.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## COUNT II—TITLE VI

590.    Plaintiff incorporates herein by reference the above paragraphs as if set forth herein in their entirety.

591.    By committing the foregoing acts of discrimination and retaliation against Plaintiff based on race and her complaints of race discrimination Defendant has violated Title VI.

592.    Plaintiff's former attorney, Stacy Forchetti of the Lento Law Firm was compromised and conspiring against Plaintiff to further Defendant's discriminatory ends and failed to advise Plaintiff of the need to file with the EEOC in a timely manner so that Plaintiff's workplace racial discrimination claims would be heard in a timely manner.

593.    Plaintiff's former attorney, Stacy Forchetti, maintained that Plaintiff had not suffered any harm, despite being knowledgeable about all of the paragraphs contained herein this complaint. Defendants, along with Stacy Forchetti, gave Plaintiff bad legal advice and harmed Plaintiff in connection with their violation of Title VI because Plaintiff is Black and complained of racial discrimination.

594.    Defendant acted intentionally, and with malice and/or reckless indifference to Plaintiff's rights, and its conduct warrants the imposition of punitive damages.

595.    As a direct and proximate result of Defendant's violation of Title VI, Plaintiff has suffered the losses set forth herein and has incurred attorneys' fees and costs.

596.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary

damages as a result of Defendant's discriminatory and retaliatory acts unless and until

this Court grants the relief requested herein.


## COUNT III—TITLE VII (Sex Discrimination and Retaliation)

597.    Plaintiff incorporates herein by reference the above paragraphs as if set forth herein in

their entirety.

598.    By committing the foregoing acts of discrimination and retaliation against Plaintiff

based on sex and complaints of sex discrimination Defendant has violated Title VII.

599.    Defendant acted intentionally, and with malice and/or reckless indifference to

Plaintiff's rights, and its conduct warrants the imposition of punitive damages.

600.    As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has

suffered the losses set forth herein and has incurred attorneys' fees and costs.

601.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary

damages as a result of Defendant's discriminatory and retaliatory acts unless and until

this Court grants the relief requested herein.


## COUNT IV - SECTION 1981

602.    Plaintiff incorporates herein by reference the above paragraphs as if set forth herein in

their entirety.

603.    Among federal statutes that address racial discrimination, 42 U.S.C. § 1981's contract

clause, among the general text of the statute, uniquely focuses on guaranteeing a person's

equal right to make and enforce contracts without regard to race. More specifically, §

1981's contract clause provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens.

604. By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant has violated Section 1981.

605. Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

606. As a direct and proximate result of Defendant's fraud, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

607. Plaintiff suffered irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

608. By committing the foregoing acts of discrimination and retaliation against Plaintiff in the course of her employment at Defendant Law School, Defendant has violated Section 1981.

609. Said violations by Defendant Law School and above listed Defendants were done and/or carried out with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

610. As a direct and proximate result of Defendant's violation of Section 1981, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs (including the $15,000 paid to Lento Law Firm.)

611. Plaintiff requests relief of attorney fees paid to Lento Law Firm in connection with the Kangaroo court-esque decision making of Defendants Hudson, Wild, Walsh, and

Gore - it didn't matter that Plaintiff retained counsel. Defendants still acted willfully and knowingly in violation of all of the laws alleged in this complaint.

612.    Plaintiff suffered irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

613.    No previous application has been made for the relief requested herein.


**Count V - Fraud and Misrepresentation, Maryland Common Law**

**(Doctoring and editing emails, The Lento Law Firm, and Untruthfulness to Forum)**

614.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

615.    By their actions set forth above, Defendants committed fraud upon Plaintiff.

616.    Plaintiff reasonably relied, to his detriment, on the material misrepresentations and omissions of fact made by Defendants.

617.    No previous application has been made for the relief requested herein.

618.    Plaintiff was suspended from law school for over 6 months, from November 2022 to May 2023 for no cause.

619.    Defendant defrauded Plaintiff by requiring Plaintiff to pay tuition for classes that were either 1) "lost" (according to Defendant Walsh) 2) "unavailable" or 3) not recorded at all (in the case of Professor Sadat's class.)

620.    In or around the end of November/December 2023, Plaintiff went to meet with Nicole Gore to view the "evidence" that the Dean had compiled.

621.   Plaintiff saw several heavily redacted exhibits that did not mention her by name, but were attributed to her by Defendants.

622.   These exhibits, allegedly from November 2022, when asked to be re-entered into evidence in the Student Conduct Board hearing, appeared to be doctored and fraudulent to the effect of having 3 different fonts in one e-mail, and several unconventional formatting issues.

623.   The exhibit of Professor Katz referring to Plaintiff's love of Cardi B and Drake as "inappropriate" never resurfaced, despite Plaintiff asking Defendant Hudson and Defendant Wendler-Modde that the exhibits had been tampered with and did not reflect Plaintiff's copious notes where Plaintiff copied each of Defendant Walsh's exhibits by hand while being surveilled by Defendant Nicole Gore's secretary, Lora Clark. Obscuring this exhibit which demonstrated Defendant Katz's discriminatory intent towards Plaintiff constitutes fraud.

624.   Defendants engaged in fraud by editing and doctoring their emails about the "investigation" (as stated by Defendant Peggy Smith in emails to Defendant Russell Osgood and Defendant Elizabeth Walsh) into Plaintiff in order to make Plaintiff look more culpable in their "investigation" plot to get Plaintiff expelled from law school.

625.   Defendants never addressed, confirmed, or denied Plaintiff's allegations of fraud, which were detailed in one of Plaintiff's emails to Defendant Nicole Gore, Lora Clark, and Stacy Forchetti. One particular e-mail from Plaintiff addressing Defendant's alleged fraud was dated Wednesday, February 22, 2023 at 2:14 AM, addressing the concerns regarding the font sizes, the omissions of certain e-mails in their entirety, and the different contents of e-mails.

626.    Further, Defendants engaged in fraud by contracting with the Lento Law Firm to retain Stacy Forchetti as Plaintiff's attorney.

627.    Defendants Stacy Forchetti and the Lento Law Firm engaged in a pattern of suspicious activity in connection with their representation of Plaintiff. Plaintiff requests and reserves the right to request discovery from the

628.    Stacy Forchetti from the Lento Law Firm was only at the law firm for 6 months - most, but not all of the duration of Plaintiff's case.

629.    Stacy Forchetti did not produce one piece of work product in connection with Plaintiff's representation against Defendant in the Student Conduct Board hearing.

630.    Stacy Forchetti was allegedly often sick with COVID, or having other obligations (e.g. doctors appointments) that substantially interfered with Plaintiff's hearing strategy; Plaintiff drafted and litigated the entirety of the student conduct board hearing herself.

631.    Stacy Forchetti said that "[Defendant] just doesn't like you and that's why they won't negotiate with you." to Plaintiff.

632.    Stacy Forchetti said that Plaintiff had not suffered any injury, despite being erroneously suspended for a total of 6 months, unable to communicate with peers, friends, teachers, or participate in any campus activities.

633.    Stacy Forchetti never suggested that Plaintiff had any civil rights claims of sex or race discrimination.

634.    Stacy Forchetti did not advise Plaintiff to file a complaint with the Missouri Council for Human Rights, a crucial piece of legal advice that could have

635.    Stacy Forchetti engaged in fraud by practicing an area of law that she did not have experience with, with a case

636.    Stacy Forchetti did not intervene on behalf of Plaintiff to help secure her course materials even though Plaintiff paid Lento Law Firm $15,000 to represent her in connection with the Student Conduct Board hearing.

637.    Stacy Forchetti counseled Plaintiff to accept a plea agreement that would have left Plaintiff in a materially worse condition than when she retained Lento Law Firm.

638.    Stacy Forchetti and Defendants engaged in fraudulent conduct in violation of the ABA's Model Rules of Professional Responsibility regarding her representation and counseling of Plaintiff.

639.    Specifically, Stacy Forchetti conspired with various members of Defendant Law School's administration to make Plaintiff sign a release of all claims and a non disparagement agreement in exchange for Plaintiff attending a different law school at no additional cost.

640.    Stacy Forchetti was completely unavailable to assist in responding to Defendant Darrell Hudson's Student Conduct Board request for information with a deadline.  Due to Stacy Forchetti's unavailability, Plaintiff filed a damaging list of Defendant's discriminatory actions against Plaintiff without her input shortly before the deadline. Within an hour of Plaintiff's filing, Stacy Forchetti lambasted Plaintiff for acting without her input.

641.    The documents provided from Defendant to investigators from the American Bar Association in 2024 contain factually erroneous and damaging material to Plaintiff.

642.    The documents provided from Defendant to investigators from the US Department of Education in 2024 contain factually erroneous and reputation damaging material to Plaintiff.

643.    Defendant made unambiguous promises to Plaintiff, both before and during her tenure at Washington University, that any student would not have their scholarship revoked if not found guilty of violating the Student Conduct Code, Honor Code, and or any other university policy.

644.    Defendant (especially Defendant Robert Wild) made unambiguous promises to Plaintiff, both before and during her temporary suspension at Washington University, that if she were accused of a violation of the USCC, she would not be sanctioned without a fair disciplinary procedure, an impartial investigation and equitable resolution. Despite Defendant Wild giving Plaintiff unambiguous promises and assurances for the "University process" to be fair, Plaintiff's 14th amendment rights were violated as she was sanctioned heavily through Defendant's unfair hearing determinations regarding evidence, Defendant's failure to provide Plaintiff with her coursework in a timely manner, retaliatory billing practices, even though she was found not guilty by the Student Conduct Board.

645.    Plaintiff relied on such promises when she decided to enroll, and continued to enroll for six semesters, at Defendant Law School. Plaintiff maintained "full time student status", the sole condition of her scholarship letter, at all times from matriculation at Wash U to completing the graduation requirements at Defendant Law School.

646.    Plaintiff's reliance on "full time student status" being the sole condition of the scholarship because it was the only term listed on the scholarship letter was expected and foreseeable by Defendant, especially since the ABA Standard 509 requires all ABA approved law schools to fully disclose the conditions of any conditional offer or scholarship.

647.    Defendant knew Plaintiff was attempting to graduate from law school.

648.    Plaintiff has relied on Defendant's promises to her detriment as Defendant wrongfully suspended Plaintiff, kept all the tuition money and FAFSA loans collected from Plaintiff, failed to provide her with a fair and equitable process that satisfied due process before expelling her for an alleged violation of the Student Conduct Code, then breached its promise by wrongfully suspending Plaintiff, and preventing Plaintiff from securing her post-graduation employment at Norton Rose Fulbright.

649.    As a direct and proximate result of Plaintiff's reasonable reliance on Defendants' misrepresentations and omissions of fact, which Defendants knew to be false, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' unlawful acts unless and until this Court grants the relief requested herein.

**Count VI - Intentional Infliction of Emotional Distress - Maryland Common Law**

650.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

651.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant has committed the intentional tort of intentional infliction of emotional distress.

652.    Defendant prolonged the Student Conduct Board hearing while possessing video evidence of every single class that Plaintiff participated in.

653.    Defendant has repeatedly erroneously characterized the reason for the Student Conduct Board hearing delay as due to a request from Plaintiff.

654. Plaintiff did not request the hearing to be delayed from December to February for her own personal advantage or preference - it was because of Defendant Nicole Gore and her assistant, Lora Clark's willful and intentional actions of misconstruing and mislabeling Plaintiff's exhibits that caused Plaintiff to be suspended for over 6 months.

655. As a result of Defendant Nicole Gore and her assistant, Lora Clark, intentionally botching Plaintiff's exhibits, miss numbering pages, miss numbered exhibits, struck several pages of several key exhibits from the record to ensure Defendant Elizabeth Walsh's success and Plaintiff's continued suspension (and hopeful expulsion) the hearing was forced to be rescheduled to February - after Christmas break. This caused severe mental and emotional distress to Plaintiff and her mother, an attorney who also repeatedly begged for Defendants to stop their psychological torture of Plaintiff.

656. Defendant caused Plaintiff to be involved and actively testifying in a bogus Title IX proceeding with a known sexual predator that Defendant failed to protect her from for her 25th birthday, erroneously suspended from law school on her 26th birthday because Defendant Elizabeth Walsh didn't like Plaintiff because she is Black and complained of racial discrimination in connection with her employment, and unilaterally revoked her scholarship and pocketed all of her FAFSA money in retaliation for winning the Student Conduct Board hearing against Defendant Elizabeth Walsh leaving her destitute, financially crippled (broke) on her 27th birthday. Defendant intentionally and repeatedly traumatized Plaintiff by exposing Plaintiff to sexual predators, prolonging hearings, tampering with evidence and doctoring e-mails.

657.    In February 2023, Plaintiff begged Defendants (namely, Gore, Walsh, and Wild) via e-mail to allow her to settle this matter because she was concerned that the stress was going to kill her mother.

658.    At first, Defendants ignored Plaintiff. Plaintiff sent a minimum of 3 emails begging Defendant to draft a settlement so that Plaintiff's distress and Plaintiff's mother's distress would subside.

659.    Defendants did not respond in a timely fashion - they waited weeks to draft a settlement letter, which then included a release of all claims and a non disparagement agreement - all while knowing that they did not possess enough evidence to find Plaintiff guilty of any violation of the Student Conduct Board code, or any other University policy.

660.    Defendant negotiated in bad faith for concessions that the Student Conduct Board could not give her, causing significant harm to Plaintiff.

661.    For example, Defendant asked Plaintiff to sign a "release of all claims" and a "non-disparagement agreement" as conditions of her settlement agreement with Defendant Law School. The Student Conduct Board does not have the authority to bind Plaintiff to a "release of all claims" nor a "non-disparagement agreement."

662.    Defendant's negotiation strategy and failure to comply with basic evidentiary rules and procedure during the Student Conduct Board hearing caused Plaintiff significant emotional and physical harm.

663.    Plaintiff asks Defendant Nicole Gore why Defendant Walsh is asking for negotiation concessions that the Student Conduct Board would not be able to provide even if Defendant Walsh did prevail in the Student Conduct Board hearing.

664.    Plaintiff is ignored, again, and the Student Conduct Board hearing begins in February 2023.

665.    Additionally, several of Dean Walsh's key witnesses dropped out between December and February – including Professor Davis, Professor Katz, and Professor Shields – the only professors who had Plaintiff as a student.

666.    To assert that Plaintiff requested the hearing to be delayed is ahistorical and a mischaracterization of the facts.

667.    Additionally, Defendant, through agent Gillian, said in her determination in August 2024 that Plaintiff was suspended because Plaintiff's "behavior was concerning."

668.    Defendant does not specify what "behavior" of Plaintiff's caused concern.

669.    Defendant was referring to Plaintiff's behavior of being Black and complaining of racial discrimination.

670.     Yet, at the Student Conduct Board hearing, and in the determination letter by the Student Conduct Board.


## COUNT VII - Negligence, Maryland Common Law

671.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

672.    Defendant exposed Plaintiff to a sexual predator with a history of sexual violence, Richard O. Defendant had a duty to protect Plaintiff from harm.

673.    Defendants had a duty to protect their students from known sexual predators.

674.    Defendant gave a sexual predator a full Chancellor's scholarship making him appear to Plaintiff as not being a sexual predator.

675.    Defendant failed to exercise a reasonable standard of care in recruiting non-dangerous individuals to their campus.

676.    Defendant's breach of duty caused the Plaintiff's injury.

677.    Plaintiff suffered damages as a result of the injury.

## COUNT VIII - Breach of Contract

678.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

679.    Defendant and Plaintiff had a legally enforceable obligation/agreement through the scholarship award letter that specified and required one term of performance by Plaintiff: "maintain full time student status."

680.    Defendant interfered with Plaintiff's completion of the contract by erroneously suspending her for over 6 months and banning her from campus without due process because she complained of racial discrimination at Defendant Law School.

681.    Defendant breached this obligation by stealing Plaintiff's financial aid (FAFSA loans), unilaterally revoking Plaintiff's scholarship via email, and lying to multiple federal agencies about the contents of their Student Handbook.

682.    Defendant required Plaintiff to hire a lawyer and spend $15,000 to ensure that Plaintiff's rights would not be violated during the Student Conduct Board Hearing; Plaintiff's rights were violated anyway because Defendant wanted to punish Plaintiff for being Black and complaining of racial discrimination

683.    Plaintiff had to apply for food stamps and receive food supplemental assistance in the State of Maryland as a result of Defendant's breach of contract.

684.    Plaintiff had to work 3 jobs at one time during her final year of law school, making it exceedingly difficult for her to survive.

685.    Plaintiff had to resign from her job at the District of Columbia Office of Human Rights to take a less prestigious job at a local immigration law firm in order to survive and make ends meet as a result of Defendant's breach of contract and other violations of the law.

686.    This resulted in a Bar organization asking Plaintiff if she had "attendance issues" relating to her job at the DC Office of Human Rights, when in actuality, she had to resign from her job at the DC Office of Human Rights because of Defendant's fraud and breach of contract. Defendant Elizabeth Walsh's actions caused the bar to be doubtful of Plaintiff's character and fitness for admission to the bar, and caused Plaintiff to be questioned for more than 4 hours regarding her suspension, whereas other bar examiner character and fitness interviews only last 10-15 minutes.

687.    Defendant's behavior continues to harm Plaintiff as Plaintiff is unsure whether or not Defendant will continue to malign and blemish Plaintiff's character to Bar Associations and other organizations because she is Black and complained of racial discrimination in connection with her employment and prior.


**COUNT IX - DEFAMATION GENERALLY; SLANDER AND LIBEL**

688.    Plaintiff incorporates herein by reference the above paragraphs as if set forth herein in their entirety.

689.    Plaintiff restates and realleges the allegations contained both above and below as contained therein.

690.    Defendant Adrienne Davis's performance (which is recorded on a tape held by Defendant Law School on November 2, 2022) where Defendant Adrienne Davis feigned that Plaintiff called her a white supremacist is slander as it fits the following requirements: a false and defamatory statement concerning another; an unprivileged publication to a third party; fault amounting at least to negligence on the part of the publisher; and, either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

691.    One of Dean Walsh's witnesses said that Plaintiff "made" Defendant Adrienne Davis cry. This was not true, and unable to be confronted by Plaintiff because of the arbitrary and illegal evidence rules imposed by Defendant Darrell Hudson during the Student Conduct Board hearing. These untrue and defamatory statements left impressions in the minds of all of the participants of the Student Conduct Board hearing that Plaintiff was unable to confront because of the discriminatory decision making of Defendants Darrell Hudson and Nicole Gore to not enter in the tapes of the November 2, 2022 class that would have proved unequivocally that Plaintiff did not make Defendant Adrienne Davis cry.

692.    Further, Plaintiff, a 25 year old woman, cannot be held responsible for the wholly unrelated defamatory conduct of a 54 year old woman displaying a mental health crisis in the middle of class. Attempts to hold Plaintiff responsible for the actions of a separate 54 year old tenured faculty member of a top 20 law school is repugnant and ludicrous. The only reasoning for trying to hold Plaintiff accountable is racial discrimination against Plaintiff because she is Black and complained of racial discrimination.

693.    Defendant Walsh defamed Plaintiff's character to Norton Rose Fulbright by erroneously suspending Plaintiff for 6 months.

694.    Defendant Walsh and Davis caused immense harm to Plaintiff through their publication of false statements to third parties including Plaintiff's prospective employer, the law school community, the larger Wash U community, and the enduring effect that these libelous statements contained in a variety of Defendant's correspondence have on Plaintiff's friends and family.

695.    Defendant Walsh slandered Plaintiff to Norton Rose Fulbright by erroneously suspending her, resulting in Plaintiff's loss of an employment offer.

696.    There are several mischaracterizations of fact within every single document that Defendant has furnished to the American Bar Association, to federal investigators at the US Department of Education and FAFSA's Ombudsman Office..

697.    The Student Conduct Board Hearing determination issued by Defendant Hudson and Defendant Gore contains harmful and untrue statements about Plaintiff.

698.    Defendants transmitted and publicized harmful and untrue statements about Plaintiff to various individuals including the bar association to which she has applied, as well as other organizations and individuals.

699.    Defendants continue to transmit harmful and untrue messages about Plaintiff to prospective employers and other legal professional entities.

700.    Plaintiff's harm will continue until the court acts to impose damages on Defendant.

### Count X - 18 USC Section 241 - Conspiracy Against Rights Statute

701.    Plaintiff incorporates herein by reference the above paragraphs as if set forth herein in their entirety.

702.    Plaintiff restates and realleges the allegations contained both above and below as contained therein.

703.    By committing the foregoing act of conspiracy against rights, Defendants injured, oppressed, threatened, and intimidated Plaintiff from exercising their civil rights. Defendants (especially Elizabeth Walsh and Robert Wild) repeatedly harmed Plaintiff because she is Black and complained of racial discrimination in connection with her employment and prior while a student at Defendant Law School. Defendant threatened Plaintiff with arrest by the police if she were to be found on campus or at any Defendant-sponsored event. Plaintiff was innocent the entire time, but Defendants still chose to conspire to deprive Plaintiff of her rights in violation of 18 U.S.C. Section 241.

704.    Thus, defendants hindered Plaintiff from exercising their civil rights in violation of 18 U.S.C. Section 241 (Conspiracy Against Rights Statute.)


### Count XI - Maryland Code Section 13A.01.07.03 ("Maryland Non-Discrimination in Education") ("Maryland Non-Discrimination in Education")

705.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

706.    Plaintiff restates and realleges the allegations contained both above and below as contained therein.

707.    Defendant violated Maryland Code Section 13A.01.07.03 because they failed to protect Plaintiff's right to learn in an environment free from unlawful discrimination. Further, they facilitated and encouraged discrimination against Plaintiff.

708.    By committing the foregoing acts of discrimination and retaliation against Plaintiff based on her race, sex and complaints of sex discrimination, Defendant has violated Maryland Code Section 13A.01.07.03.

709.    Defendant acted intentionally, and with malice and/or reckless indifference to Plaintiff's rights, and its conduct warrants the imposition of punitive damages.

710.    As a direct and proximate result of Defendant's violation of Maryland Code Section 13A.01.07.03, Plaintiff has suffered the losses set forth herein and has incurred attorneys' fees and costs.

711.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## COUNT XII - Amendment XIV of the US Constitution

712.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

713.    Plaintiff restates and realleges the allegations contained both above and below as contained therein.

714.    As a private actor that receives federal funding, Defendant Law School is subject to the 14th Amendment.

715.    By committing the foregoing acts of discrimination and retaliation against Plaintiff based on her race, sex and complaints of sex discrimination, Defendant has violated the Fourteenth Amendment of the US Constitution.

## COUNT XIII – UNJUST ENRICHMENT

716.    Plaintiff incorporates by reference the above paragraphs as if set forth herein in their entirety.

717.    Plaintiff restates and realleges the allegations contained both above and below as contained therein.

718.    Defendant unjustly suspended Plaintiff and withheld or lost a significant amount of course materials, and substantially interfered with her rights because she is Black and complained of racial and/or sex discrimination.

719.    Defendant has been unjustly enriched by an amount equal to all the monies collected from Plaintiff between November 2022 and May 2023 while Plaintiff was erroneously suspended, and the unilateral revocation of Plaintiff's scholarship for the 2023-2024 school year from August 2023 to present. Defendant only took these actions against Plaintiff because she was Black and complained of racial and/or sex discrimination.

720.    Fundamental fairness requires Defendant to return all of Plaintiff's tuition during her suspension and 3rd year of law school including any financial aid paid to Defendant by a third party on Plaintiff's behalf. Defendant's retaliatory billing practices and unjust enrichment arise out of a timeline that details how Defendant discriminated against Plaintiff and enriched themselves with her tuition monies.

721.    As a result of Defendant's unjust enrichment, Plaintiff is entitled to recover monetary

damages equal to the amount of tuition during her suspension, plus prejudgment interest, and costs as may be recoverable at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant:

(a) declaring the acts and practices complained of herein to be a violation of Title VI;

(b) declaring the acts and practices complained of herein to be in violation of Title VII;

(c) declaring the acts and practices complained of herein to be in violation of Section 1981;

(d) declaring the acts and practices complained of herein to be in violation of the Section 1985;

(e) declaring the acts and practices complained of herein to be in violation of all of the aforementioned and alleged laws and policies listed by Plaintiff;

(f) declaring the acts and practices complained of herein to be in violation of the common law of the State of Maryland with regard to breach of contract, and Plaintiff's torts claims;

(g) entering judgment against Defendant and in favor of Plaintiff in an amount to be determined;

(h) enjoining and restraining permanently the violations alleged herein;

(i) awarding compensatory damages to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits, and earning capacity, which Plaintiff has suffered and will continue to suffer as a result of Defendants' discriminatory, retaliatory, and unlawful misconduct;

137

(j)  awarding liquidated damages;

(k)  awarding compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures, and pain and suffering;

(l)  awarding Plaintiff costs of this action, together with reasonable attorney's fees;

(m) awarding punitive damages to Plaintiff;

(n)  awarding Plaintiff such other damages as are appropriate under the Title VI, Section 1981, Section 1985,

(o)  granting such other and further relief as this Court deems appropriate.

Respectfully submitted,

Allison Brown

Plaintiff