# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALLISON BROWN, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 8:24-cv-03198-TDC |
| WASHINGTON UNIVERSITY | ) | |
| SCHOOL OF LAW, et al., | ) | |
| Defendants. | ) | |
| | **)** | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF THEIR REPLY AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**INTRODUCTION** ......................................................................................................... **1**

**ARGUMENT** ...................................................................................................11

**I. MARYLAND HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS** …..…..11

**a. Standard of Review - Maryland's Long-arm Statute and Due Process**............................11

**b. Prong One: Maryland's Long Arm Statute – § 6-103(b)(3) and § 6-103(b)(4)**.....................12

**c. Conspiracy Theory of Jurisdiction** ......................................................…………..15

**d. On § 6-103(b)(1),(2), and (5) - Defendants Contacts in the State of Maryland**.....…………..18

**II. PRONG 2: DUE PROCESS**......................................................... **20**

**a. General Jurisdiction**.................……......................................... **21**

**b. Specific Jurisdiction**.........................……..................……...................................**21**

**III. Plaintiff Requests Discovery to Establish Jurisdiction**…………………………….....25

**VI. PLAINTIFF HAS PROPERLY PLED ALL CLAIMS AGAINST DEFENDANTS**......26

**a. Standard of Review.** ...................................................................................**26**

**b. Maryland Law Governs Plaintiff's Claims** ……………………………….................. **26**

**c. Count I – "Title VII"** ...........................................................................**27**

**d. Count II – "Title VI"** ................................................................... **28**

**e. Count III – "Intentional Infliction of Emotional Distress"** ................................................. **29**

**f.  Count IV– "Breach of Contract"** ................................................. **30**

**EXHIBITS 1-40**............................................................................. **Contained in Attached Filings**

**INTRODUCTION**

On November 13th 2024, Plaintiff Allison Brown ("Plaintiff") filed a Complaint complying with the Local Rules. The complaint (Am. Comp.) filed on November 13th, 2024, omitted 90 pages from her November 4th complaint, which alleged additional facts plead with particularity and documentation of the extensive racial and sexual discrimination, harassment, and harm throughout Plaintiff's tenure at Washington University in St. Louis (WASHU) and thereafter at the hands of Defendants. Defendants in their memorandum (ECF 33-1) misstate and invent facts profusely, while refusing to take accountability for the harm they caused and continue to cause Plaintiff.

In Fall 2021, Defendants conducted a sham Title IX investigation into Plaintiff after Richard O, a known sexual predator with a long history of assaulting *at least* three different Black women at his undergraduate school, the University of Chicago, accused Plaintiff of sexual harassment. (Am. Comp. ¶ 38) Defendants failed to act as a reasonable law school exercising ordinary care when they exposed the entire WASHU community (including Plaintiff) to an unreasonable risk of harm by recruiting Richard O, a dangerous individual with an easily discoverable record of sexual crime to attend their institution. (Am. Comp. ¶ 38, 74, 162, ECF Document 1-3, Exhibit A) Defendants breached their duty to not harm Plaintiff, a victim of Richard O's relentless campaign of sexual harassment by retraumatizing Plaintiff, and victim-blaming Plaintiff during Defendants' ridiculously long questioning sessions lasting over 8 hours over several months, from October 2021 to January 2022. (Am. Comp. ¶ 36-39, 164-165, ECF Document 1-3, Exhibit A) A reasonably prudent investigation from a top 20 law school would have exonerated Plaintiff and ended far sooner because Defendants had no evidence that Plaintiff harassed Richard O. (Am. Comp. ¶ 39, 74, 162; ECF Document 1-3, Exhibit A) Therefore, Defendants' actions were a foreseeable and intentional breach of their duty as a reasonable law

1

school to not cause Plaintiff immense stress and psychological harm. (Am. Comp. ¶ 164-165) Defendants' investigation ultimately resulted in Plaintiff being found "not responsible" for any violation of the Student Conduct Code. (ECF Document 1-4, Page 2 of 4, Exhibit B)

In contrast, in late April 2022, when Plaintiff filed charges with Defendant's Title IX Office accusing Richard O of sexual harassment, attaching a contract that Richard O had sent Plaintiff, asking her to consent to odd rape rituals involving semen and blood, **Defendants declined to investigate.** (Am. Comp. ¶ 38-39, ECF Document 1-4, Page 3 of 4, Exhibit B) In contrast to Richard O's claims, which warranted an investigation, the Defendants found there was insufficient evidence to even investigate Plaintiff's claims, and dismissed her claims. (Am. Comp. ¶ 38-39) **Why?** Because Plaintiff had previously complained of racial discrimination of Defendants (Walsh and Katz) while Richard O had not complained of racial discrimination. (Am. Comp. ¶ 35-37, 38-39, 41, 50, 60, 74, 90, 100, 115-16, 131, 135-37, 139, 154, 162, and 179)

In February 2022, ***shortly before*** Plaintiff filed the sexual harassment complaint against Richard O in Defendants' Title IX office, Plaintiff along with non-black law students complained to Defendant Walsh and Defendant Angela Smith regarding Defendant Katz's racist classroom practices of reiterating false and racist narratives about the history of vagrancy, slavery, and systemic rape of Black women in the US; inviting unscrupulous and racist conversations in the classroom devaluing Black people's lives in relation to personal property; asserting patently false and racist justifications for Black judges' rulings; and singling out Plaintiff, one of six Black students in a classroom of 80 and accusing her comments, but not any other students' comments as "off-topic" and "unprofessional." (Am. Comp. ¶ 42, 43, 44, 46-47, 55.) Additionally, white male students (Graeme H, Shane O, and Yehoshua W) and non-complaining students were able to speak freely in the class without being suspended, and Defendant Katz, Defendant Smith, and

Defendant Walsh issuing public and private reprimands and lectures on "professionalism." (Am. Comp. ¶ 46-47, 55.) In contrast, Plaintiff's innocuous class contributions were met with racist acts by Defendant Katz, Defendant Peggy Smith and Defendant Walsh such as: 1) Defendants' November 2022 suspension of Plaintiff, 2) racially coded public and private reprimands and 3) lectures on how to perform whiteness and "professionalism." (Am. Comp. ¶ 46-47, 55)

From February 2022 to April 2022, Plaintiff was called into different Dean's Offices five separate times and warned against complaining of racial or sexual discrimination in the offices of Defendant Walsh, Defendant Angela Smith, and Defendant Peggy Smith regarding her "tone" and "professionalism" in a manner consistent with a list of articles discussing tone policing of Black students that Plaintiff furnished to Defendants Walsh and Katz. (Am. Comp. ¶ 47-50, 55) Defendants tried to persuade Plaintiff against complaining of racial and sexual discrimination at Defendant Law School as Defendant Peggy Smith stated that she would "expel any student that used the word 'racist' both to Plaintiff privately in Missouri on April 7, 2022, and in the Student Conduct Board Hearing (SCBH) in Maryland in March of 2023. (Am. Comp. ¶ 58-62)

Plaintiff, a Black woman, was the only student reprimanded and subsequently, suspended, in her entire law school for objecting to Defendant Katz's racist behavior in Spring 2023, despite not being the only student to complain of Defendant Katz's behavior. (Am. Comp. ¶ 136, 137) Dinora O, Plaintiff's classmate, even testified through the zoom conference hearing in Maryland that Defendant Katz's class was "trash" and that white law students often approached and interrogated her after class, asking "if she held similar views to Plaintiff because both Plaintiff and Dinora are people of color." (Am. Comp. ¶ 113)

Defendants blamed Plaintiff for Defendant Katz's classroom issues and poor survey results even though Plaintiff was not named in any of the survey responses, which Defendant

3

Katz admitted, because Defendants did not know how to rectify Katz's racially violent classroom environment. (Complaint Am. ¶¶ 48-50, 53, 56-64) Plaintiff's non-Black, non-complaining counterparts were not blamed for Katz's pedagogical shortcomings. (Am. Comp. ¶ 53-54).

Shane G and Graeme H, two of Plaintiff's disruptive classmates who encouraged shooting Black Lives Matter protestors in defense of property during class were never called into the Dean's Office regarding their tone or professionalism, as "it wasn't [Defendants] concern." (Am. Comp. ¶ 46-47, 55, 59-61) Defendants Peggy Smith and Angela Smith, who are both Black, gaslit Plaintiff and dismissed Plaintiff's complaints of racial discrimination regarding Defendant Katz. (Am. Comp. ¶ 56-64)

When Plaintiff began to fear for her safety at WASHU, she attempted to transfer by applying to other institutions. (Am. Comp. ¶ 67-68) Plaintiff gave Defendants an opportunity to get rid of her and her complaints of racial and sexual discrimination by simply providing a "letter of good standing" to Plaintiff's transfer law schools. (Am. Comp. ¶ 67-68) But Defendants would not have been able to punish Plaintiff for her myriad complaints of racial and sexual discrimination if Plaintiff left WASHU. (Am. Comp. ¶ 67-68) Instead of furnishing the letter in a timely manner as Defendant Walsh did for other non-complaining and non-Black transfer students, Defendant Walsh intentionally refused to submit the letter of good standing until after the deadline. (Am. Comp. ¶ 68) Defendant Walsh's intentional act of refusing to send the letters of good standing ensured: 1) Plaintiff would not be able to transfer, and 2) Defendants could continue to harm Plaintiff for complaining of racial and sexual discrimination. (Am. Comp. ¶ 68)

While Plaintiff felt that Defendants were going to continue to retaliate against her for complaining of racial and sexual discrimination, Plaintiff had no idea that Defendants were going to try to expel her and destroy her legal career through shameless fraud. (Am. Comp. ¶ 150-160)

Defendants planned to use Defendant Davis, Plaintiff's supervisor, to gain her trust so that Defendant Davis could give Defendants a facially legitimate reason to expel Plaintiff from WASHU. (Am. Comp. ¶ 75-76, ¶ 150-160)

Defendant Davis seized the opportunity to get Plaintiff suspended when, as recorded in a videotape on November 2nd, 2022, she ran out of "Race and the Law" class, proclaiming that she was a "member of the KKK", "Bull Connor" and a "white supremacist," and complained about Plaintiff's behavior in her class as "threatening" to Defendant Walsh. (Am. Comp. ¶¶ 87, 90-91) Less than 48 hours after Davis's performance, Defendants Wild, Walsh, and Gore erroneously suspended Plaintiff, defamed Plaintiff and labeled Plaintiff a "threat" to the University and threatened Plaintiff with arrest in Missouri in her suspension letter dated November 4th, 2022, and signed by the Chief of Police of St. Louis. (Am. Comp. ¶ 90-91, ECF Document 1-6; Exhibit D) But for Defendant Davis's outrageous behavior of calling herself one of the most avowed white supremacist segregationists of all time in American History on November 2nd, 2022, and Defendants subsequent failure to investigate (specifically, when Plaintiff reported Defendant Davis to Defendant Kamimura-Jimenez) Plaintiff would have never been suspended and fled the state of Missouri in November 2022 for her safety. *Id.* (Am. Comp. ¶ 150-173) Defendant Kamimura-Jimenez *did nothing* in response to Plaintiff filing a complaint against Defendant Davis with the Bias Report and Support System at Defendant Law School, furthering the conspiracy to punish Plaintiff for engaging in protected activity. (Am. Comp. ¶ 131, 150, 161)

Defendant Davis's performance set the stage for Defendants Wild, Walsh, and Gore to harm Plaintiff by suspending Plaintiff from law school for six months in retaliation for complaining of racial and sexual discrimination. (Am. Comp. ¶ 83) Defendants subsequently banned Plaintiff from campus, all off-campus events, prohibited Plaintiff's communication and contact with any of her

professors or peers, forced Plaintiff to relocate to Maryland, made Plaintiff's grades suffer which harmed her future employment prospects, denied Plaintiff's requests to attend virtual office hours, refused to produce tapes of her classes (which were promised as a condition of her suspension), interfered with Plaintiff's post-graduate employment in New York, prohibited Plaintiff from enrolling in clerkships to be performed in Maryland, unilaterally revoked Plaintiff's scholarship *after* she relocated to Maryland, and furnished false statements to the Maryland Bar. (Exhibit 15, Am. Comp. ¶ 89-96, 105-125, 146-147, ECF Document 1-6; Exhibit D.)

Any reasonable University and their general counsel, upon notification by both Plaintiff and her mother, a Harvard Law alum, attorney, and Maryland resident, of Defendant Davis's racialized campaign to expel Plaintiff, would have investigated Defendant Davis's actions and accusations against Plaintiff by reviewing the November 2nd class recording and unsuspending Plaintiff. (Am. Comp. ¶ 99-106) Davis's behavior was outrageous - crying, screaming, yelling, and proclaiming that she was one of the most avowed white supremacist and proponents of extrajudicial violence in US history. (Am. Comp. ¶ 122) Yet, Defendants, **to this day**, refuse to investigate, produce the November 2nd class recording, acknowledge and/or rectify Defendant Davis's discriminatory actions. (Am. Comp. ¶ 89-96, ¶ 99-106 ¶ 106-109 ¶122)

In November 2022, Defendants insisted that Plaintiff should leave WASHU and finish at another institution with her WASHU scholarship pursuant to: 1) a non-disparagement agreement, forbidding Plaintiff from discussing the racial discrimination to which she had been subjected, and 2) a release of all claims (Am. Comp. ¶ 96) Defendants told Plaintiff that this was the only way she could finish her law degree at Defendant Law School: by signing an unconscionable waiver of her right to speak about racial and sexual discrimination to which Defendants subjected her, OR by demonstrating her innocence through an arduous and painful SCBH. (Am. Comp. ¶ 96-106)

Defendants, specifically Defendant Hudson, refused to hold the SCB hearing ("SCBH") in person on campus in Missouri**, after Plaintiff personally requested for Defendants to hold the hearing in Missouri**, because Defendant Katz was no longer in Missouri, and zoom was "more convenient for all parties and witnesses." (Exhibit 4) As a result of Defendant Walsh and Defendant Hudson's insistence on a zoom SCBH, and the oppressive conditions of Defendants' suspension of Plaintiff, Plaintiff relocated to Maryland for her safety, and the SCBH occurred in Maryland on four different days for over 15 hours total during the Spring 2023. (Am. Comp. ¶ 96) Plaintiff's absence from Missouri did not deter Defendants from botching and mislabeling Plaintiff's exhibits, doctoring and altering emails, prolonging the hearing, and causing undue delay resulting in a suspension of six months to harm Plaintiff. (Am. Comp. ¶¶ 153, 161)

Plaintiff was forced to engage with Defendants' kangaroo court, the SCBH, or forfeit her law degree from Defendants. (Am. Comp. ¶ 91, 95, 96) Defendants' breach of contract, their fiduciary duties, and ethical duties to conduct a fair hearing before erroneous deprivation of Plaintiff's property interest in her law school education required Plaintiff to hire the Lento Law firm to represent her. (Am. Comp. ¶ 97) The Lento Law Firm (of whom Joseph Lento has been suspended from the practice of law for six years) worked with Defendants to convince Plaintiff that she had not experienced any discrimination, and that Defendants were "just mean to Plaintiff because they did not like her." (Am. Comp. ¶ 116-119) Consequently, Defendants vis a vis the Lento Law Firm discouraged Plaintiff from asserting she was a victim of racial and/or sexual discrimination, and from protecting her rights under Title VII by filing by failing to even mention the Title VII EEOC filing requirement. (Am. Comp. ¶ 117)

Defendant Hudson and the Student Conduct Board did not issue their decision completely exonerating Plaintiff until May 2023, six months after Plaintiff had been suspended and

**approximately 180 days** from when Plaintiff was suspended and/or complained of racial discrimination, which is also the statute of limitations for bringing a claim before Missouri Commission on Human Rights (MCHR), the Missouri administrative prerequisite for filing with the EEOC. (Am. Comp. ¶¶ 75-76, 126, 153, 158-161) Meanwhile, students who had brought guns to campus and campus events in violation of school policy were not suspended at all. (Am. Comp. ¶ 41) Yet, for the rest of Plaintiff's life, her transcript will be fixed with the low grades caused by Defendant Walsh's substantial interference, refusal and failure to furnish class recordings, and Plaintiff must disclose on bar and employment applications that she was suspended from law school for six months for the defamatory and demonstrably false reasons that Defendants listed in her suspension letter; not the reality of Defendants' racial and/or sex discrimination and retaliation of Plaintiff attested to by both Plaintiff and Defendant's witnesses during the SCBH. (Am. Comp. ¶¶ 75-76, 103, 112, 120, 121, 122, 126, 153, 161)

The SCBH substantiated Plaintiff's claims that Defendant Law School was a racially intolerant institution, where students and professors regularly engaged in tone-policing of Plaintiff. (Am. Comp. ¶ 102) The hearing was disproportionately Black, and none of Plaintiff's Black witnesses were allowed to testify. (Am. Comp. ¶ 120) The one white witness that Plaintiff was allowed to have testify, testified that Plaintiff would not have been before the Student Conduct Board if Plaintiff were white. (Am. Comp. ¶ 122) Defendant Walsh blamed Plaintiff for issues outside of her control, including the actions of their white classmates, who would harass Dinora O after Plaintiff spoke in class. (Am. Comp. ¶ 113, ECF Document 1-6; Exhibit D)

And while Defendant Walsh had already made sure that Plaintiff would have a lower grade point average than she would have had if Defendant Walsh had complied with the terms of

Defendants' temporary suspension of Plaintiff by producing Plaintiff's classroom recordings –
she simply hadn't harmed Plaintiff enough to be satisfied. (Am. Comp. ¶ 109)

Defendant Walsh was deeply embarrassed by losing the SCBH. (Am. Comp. ¶ 106)  So,
Defendant Walsh decided to harm Plaintiff's employment, and ensure Plaintiff's former
employer, Norton Rose Fulbright, would not extend Plaintiff an offer after Plaintiff told them she
was relocating to Georgetown University for the next Fall. (Am. Comp. ¶ 129-130) Defendant
Walsh also decided to unilaterally revoke Plaintiff's scholarship which was promised for three
years, based on the ABA guidelines (ABA Section 509) which require all terms of conditional
scholarships to be included in the letter, and the fact that Plaintiff had not violated any terms or
been found responsible for violating any portion of the Student Conduct Code or Honor Code.
(Am. Comp. ¶ 33-34) Defendants' actions intentionally and foreseeably caused Plaintiff to be so
impoverished during her third year of law school she was forced to obtain food stamps (SNAP)
from the state of Maryland while attending Georgetown. (Am. Comp. ¶ 162-165)

Contrary to Defendants' delusions, Defendants' discriminatory and sexist actions caused
Plaintiff's relocation to Maryland in November 2022. (ECF 33-1) Defendants' actions caused
Plaintiff to flee Missouri; Plaintiff has resided in Maryland ever since her suspension, and didn't
even attend her law school graduation because she was so afraid of Defendants. (Am. Comp. ¶ 96)
Defendant Davis was even given the honor of commencement speaker at Plaintiff's would-be law
school graduation – as an award for successfully harming Plaintiff. (Am. Comp. ¶ 131-134)

The extent of Defendants' conspiracy would have allowed Plaintiff to file suit in any of the
districts where Defendants' caused Plaintiff harm, and/or have a significant relationship to the
harm that Defendants' caused Plaintiff. (Am. Comp. ¶ 20-23) Maryland is where Defendants'
actions forced Plaintiff to relocate **upon Defendants' threat of arrest in Missouri.** (Am. Comp.

¶ 22-23, ECF Document 1-6; Exhibit D) Accordingly, Plaintiff has initiated suit in Maryland, where Plaintiff is domiciled, was domiciled before attending law school, domiciled while finishing her degree at Georgetown, and where she informed Dr. Joy Johnson in Defendants' Admissions Office where she would reside after graduation. (Am. Comp. ¶ 22-23)

Defendants would be subject to personal jurisdiction in the following jurisdictions: 1) New York, where Defendants actions caused Norton Rose Fulbright to not offer Plaintiff employment as a result of Defendant erroneously suspending Plaintiff for complaining of racial and sexual discrimination; 2) Pennsylvania, where Defendants conspired with Plaintiff's former attorney to convince Plaintiff she had been not subject to racial or sexual discrimination, failing to inform Plaintiff of the Title VII requirement to file with the EEOC, AND where Defendants have refused to communicate with the Pennsylvania Bar Association regarding Plaintiff's application; and 3) Washington D.C., where Defendants unilaterally revoked Plaintiff's scholarship and engaged in retaliatory billing practices by refusing to pay Georgetown Law Center until directed to by the Department of Education. (Am. Comp. ¶ 22-23, 75-76, 126, 153, 161)

Defendants have continued to cause harm from Plaintiff's matriculation to the present, as Defendants have now initiated collections actions against Plaintiff in Maryland, sent billing notices to her Maryland address several times a month (the most recent of which was dated March 4th, 2025); issuing demonstrably false statements such that Plaintiff ever posed a threat to Defendant Law School to bar associations where Plaintiff had applied; and indelibly harming Plaintiff. (Exhibit 47, Am. Comp. ¶ 20-23)

Plaintiff requests now for the Court to grant the relief requested in her Complaint, and sanction Defendants for their myriad lies and fraud. (Am. Comp. Page 39 ¶ Prayer for Relief)

# ARGUMENT

## I.    MARYLAND HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS.

### a.    Standard of Review.

Under Federal Rule of Civil Procedure 12(b)(2), the Plaintiff must establish personal jurisdiction. *See Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59-60 (4th Cir. 1993). When a court decides a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff must make a prima facie showing that a defendant is properly subject to the court's jurisdiction. *Id.*; *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In evaluating the plaintiff's showing, a court must accept the plaintiff's allegations as true, and draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Mylan Labs., Inc.,* 2 F.3d at 59-60. The Court may consider declarations and other submitted evidence in resolving a Rule 12(b)(2) motion. *See Costar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763-64 (D. Md. 2009).

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396 (4th Cir. 2003). A district court's exercise of personal jurisdiction over a nonresident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.*

The Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103 (West 2020), authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment, courts must address both prongs of the personal jurisdiction analysis. *See ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002);

*Beyond Sys. Inc. v. Realtime Gaming Holding Co.*, 878 A.2d 567, 576 (Md. 2005). The Maryland

long-arm statute provides the following requirements for jurisdiction:

> Section 6-103; Cause of action arising from conduct in State or tortious injury outside
> State (a) Condition. -- If jurisdiction over a person is based solely upon this section, he
> may be sued only on a cause of action arising from any act enumerated in this section.
> (b) In general. -- A court may exercise personal jurisdiction over a person, who directly
> or by an agent: (1) Transacts any business or performs any character of work or service in
> the State; (2) Contracts to supply goods, food, services, or manufactured products in the
> State; (3) Causes tortious injury in the State by an act or omission in the State; (4) Causes
> tortious injury in the State or outside of the State by an act or omission outside the State if
> he regularly does or solicits business, engages in any other persistent course of conduct in
> the State or derives substantial revenue from goods, food, services, or manufactured
> products used or consumed in the State; (5) Has an interest in, uses, or possesses real
> property in the State; or (6) Contracts to insure or act as surety for, or on, any person,
> property, risk, contract, obligation, or agreement located, executed, or to be performed
> within the State at the time the contract is made. . .

Md. Code Ann., Cts. & Jud. Proc. § 6-103(1)(2)(3)(4)(5)(6). Although Maryland courts have

consistently held that the state's long-arm statute is coextensive with the limits of personal

jurisdiction set out by the Due Process Clause of the Constitution, courts must address both

prongs of the personal jurisdiction analysis. *ALS Scan*, *Id.* To exercise personal jurisdiction under

the long-arm statute, the Court must determine under the first prong that at least one of these

bases has been satisfied. *Carefirst, Id*. Under the second prong, courts determine whether the

exercise of personal jurisdiction comports with the Fourteenth Amendment's due process

requirements. *See id.* § 6-103(a).

### b. Prong One: Maryland's Long Arm Statute – § 6-103(b)(3) and § 6-103(b)(4)

"As to causing tortious injury in the state, personal jurisdiction may be asserted over a

defendant based solely on electronic contacts with the forum state." *See Lewis v. Willough at

Naples*, 311 F. Supp. 3d 731 (D. Md. 2018). Plaintiffs allege that personal jurisdiction is

warranted on this basis under the three-part test regarding electronic activity adopted by the

Fourth Circuit in *ALS Scan, Id.*

Under that test, personal jurisdiction over a defendant complies with Due Process based on a defendant's electronic activity if the defendant: "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 714; see also *Lewis v. Willough at Naples*, 311 F. Supp. 3d 731, 737 (D. Md. 2018) (applying *ALS Scan*).

Plaintiff here has adequately met these threshold requirements, similar to the Plaintiffs in *Coastal Labs., Inc. v. Jolly,* 502 F. Supp. 3d 1003 (D. Md. 2020). Defendants directed electronic activity into the state by communicating 1) for the past 3 years with Plaintiff and her mother, Maryland citizens, 2) throughout the entirety of the SCBH in Maryland via zoom and email communication and in every single instance thereafter because Plaintiff never returned to Missouri after November 2022, as she was threatened with arrest and feared for her safety and 3) unilaterally revoking Plaintiff's scholarship *after* she had moved to Maryland to attend Georgetown for her final year of law school at Defendants. (Id. ¶¶ 81-88.) Additionally, Defendants have interfered with Plaintiff's employment contracts to be completed in Maryland, and furnished lies and defamatory statements (that Plaintiff was ever a threat to the WASHU campus) to the Maryland bar in 2024 about Plaintiff's fitness for the practice of law, causing the Maryland Bar to be doubtful of her character. (Am. Comp. ¶¶ 81-88.) Accordingly, this Court should be satisfied that personal jurisdiction over Defendants comports with Due Process because Defendants directed electronic activity within Maryland with the intent of engaging in business (and defrauding Plaintiff) within the State, and that such activity caused harm to Maryland residents, Plaintiff and her mother. Further, this harm to Plaintiff was foreseeable because Plaintiff demanded adequate assurances that she would not be harmed if she were to return to Missouri, and Defendants Gore and Wendler-

13

Modde refused to give them. (Am. Comp. ¶ 127) Therefore, Plaintiff has established that Defendants have the requisite minimum contacts to satisfy Due Process under Section 6-103(b)(3) for "tortious injury in the State." (Am. Comp. ¶ 127, 131, 132)

Further, in *Swarey v. Stephenson*, 222 Md. App. 65, 112 A.3d 534 (2015), the Maryland Court of Special Appeals explained that to "transact business" under the statute requires that the defendant's actions "culminate in purposeful activity within Maryland." *Id.* 222 Md. App. at 99-100, 112 A.3d 534 ; see also *Advanced Datacomm Testing Corp. v. PDIO, Inc.* , No. DKC-08-3294, 2009 WL 2477559, at *4 (D. Md. Aug. 11, 2009) ("Where the contacts involve a contract, 'Maryland courts could and would assert jurisdiction over a party to a contract in a suit for breach of that contract if the party has performed purposeful acts in Maryland in relation to the contract, albeit preliminary or subsequent to its execution.' " (quoting *Du–Al Corp. v. Rudolph Beaver, Inc*., 540 F.2d 1230, 1232 (4th Cir. 1976).

Defendant Law School and WASHU's actions meet the standard in *Burger King Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985*) and *Swarey v. Stephenson* and by performing purposeful acts (fraud and conspiracy) in Maryland in relation to their contract for Plaintiff's legal education by: 1) threatening and suspending Plaintiff, a Maryland citizen, with arrest in Missouri if she were to participate in any on campus or off campus activities (ECF Document 1-6; Exhibit D) 2) refusing to hold the SCBH in person, in Missouri, after Plaintiff's request to do so (holding the SCBH hearing virtually via zoom because it was "more convenient"; (Exhibit 4) 3) unilaterally revoking Plaintiff's scholarship **after** Plaintiff had already matriculated into Georgetown University and relocated to the state of Maryland. (Am. Comp. ¶ 89, 91-96) Therefore, Defendant Law School and WASHU committed

a substantial part of their harm in Maryland, where they forced Plaintiff to relocate back to for her safety. (Am. Comp. ¶ 22-23)

Defendants cannot plausibly claim that they are surprised that Plaintiff brought her claims in this Court. *See Vogel v. Morpas*, No. RDB-17-2143, 2017 WL 5187766, at *6 (D. Md. Nov. 9, 2017) ("[Defendant] cannot plausibly claim that it is surprised that as a result of brokering that Agreement, litigation in Maryland might ensue.") If litigating in Maryland is so unduly burdensome, Defendants should have given Plaintiff adequate assurances that Defendants would not continue to retaliate and discriminate against Plaintiff. (Am. Comp. ¶¶ 127-128, 136-138) Further, Defendants should have thought about the consequences of their harm to Plaintiff before they gave Defendant Katz a civil rights award right after Plaintiff complained, gave Defendant Davis a civil rights award two days after the conclusion of the SCBH, and then made Defendant Davis commencement speaker for Plaintiff's law school graduation. (Am. Comp. ¶¶ 22-23, 67, 87, 106, 131) Accordingly, this Court should find that Defendants purposefully availed themselves of the privilege of conducting activities in Maryland, and exercise personal jurisdiction over them under Maryland's Long Arm Statute. (Am. Comp. ¶ 22-23)

### c. Conspiracy Theory of Jurisdiction Under Maryland Long Arm Statute

Maryland's long-arm statute also confers personal jurisdiction "over a person, who directly or by an agent . . . [c]auses tortious injury in the State by an act or omission in the State." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) (emphasis added). The State's highest court has determined that a co-conspirator falls within the definition of an "agent" for purposes of its long-arm statute. *Mackey v. Compass Mktg*., Inc., 391 Md. 117, 142, 892 A.2d 479, 493 (2006) ("a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators.") This "conspiracy theory" of personal jurisdiction recognizes that certain acts of a

co-conspirator done in furtherance of a conspiracy may be attributed to another co-conspirator for purposes of a jurisdictional analysis. *Id.* at 484. To establish personal jurisdiction under this theory, a plaintiff must make a threshold showing that: (1) two or more individuals conspire to do something; (2) that they could reasonably expect to lead to consequences in a particular forum, if (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state. *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2022 U.S. Dist. LEXIS 128686 (D. Md. July 19, 2022); Id. at 486 (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982).

If a plaintiff demonstrates these conditions, then a co-conspirator's conduct is "attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum." *Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003 (D. Md. 2020) Section 6-103(b) allows the exercise personal jurisdiction over a person, who directly or by an agent fulfills one of the six bases for personal jurisdiction enumerated in the statute. *Id.*

Under 6-103(b)(3), the Maryland Long Arm Statute, Defendant Law School, Defendants, WASHU, and their respective agents have satisfied the four requirements to establish the conspiracy theory of jurisdiction including but not limited to the events in the Complaint: 1) Defendant Katz directing Defendant Osgood and Defendant Walsh to harm Plaintiff as a result of her complaints of racial discrimination in Defendant Katz's class 2) Defendants refusing to investigate Plaintiff's Title IX claims against Richard O; 3) Defendant Peggy Smith telling Plaintiff not to complain of racism, or she would be expelled; 4) Defendant Angela Smith, Defendant Osgood, and Defendant Kamimura-Jimenez ignoring Plaintiff's complaints in the

Bias Reporting System regarding Defendant Katz and Defendant Davis; 4) Defendant Davis yelling that she is the Klan in the middle of class, lying about her behavior, and complaining to Defendant Walsh to get Plaintiff suspended; 5) Defendants Walsh, Wild, and Gore threatening Plaintiff with arrest in Missouri if she were to participate in any on campus or off campus activities, forcing Plaintiff to relocate for her safety to her home state of Maryland; 6) Defendant Hudson refusing to hold the SCBH in person, in Missouri, **after Plaintiff's request to do so** (holding the SCBH virtually via zoom because it was "more convenient"); 7) Defendants Wendler Modde, Hudson, and Gore enforcing the kangaroo-court restrictions at the SCBH in violation of Plaintiff's 5th and 14th Amendment rights; 8) Defendants Wendler-Modde, Hudson, and Gore refusing to admit any evidence of any classes of Plaintiff, including Defendant Davis's behavior or evidence of Richard O's sexual harassment of Plaintiff; 9) Defendant Walsh refusing to furnish Plaintiff with recordings of her classes;  10) Defendant Burns and Walsh unilaterally revoking Plaintiff's scholarship **after** Defendants were aware that Plaintiff relocated back to the state of Maryland, matriculated into Georgetown University, and impoverishing Plaintiff so that she was forced to apply for SNAP benefits from the state of Maryland; 11) Defendants interfering with Plaintiff's clerkship/employment contracts to be performed in Maryland and Washington D.C.; 12) Defendants furnishing false statements to the Maryland Bar Association; 13) Defendants initiating collections actions against Plaintiff and continuously sending billing documents to Plaintiff in Maryland; 14) Defendant Burns and Defendant Walsh acting to defraud and intentionally impoverish Plaintiff through the unilateral, intentional and retaliatory revocation of Plaintiff's scholarship after she had relocated to Maryland; and 15) Defendants refusing to correspond with the Pennsylvania Bar on behalf of Plaintiff, a Maryland citizen's application. (ECF Document 1-6, Exhibit D; Am. Comp. ¶¶ 43-46, 51-52, 91-96; Exhibit 48)

Therefore, Plaintiff has identified (1) two or more individuals (the named Defendants) conspiring to do something (conspiring with Plaintiff's attorney to get her to sign a release of all claims and non-disparagement agreement that would have harmed Plaintiff and left Plaintiff in a materially worse position than before she retained the Lento Law Firm; defrauding, harming, discriminating against and disenfranchising Plaintiff based on her race and/or sex and/or her complaints of race and/or sex discrimination and retaliation); (2) that they could reasonably expect to lead to consequences in a particular forum, (which Defendants could have expected, because **what they did is patently racist, very illegal, and almost every Defendant has a law degree);** if (3) one co-conspirator commits overt acts in furtherance of the conspiracy, (Defendants', especially Walsh, subjecting Plaintiff to racism and sexism, suspension of Plaintiff, unilateral revocation of Plaintiff's scholarship); and 4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state. Under 6-103(b)(3), Defendants would be subject to personal jurisdiction as they committed torts within the state of Maryland.

Further, under § 6-103(b)(3), Defendants caused tortious injury in the state of Maryland. Defendant Law School and WASHU conspired against Plaintiff in Maryland, and committed a substantial part of their harm in Maryland, where they forced Plaintiff to relocate back to for her safety, and breaching their contractual agreement with Plaintiff and unilaterally revoking her scholarship while attending Georgetown University as a visiting student while completing her WASHU law degree. (Am. Comp. ¶ 22-23, 162)

### d. On § 6-103(b)(1),(2), and (5) - Defendants Contacts in the State of Maryland

"It is clear today that physical presence within a state is not a necessary prerequisite to the proper assertion of personal jurisdiction and that under most states' long-arm statutes, certain

acts and effects of those acts may be the basis for a court to exercise jurisdiction of a nonresident as well as a person who has not physically entered within the territorial borders of the state." *Mackey v. Compass Mktg*., 391 Md. 117, 892 A.2d 479 (2006).

Additionally, Defendants, through their actions and the facts in the Complaint, satisfy the requirements of Maryland Long Arm Statute Section 6-103(b)(1) 6-103(b)(2) and 6-103(b)(5) because Defendant Law School, through the only identifiable and corrigible parent legal entity, Washington University of St. Louis, commonly known as WASHU but legally known as Washington University, EIN 43-0653611, has satisfied numbers 1, 2, and 5 of the long arm statute. (Exhibits 32-46, Am. Comp. ¶ ¶ 1-179) Further, Defendant Law School and WASHU are subject to jurisdiction under Maryland's long-arm statute, because the only applicable legal entity to this action, Washington University, EIN 43-0653611 known as WASHU[1], has contracts in excess of $1 billion dollars with Maryland universities, entities, and individuals including Plaintiff, but also not limited to National Institute of Health in Bethesda, Maryland, Goddard Space Center in Greenbelt, Maryland, Johns Hopkins University in Baltimore, Maryland, and four universities (McDaniel College, Washington College of Maryland, St. Mary's College and Notre Dame of Maryland) with dual degree programs at WASHU. (Exhibits 32-46.)

Based on these exhibits and Defendants' conduct, WASHU has availed itself to the state of Maryland, and is subject to personal jurisdiction based the fact it has performed business and several character of work or service in the State (also including Defendant Davis's contractual employment relationship with Plaintiff, and WASHU's Center for Race and Ethnicity giving Plaintiff, a Maryland resident, $1,000 to perform research during the 2022-2023 school year,

---

[1] Defendants hid this information by not clarifying their parent legal organization in ECF 33-1.

when Defendants forced her to flee from Missouri to Maryland for her safety.) (Am. Comp. ¶
¶77)

In sum, Defendants and WASHU have satisfied multiple portions of the long arm statute,
as Defendants: 1) Transacts any business or performs any character of work or service in the
State 2) contracted to supply goods, food, services, or manufactured products in Maryland, 3)
caused tortious injury against Plaintiff in Maryland by several acts and omissions in Maryland,
4) caused tortious injury in Maryland or outside of the State by an act or omission outside the
State through their myriad harms against Plaintiff, 5) engaged in many other persistent courses of
conduct in Maryland or derives substantial revenue from services (over $1 billion as WASHU
employs and recruits people from all over Maryland, using NIH property and enters into
contracts), and 6) contracted with Plaintiff, a Maryland citizen, in the state of Maryland, before
Plaintiff had ever stepped foot in Missouri, for a law school education that comports with the
laws of the United States, and 7) Defendants acted together to harm Plaintiff and interfered with
Plaintiff's Maryland contracts under the conspiracy theory of jurisdiction. (Exhibits 32-46; Am.
Comp. ¶ ¶ 1-179) Thus, Maryland has personal jurisdiction over all Defendants through the
Maryland long-arm statute.

## II.    Prong 2: Due Process

Under the second prong of the personal jurisdiction analysis, courts determine whether
the exercise of personal jurisdiction comports with the Fourteenth Amendment's due process
requirements. *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006). For a non-
resident defendant, due process requires only that a Defendant have certain minimum contacts
such that the maintenance of the suit does not offend traditional notions of fair play and
substantial justice. *Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003 (D. Md. 2020) A minimum

contacts determination rests on the number and relationship of a defendant's contacts to the forum state, as well as whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state. *Id.*

The United States Supreme Court has recognized two distinct types of personal jurisdiction: general and specific. Both exist here.

## A.  General Jurisdiction

General jurisdiction may be asserted over a defendant "whose activities in the forum state have been continuous and systematic . . . . But the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ESAB Group*, 126 F.3d at 623 (internal quotation marks and citation omitted).

Defendants arguing they are not at "home" after they accepted a billion dollars from Maryland institutions, have agents state publicly that they plan to seek out more money, while also asserting that you are not at home in that state is just ungrateful. I tell you this – if you give me a billion dollars, I will be at home wherever you say I am at home. Defendants should be "at home" in Maryland.

## b. Specific Jurisdiction

Specific jurisdiction cases arise where the cause of action arises from, or is directly related to, the defendant's contacts with the forum state. In short, the defendant's contacts with the forum state form the basis for the suit. *Pinner v. Pinner*, 467 Md. 463, 225 A.3d 433 (2020) The phrase if "he or she regularly does or solicits business, engages in any other persistent course of conduct in the State or" makes it clear that regularly doing business or regularly soliciting business is a persistent course of conduct. *Id.* A strict causal relationship between a plaintiff's cause of action and a defendant's contacts with the forum state is not required, so long as "there

is a strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Montana Eighth Judge. Ct* 529 US 141 S. Ct. 1017 (2021)    Ultimately, the question is whether the contract had a "substantial connection" to the forum state. *Burger King,* Id.; *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000). Lastly, "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Carefirst*, 334 F.3d at 397 (citation omitted); *see also Under Armour, Inc. v. Battle Fashions*, Inc., 294 F. Supp. 3d 428, 434 (D. Md. 2018).

The Fourth Circuit has formulated a three-part test to determine whether there is specific jurisdiction over a defendant. The three prongs are: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Jones v. Mutual of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 549 (D. Md. 2022) (quoting *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)). It is necessary to evaluate the second and third prongs of the test for specific personal jurisdiction "[i]f, and only if" the first prong is satisfied." *Consulting Eng'rs Corp.,* 561 F.3d at 278

### b. 1 – Defendant's purposeful availment

If Defendants argument, that "Plaintiff suffered the harm in Missouri," and the "crux of her Amended Complaint was her suspension" are true, then Plaintiff's forcible relocation to the state of Maryland upon threat of arrest by Defendants satisfies the standard in *Ford* and *Carefirst*. (ECF 33-1) Therefore, Defendants purposefully availed themselves to the state of Maryland by suspending Plaintiff and forcing her to relocate to Maryland for her safety.

Defendants' purposeful availment has been discussed above with regards to their continuous presence in the forum and their contacts with Plaintiff under the Maryland Long Arm Statute. Accordingly, Defendants' myriad contacts, contracts, and robust conspiracy against Plaintiff give rise to Defendants' purposeful availment in the state of Maryland.

**b. 2 - Whether the plaintiffs' claims arise out of those activities directed at the State**

Defendants are employees and a multi-billion-dollar education institution who receive at least a half a billion dollars a year from Maryland entities. Plaintiffs' most important claims arise out of Defendants' acts and omissions that occurred in Maryland, including but not limited to the SCBH, the unilateral revocation of Plaintiff's scholarship, and the interference with her post-graduate employment.

Arguing that Plaintiff herself, alone, is the sole contact between Defendants and the state of Maryland is absurd given the extent of Defendants' conspiracy. Nevertheless, Defendants fail to acknowledge is that the worst of Plaintiff's harm *was not* Plaintiff's suspension from law school. (ECF 33-1, Page 12) It was Defendants' continued practice of ignoring Plaintiff's pleas to not unilaterally revoke her scholarship after she matriculated at Georgetown and their systematic failure to acknowledge and rectify their discrimination that caused the most harm to Plaintiff. (Exhibit 53) Further, Defendants' interference with Plaintiff's post-graduate employment in New York, where her salary would've been over $100,000 than it is now; the unilateral revocation of Plaintiff's scholarship and her subsequent impoverishment; the defamation and tortious interference with Plaintiff's clerkships and employment contracts to be performed in the state of Maryland; and furnishing documents full of omissions and lies to the Bar Associations (including Maryland and Pennsylvania) to which Plaintiff has applied caused Plaintiff *much more harm* than the suspension alone. (Am. Comp. ¶¶ 74, 89, 91, 129, 131, 162)

Nowhere in the law does it state that personal jurisdiction does not exist over non-resident Defendants and Defendants agents who proclaim themselves to be avowed white supremacists, threaten Plaintiffs with arrest after complaining of racial and sexual discrimination, and quarantine them away from the rest of the campus when they had not been found guilty of any crime, violation of the Student Conduct Code, and/or the Honor Code at a Defendant Law School. (Am. Comp. ¶ 96-197)

Yet, Defendants would have you believe that innocent and exonerated Plaintiffs should be forced back into the forum where Defendants originally threatened to arrest them after they had complained of racial and sexual discrimination and engaged in protected activity. (Am. Comp. ¶ 96-197)

To force Plaintiff to litigate in a hostile forum such as Missouri, where Defendants have already committed fraud with impunity and openly disregarded the civil rights laws of this country, would further disenfranchise Plaintiff and every other suspended Black student who seeks safety and refuge from the invidious discrimination of their former institution's agents. (ECF Document 1-6; Exhibit D). (Exhibit 50)

**b. 3 - Constitutionally Reasonable - Fair Play and Substantial Justice**

A strict causal relationship between a plaintiff's cause of action and a defendant's contacts with the forum state is not required, so long as "there is a strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co v. Montana Eighth Judge. Ct* 529 US 141 S. Ct. 1017 (2021)

Defendants' arguments border on absurd and deeply offend traditional notions of fair play and substantial justice. Plaintiff is one person – a Black woman who, after complaining of racial and sex discrimination – was harmed and severely impoverished by the unilateral taking of

24

her scholarship by Defendants in retaliation for winning the SCBH against Defendant Walsh. (Am. Comp. ¶ 127, 130)

It is in the best interest of justice for Plaintiff to be able to litigate her Complaint in Maryland. The bulk of the evidence Plaintiff wishes to assert against Defendants is already in existence, easily obtainable via subpoena and electronic means. Plaintiff does not anticipate the need for any depositions, nor does she intend to take depositions of Defendants, because the recordings of Plaintiff's classes, Defendant Davis's November 2nd, 2022 class, the SCBH, emails and other documentation speak for themselves. Further, Plaintiff, in the state of Maryland, sent Defendants a spoliation letter in April 2023; this evidence should be intact. (Am. Comp. ¶ 128)

In summary, Plaintiff's arguments under Sections 6-103(b)(1), 6-103(b)(2), and 6-103(b)(5), satisfy general jurisdiction while Sections for the purposes of due process, while 6-103(b)(3) and 6-103(b)(4) satisfy specific jurisdiction for the purposes of due process. Further, the conspiracy theory of jurisdiction discussed above and tortious injury in the state of Maryland 6-103(b)(3) and tortious injury outside of the state 6-103(b)(4) under the Maryland Long Arm Statute Specific Jurisdiction) satisfy the requirements of due process: general and/or specific jurisdiction.

### III.    Plaintiff Requests Discovery to Establish Jurisdiction if not Satisfied Elsewhere

A court may grant a request for limited discovery related to the issue of jurisdiction if the plaintiff proffers enough evidence to show that additional information will produce the evidence needed to establish jurisdiction. *Carefirst of Md. v. Carefirst Pregnancy Ctrs*., 334 F.3d 390, 402 (4th Cir. 2003); *ALS Scan v. Digital Serv. Consultants,* 293 F.3d 707, 716 n.3 (4th Cir. 2002).

Plaintiff's allegations against Defendants have proffered enough facts to show that additional information will produce the evidence needed to establish jurisdiction, whether under

the Maryland Long Arm Statute's conspiracy theory of personal jurisdiction or through comporting with the due process requirement of the 14th Amendment.

### V. PLAINTIFF HAS PROPERLY PLED CLAIMS AGAINST DEFENDANTS

#### a. Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein,* 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999)). Thus, when considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at 212. "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King Spalding, 467 U.S. 69, 73." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 507 (2002) Notably, "[f]ederal courts are obliged to liberally construe filings by pro se litigants." *United States v. Brown*, 797 F. App'x 85, 89 (4th Cir. 2019) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). A pro se litigant's pleadings are held to "less stringent standards than formal pleadings drafted by lawyers[.]" *Haines*, 404 U.S. at 520-21.

"Dismissal of a pro se complaint for failure to state a valid claim is therefore only appropriate when, after applying this liberal construction, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Spencer v. Earley*, 278 F. App'x 254, 259-60 (4th Cir. 2008) (emphasis in original) (quoting *Haines v. Kerner*, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). Accordingly, Plaintiff's claims should not be dismissed.

#### b. Maryland Law Governs Plaintiff's Claims

As described above, the most substantial, harmful, and redressable wrongs to Plaintiff occurred in Maryland, and thus should be adjudicated and litigated in Maryland for Plaintiff's safety. Defendants, as true parishioners of the land of Dred Scott and Michael Brown have significant influence over Missouri courts and have exhibited less than zero regard for Plaintiff's civil rights through their participation in the aforementioned conspiracy. (Am. Comp. ¶ ¶ 126-179) Contrary to Defendants' assertion that "all the alleged wrongs occurred in Missouri", the Individual Defendants participated in zoom conferences, hearings, and electronic activities continuously aimed at Plaintiff, the forum state of Maryland through the SCBH, and their tortious conduct interfering with her employment, clerkships, and revoking her scholarship as Defendants continued to harass and impoverish Plaintiff in Maryland. (Am. Compl. ¶¶ 7-16.) Therefore, Maryland law applies to Plaintiff's common law claims. (Am. Comp. ¶ ¶ 1-179)

Plaintiff is also submitting, with this reply, a request for the court's leave to amend her complaint. Plaintiff requests that she is afforded an opportunity to resubmit and plead with particularity her Amended Counts in a supplemental brief with case law, and rebut Defendants' arguments against her Counts contained in ECF 33-1 after amending her Complaint. For the purposes of this reply, however, Plaintiff rebuts Defendants' arguments to several, but not all of Plaintiff's counts enumerated in ECF 33-1 in the below sections.

### Count I – Title VII

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). "To prove such a claim, a plaintiff must show that (1) the plaintiff experiences unwelcome harassment; (2) the harassment was

based on the plaintiff's race, color, religion, national origin, [*22] or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Defendants' conspiracy, suspension of Plaintiff and the actions of Defendant Davis,, Plaintiff's supervisor, easily rise to the level of actionable harassment. (Am. Comp ¶ ¶ 82-96)

## Count II – "Title VI"

42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Defendants' treatment of Plaintiff has violated 42 U.S.C. § 2000d through the myriad harms that Defendants effectuated upon Plaintiff because of her race. Further, in *Ricketts v. Wake Cnty. Pub. Sch. Sys.*, 125 F.4th 507, 2025 U.S. App. LEXIS 303, 2025 WL 37342, the 4th Circuit Court of Appeals held that: To successfully state a claim for deliberate indifference to student-on-student harassment, a plaintiff must show: (1) they were a student at an educational institution receiving federal funds; (2) they suffered racial harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged

harassment. A school acts with deliberate indifference when its response to the alleged harassment or the lack of any such response is clearly unreasonable considering the known circumstances." Defendants' actions and unreasonable response to Plaintiff's complaints of racial and sexual harassment fall into the category of a Title VI deliberate indifference claim. (Am. Comp ¶ ¶ 1-197) Accordingly, the Court should not dismiss Plaintiff's Title VI claim.

### Count III – "Intentional Infliction of Emotional Distress"

In Maryland, to successfully plead and prove a claim of intentional infliction of IIED, a plaintiff must first allege and then present evidence showing: (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) emotional distress of a severe nature. *Continental Cas. Co. v. Mirabile*, 52 Md. App. 387, 403 (1982) (emphasis added.) In Maryland, IIED is reserved for instances of conduct that is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris v. Jones*, 281 Md. 560, 569 (1977); *see, e.g.*, *Figueiredo-Torres v. Nickel*, 321 Md. 642 (1991).

Defendant Davis screamed that she was a member of the Ku Klux Klan – a group classified by the US Government as a "subversive terrorist organization." Defendant Davis stated that she was "Bull Connor", an outrageous and flamboyant white supremacist who was known for outrageous displays of extrajudicial racial violence during the Civil Rights movement. Plaintiff respectfully submits that Defendants retaliatory actions and conspiracy against Plaintiff because she complained of race and sex discrimination are so extreme in degree as to go beyond all possible bounds of decency, and are to be regarded as atrocious and utterly intolerable in a civilized community. (Am. Comp. ¶ 26-134)  Further, Plaintiff is suffering such severe harm that she is

embarrassed to disclose to the court in this public filing, but would be open to testify/disclose in a closed filing and/or evidentiary hearing.

### Count VI - Breach of Contract

To state a claim for breach of contract in Maryland, a plaintiff "must show that the defendant owed him a contractual obligation and that the defendant breached that obligation." Plaintiff does not object to the *manner* of the education during like the cases that Defendants cite; Plaintiff is stating there was a substantial breach/no education because Defendant Walsh lost over 30% of the class recordings that were promised to Plaintiff.  (Am. Comp. ¶¶   107) Further, "[T]he relationship between a student and a private university is largely contractual in nature." Harwood v. Johns Hopkins Univ., 130 Md. App. 476, 483, 747 A.2d 205, 209, cert. denied, 360 Md. 486, 759 A.2d 231 (2000). Courts applying Maryland law have recognized a contractual relationship between students and private universities. *See Streeter v. Walden Univ.,* LLC, CCB-16-3460, 2017 WL 6035253, at *2 (D. Md. Dec. 5, 2017), aff'd, 730 F. App'x 163 (4th Cir. 2018).

Similarly, Plaintiff has a contractual relationship with WASHU, which WASHU breached when Defendants retaliated against Plaintiff for complaining of race and sex discrimination at WASHU. (Am. Comp ¶¶ 1-197) Therefore, Count IV - Breach of Contract should survive Defendant's motion to dismiss.

Plaintiff respectfully submits that the Court does not dismiss her claims, and allow her leave to amend her complaint.

Allison Brown, Plaintiff | Signed 3/14/2025

30