## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ALLISON BROWN,

     Plaintiff,

     v.

WASHINGTON UNIVERSITY,
WASHINGTON UNIVERSITY IN
ST. LOUIS SCHOOL OF LAW,
ELIZABETH WALSH,
ADRIENNE DAVIS,
CARRIE BURNS,
RUSSELL OSGOOD,
ROBERT WILD,
DARRELL HUDSON,
DEANNA WENDLER-MODDE,
NICOLE GORE,
PEGGIE SMITH,
MARK KAMIMURA-JIMENEZ,
ELIZABETH KATZ and
ANGELA SMITH,

     Defendants.

Civil Action No. 24-3198-TDC

### MEMORANDUM OPINION

Self-represented Plaintiff Allison Brown has filed this civil action against Defendants Washington University in St. Louis ("WashU"), Washington University in St. Louis School of Law ("WashU Law School"), and 12 faculty or staff members of WashU or WashU Law School in which she asserts 12 causes of action arising from allegedly discriminatory conduct resulting in Brown's suspension from law school and the withdrawal of her scholarship. Defendants have filed a Motion to Dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim under Rule 12(b)(6). The Motion is fully briefed. Having

reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

For purposes of the Motion, the Court accepts as true the following relevant facts asserted in the presently operative Second Amended Complaint ("the Complaint") or contained in relevant exhibits.

Plaintiff Allison Brown, a Black woman, is a resident of Maryland and a former student at WashU Law School. On February 24, 2021, while in Maryland, Brown submitted her application to WashU Law School. On March 22, 2021, Brown was notified of her acceptance via email. WashU Law School offered Brown a scholarship of $37,000 for each academic year, which she accepted. The sole condition of the scholarship was that Brown maintain "full-time student status." Am. Compl. ¶ 30, ECF No. 48. Specifically, the WashU Law School website states that:

> At WashULaw, all of our JD scholarships are guaranteed for three years. Not only is this unusual but many schools make scholarship awards conditional on maintaining a certain GPA or class rank. By contrast, WashULaw scholarships are given with no strings attached as long as you remain a student at the law school.

*Id.* ¶ 31.

## I.     Brown's Complaints

Brown began her first year at WashU Law School in August 2021. As a law student, Brown raised numerous complaints to WashU faculty and staff regarding sex discrimination, safety threats, and race discrimination which she did not consider to have been properly addressed.

### A.     Sexual Harassment

Brown alleges she was subjected to sexual harassment from a fellow law student, "Richard O," during her first year in law school. *Id.* ¶¶ 37–38. In August 2021, this student sent to Brown a "rape contract" that allegedly provided that the student could rape Brown and engage in rituals

2

involving semen and blood. *Id.* ¶ 37. After the student filed a complaint against Brown that resulted in a lengthy investigation pursuant to Title IX of the Educational Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1683, but no adverse findings, Brown submitted to WashU's Title IX Office, in May 2022, a binder of evidence on the student's sexual harassment of Brown throughout the school year. WashU, however, failed to investigate Brown's sexual harassment complaint.

### B.    Student Safety

On September 27, 2021, Brown reported to Defendant Elizabeth Walsh, the WashU Law School Associate Dean for Student Life and Academic Services, that a classmate had acknowledged carrying guns on campus and to school events. Although Brown provided emails and screenshots supporting her report, Walsh told Brown, "too bad, so sad" and that there was nothing she could do given the "culture of St. Louis." Am. Compl. ¶ 40. Walsh suggested that Brown "get over it" and "make other friends." *Id.*

### C.    Race Discrimination

In January 2022, at the start of the second semester of Brown's first year of law school, Brown was enrolled in a criminal law class taught by Defendant Professor Elizabeth Katz, who "had a documented history of students of color complaining and reporting her discriminatory practices." *Id.* ¶ 42. Beginning in February 2022, Katz showed to the class videos of the murders of Latasha Harlin, Tamir Rice, and other Black children. Brown, along with four classmates, reported Katz's "sensationalization of Black children's gruesome murders" to the WashU administration. *Id.* ¶ 44. Of the reporting students, Brown was the only one reprimanded for making the complaint. In particular, after the report, Brown was called into the Dean's Office five times over the course of the semester to discuss her "tone and professionalism" in class. *Id.* ¶ 45.

3

In one such meeting, a Zoom session on February 25, 2022, Walsh and Katz "made racialized comments regarding [Brown's] appearance" and complained to Brown about her "tone" and "professionalism." *Id.* ¶ 51. After the call, Brown emailed Walsh and Katz to state that she perceived those comments to be racist.

On March 28, 2022, Katz made a comment to Brown during class that she perceived to be racist, which Brown then reported in an email to Walsh and Defendant Angela Smith, the Assistant Dean of Diversity, Equity, and Inclusion at WashU Law School. Smith responded by writing "Thanks" but otherwise ignored Brown's complaint. *Id.* ¶ 60.

On April 7, 2022, Defendant Peggie Smith, the Vice Dean of WashU Law School and a Black woman, met with Brown, advised her not to call a policy or law "racist" in the classroom, and told her that if she did so, she would be suspended. *Id.* ¶ 56. When Brown asked Smith to clarify whether the meeting was a disciplinary warning, Smith responded that she was just giving "advice that may make life and law school easier." *Id.* Despite the fact that certain White students had made inflammatory remarks in class, Brown was the only student who received such intervention from the Dean's Office.

During the summer of 2022, Brown submitted transfer applications to 10 other law schools because she feared returning to WashU Law School for her second year in light of the ongoing sexual harassment and race discrimination. As part of the application process, Brown had asked Walsh to send a letter of good standing to these law schools, but Walsh refused. When Brown's mother, an attorney, reached out to Walsh on this issue, Walsh responded that she planned to send the letters, but Brown never received confirmation that the letters were actually sent.

## II.    Suspension

In August 2022, after her transfer applications were denied, Brown returned to WashU Law School for her second year but posted on Instagram that she did not feel safe there. When Angela Smith contacted Brown about the social media post, Brown reiterated her complaints of sexual harassment and race discrimination. Instead of responding to the complaints, Smith ignored them and, according to Brown, began to conspire with Walsh to have Brown expelled in retaliation for her Instagram post.

Specifically, Brown alleges that Walsh and Angela Smith recruited Defendant Professor Adrienne Davis to aid them in a targeted conspiracy against Brown. During the fall semester, Brown enrolled in two of Davis's classes: "Race in American Law" and "Trusts and Estates." *Id*. ¶ 69. Brown was also hired as Davis's research assistant. As the semester progressed, Davis began acting "oddly," including by sending messages to Brown "outside of business hours and asking her to meet in her office regarding unrelated and inappropriate discussions." *Id*. ¶ 76. After one such meeting, Davis "fraudulently memorialize[d]" the discussion by falsely noting that she told Brown that she "must raise her hand before talking in class," when in fact she had told Brown that she was forbidden from using the words "coon" or "Uncle Tom." *Id*. In response, Brown refused to speak in either of her classes with Davis for the next two weeks, despite Davis trying to entice her to speak.

Brown did not speak again in either of these classes until the November 2, 2022 Race in American Law class. During a class discussion about the former prime minister of the United Kingdom, Rishi Sunak, a student stated that "Rishi Sunak sucks." *Id*. ¶ 80. Davis responded by stating that such language was unprofessional. Another student then told Davis that "policing language is utilizing the same white supremacy that we are supposed to be trying to dismantle"

5

and suggested that Brown could better articulate the sentiment. *Id.* ¶ 81. When Davis called on Brown to speak, Brown stated that "the classroom is the safest place for us to talk about linguistic racism." *Id.* ¶ 82. Brown asserts that in response to her comment, Davis left the classroom while yelling, "I am a white supremacist. I am Bull Connor. I am the KKK" and telling Brown that Davis was going to the Dean's Office to get her the professor she deserved. *Id.* When Davis reentered the classroom, she was in tears, threw the microphone down, and canceled class for the following week.

Two days later, on November 4, 2022, Defendant Robert Wild, the Associate Vice Chancellor and Dean of Students at WashU, called Brown to inform her that she was suspended and banned from campus effective immediately. Wild also sent Brown by email a temporary suspension letter, which asserted that Brown had "engaged in a pattern of disruptive and harassing behavior targeted at law school community members, including faculty and students" and that her "continued presence on campus pose[d] a substantial threat to the ability of faculty and other students to continue their normal University functions and activities." Am. Compl. at 49, Ex. D, ECF No. 48. The suspension letter prohibited Brown from being present on any WashU campus or any property leased or owned by WashU and warned that Brown could be arrested if she was found on campus. Although Brown's apartment was off-campus, it was located within the WashU Police Department's off-campus "patrol zone." Am. Compl. ¶ 86. Brown was not permitted to participate in any WashU activities other than watching recordings of her classes.

On November 9, 2022, Wild and Walsh met with Brown via Zoom to discuss the suspension. On November 10, 2022, Wild sent to Brown by email another letter, this one listing her Maryland address, to answer questions that Brown raised during the November 9 discussion. The letter noted that a formal complaint would be filed with the Office of Student Conduct and

Community Standards, and that a final decision on the suspension would be made after a Student Conduct Board ("SCB") hearing.

At some point after the temporary suspension began, based on the belief that she could be arrested if she resided at her apartment within the WashU Police Department patrol zone, Brown moved back to Maryland. In December 2022, Brown retained counsel to represent her at the upcoming SCB hearing. Brown's mother, a Maryland resident, sent multiple emails to Wild and Walsh in which she made clear her opposition to Brown's suspension and alleged that Brown had been subjected to race discrimination. Brown completed her spring 2023 classes by watching video recordings of the classes while she resided Maryland. Although the terms of Brown's suspension required that she complete her coursework remotely, she alleges that Walsh interfered with her education by misplacing or losing over 30 percent of the class recordings during the semester, prohibiting Brown from communicating with professors and classmates, and forcing Brown to withdraw from a seminar. As a result, Brown's grades suffered during that semester.

## III.    Student Conduct Board Hearing

Meanwhile, Defendant Darrell Hudson, Chair of the SCB, issued evidentiary rulings in advance of the SCB hearing which Brown alleges were "discriminatory, bogus and kangaroo-court-like restrictions." *Id.* ¶ 99. Specifically, Hudson ruled that videos of classes, testimony regarding Davis's conduct, and evidence related to Brown's previous Title IX proceedings relating to alleged sexual harassment would not be admitted into evidence. Hudson also made decisions on the students who would sit on the SCB and included a student over Brown's objection. Hudson permitted five students who disliked Brown to testify against her, excluded four Black witnesses proposed by Brown, and allowed only one witness, who is White, to testify on her behalf. Brown

7

also alleges that Defendants conspired with her attorney to assist in their discrimination, including by giving Brown unsound legal advice relating to a proposed settlement agreement.

The SCB hearing was originally scheduled to occur on December 15, 2022 but was rescheduled at Brown's request and was instead conducted across four different days on February 24, March 20, April 15, and April 11, 2023. Although Brown requested that the hearing occur in person, that request was denied because she was barred from campus, and the hearing was conducted on Zoom with the SCB members and witnesses participating from Missouri and other locations, and with Brown participating from Maryland. Ultimately, in April 2023, the SCB found Brown "not guilty on all charges," *id.* ¶ 123, in that it found that the evidence was insufficient to establish that Brown's conduct constituted harassment or threatening behavior, or that it constituted interference with others' rights to engage in educational and other university activities. However, Brown asserts that the SCB hearing determination letter written by Hudson and Defendant Deanna Wendler-Modde, the Assistant Vice Chancellor and Associate General Counsel of WashU, omitted key facts regarding the deficiencies in the SCB hearing process and the nature of certain exchanges between Brown and Defendants' witnesses, including the testimony of a student that Brown would not have been suspended if she were White. This letter, which Brown contends portrays the SCB hearing and disciplinary proceedings in a false and defamatory manner, was eventually provided to bar associations and Brown's prospective employers. In particular, Brown alleges that the New York-based law firm at which she worked during the summer of 2023 did not give her a permanent offer because of the temporary suspension and the allegedly defamatory distribution of the SCB hearing determination letter.

8

## IV.    Scholarship Revocation

After the SCB ruling, Brown asked for assurances that Defendants would stop the allegedly discriminatory practices and that she would not be wrongfully suspended again if she were to come back to campus for her third year. Defendant Nicole Gore, the WashU Associate Dean for Student Conduct and Community Standards, refused to give such assurances. Instead, Brown was told that WashU Law School would prefer for Brown to finish her law degree elsewhere. Brown asserts that in the absence of any assurances, she feared that she would continue to be "threatened with arrest, arrested, harmed or possibly killed" if she were to return to WashU Law School *Id.* ¶ 124. Accordingly, Brown completed her third year of law school as a visiting student at Georgetown University Law Center ("Georgetown") in Washington, D.C. while residing in Maryland.

On August 15, 2023, WashU Law School revoked Brown's scholarship such that she was responsible for her full tuition for her third year. Brown alleges that the revocation was improper because she maintained "full time student status" at WashU Law School, as reflected on her transcript, and that the revocation was retaliation for her discrimination complaints and "for winning the SCB hearing." *Id.* ¶ 35. Brown alleges that in the time since the revocation, Defendants have engaged in "retaliatory billing practices" to retrieve the amount of the scholarship from Brown, *id.* ¶¶ 103, 156, including by initiating collection and garnishment proceedings.

## V.    Procedural History

On March 18, 2024, Brown filed a complaint with WashU's Office of Institutional Equity alleging discrimination and retaliation against her based on Defendants' course of conduct related to her suspension and scholarship revocation. Am. Compl. at 50, Ex. E, ECF No. 48. On May 7, 2024, the Office's Director of Investigations sent Brown a memorandum stating that Brown's "allegations and subsequent investigation results do not support a finding of violation of the

9

university's Discrimination and Harassment policy." *Id.* Specifically, the memorandum stated that "[t]he decision to temporarily suspend you in order to review allegations through the Office of Student Conduct was not based on your race but on feedback from multiple sources about concerning behaviors." *Id.* It also asserted that "[t]he decision to charge you tuition followed standard university procedures and was not based on race or a retaliatory purpose," because:

> The Washington University School of Law 2023–2024 Financial Aid Handbook, pages 11–12, outlines the School's tuition practice for law students visiting at another law school. This information applies to all students visiting other law schools, regardless of membership in a protected class or participation in Office of Student Conduct procedures.

*Id.*

On November 4, 2024, Brown commenced this civil action. In the presently operative Second Amended Complaint, filed on April 11, 2025, Brown asserts 12 claims in the following numbered counts: (1) race discrimination, sex discrimination, and retaliation in employment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17; (2) race, discrimination, sex discrimination, and retaliation in a federally funded program, in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d; (3) race discrimination and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); (4) fraud and unjust enrichment; (5) intentional infliction of emotional distress; (6) negligence; (7) breach of contract; (8) defamation; (9) conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985; (10) sex discrimination in an educational program, in violation of Title IX; (11) violations of due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, based on the threats of arrest, in violation of 42 U.S.C. § 1983; and (12) violations of the Fifth and Fourteenth Amendment, based on interference in a property interest in education.

10

## DISCUSSION

In the Motion to Dismiss, Defendants seeks dismissal of the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6). For the reasons set forth below, the Motion will be granted based on a lack of personal jurisdiction over Defendants, such that the Court need not and will not address Defendants' remaining arguments.

### I.    Legal Standards

Under Federal Rule of Civil Procedure 12(b)(2), it is the plaintiff's burden to establish personal jurisdiction. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). Generally, the plaintiff need only make a *prima facie* showing that a defendant is properly subject to the court's jurisdiction. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In evaluating the plaintiff's showing, a court must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Mylan Laboratories, Inc.*, 2 F.3d at 59-60. The court may consider affidavits and other submitted evidence in resolving a Rule 12(b)(2) motion. *See CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763-64 (D. Md. 2009).

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). A district court's exercise of personal jurisdiction over a non-resident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.*

The Maryland long-arm statute generally authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause. *See ALS Scan, Inc. v. Digit. Serv. Consultants,*

11

*Inc.*, 293 F.3d 707, 710 (4th Cir. 2002); *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 878 A.2d 567, 576 (Md. 2005). There may be cases, however, in which personal jurisdiction comports with federal due process but which present factual scenarios outside the scope of the long-arm statute. *Krashes* v. *White*, 341 A.2d 798, 804 (Md. 1975). Thus, the jurisdictional analysis under the long-arm statute does not simply collapse into the due process analysis. *See Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006) (stating that although the "long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause," it is not "permissible to . . . dispense with analysis under the long-arm statute").

In light of these principles, the Court will primarily address the due process requirements but will address the Maryland long-arm statute to the extent necessary to complete the jurisdictional analysis.

## II.    Due Process

Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction may be exercised over a party upon a showing that the party has sufficient "minimum contacts" with the forum state such that "maintenance of the suit [in the state] does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, (1940)). In assessing the presence of minimum contacts, courts distinguish between two types of personal jurisdiction: general and specific.

### A.    General Jurisdiction

A court has general personal jurisdiction when the defendant maintains "continuous and systematic" contacts with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984), such that they are "essentially at home." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). "The paradigm forums in which a corporate defendant is at home . . . are

12

the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017). For a natural person, "[t]he paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). The fact that an entity that is not based in a state engages in "a substantial, continuous, and systematic course of business" in the state is not alone sufficient. *See Daimler AG*, 571 U.S. at 137–38 (finding such a rule "unacceptably grasping").

It is undisputed that Defendants WashU and WashU Law School are Missouri institutions with their principal places of business in Missouri. Although Brown has alleged that WashU has "contracts in excess of $1 billion . . . with Maryland universities, entities, and individuals including" the National Institutes of Health ("NIH"), the National Aeronautics and Space Administration ("NASA"), Johns Hopkins University ("JHU"), and four universities with which it has dual degree programs, Opp'n at 19, 21, ECF No. 39, such contacts are insufficient to demonstrate that WashU has contacts that are so "continuous and systematic" that it is "essentially at home" in Maryland as required for general jurisdiction. *Daimler AG*, 571 U.S. at 139 (finding no general jurisdiction over a foreign car manufacturer in California even though its subsidiary had multiple facilities in California and sold 10 percent of its cars there, based primarily on the fact that neither the manufacturer nor the subsidiary were incorporated in California or had its principal place of business there).

As for the individual defendants who were professors or administrators at WashU or WashU Law School, Defendants have provided sworn affidavits demonstrating that none are domiciled in Maryland, and Brown has not alleged otherwise. The Court therefore does not have general personal jurisdiction over any defendant.

13

**B.    Specific Jurisdiction**

A court has specific personal jurisdiction when the defendant has "purposefully established minimum contacts in the forum State such that [it] should reasonably anticipate being haled into court there." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).   In assessing whether specific jurisdiction exists, the court must consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (quoting *ALS Scan, Inc.*, 293 F.3d at 712)).   A plaintiff must prevail on each prong. *Id.*

On the first factor, whether the defendant purposefully availed itself of the privilege of conducting business in the state, the United States Court of Appeals for the Fourth Circuit has identified a list of nonexclusive factors to consider:

(1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198 (4th Cir. 2018)).   The focus should be on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).   In assessing purposeful availment, courts consider "the *quality* and *nature* of the defendant's connections" to the forum

14

state, "not merely the number of contacts between the defendant and the forum state." *UMG Recordings,* 963 F.3d at 352.

Brown makes no allegations to establish the first, second, fifth, sixth, or seventh factors. As to the first and second factors, Brown does not allege or establish that Defendants maintain any offices, agents, or property in the state of Maryland. As to the fifth and seventh factors, Brown makes no allegations that any relevant contract, whether relating to the scholarship or otherwise, contained a choice-of-law provision selecting Maryland or was expected to be performed in Maryland. As to the sixth factor, there are no allegations of in-person contacts with Brown, her mother, or anyone else related to the case while in Maryland. Thus, the only factors on which there are arguably applicable contacts are the third, fourth, and eighth factors.

The second due process requirement is that the plaintiff's claims must "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, *S.F. Cnty.*, 582 U.S. 255, 262 (2017)). This standard does not mean "that only a strict causal relationship between the defendant's in-state activity and the litigation will do," as "some relationships will support jurisdiction without a causal showing." *Id.* Still, the standard "does not mean anything goes." *Id.* "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Here, the vast majority of the conduct by Defendants underlying Brown's claims occurred in Missouri, including the alleged race discrimination and the alleged failure adequately to address race discrimination and sexual harassment. The temporary suspension of Brown and the filing of a complaint against Brown occurred in Missouri, and the SCB hearing was conducted by Zoom from Missouri. The decision to revoke Brown's scholarship also took place in Missouri.

15

Nevertheless, Brown asserts that the following categories of contacts with Maryland are sufficient to establish personal jurisdiction over Defendants: (1) WashU's general contacts with Maryland, including WashU's contracts and other interactions with Maryland-based educational and government institutions; (2) the fact that Brown was a Maryland resident when she applied to WashU Law School and received the scholarship, and that she received correspondence from WashU sent to her Maryland address; (3) various electronic communications with individuals in Maryland, including the conduct of the SCB while Brown was in Maryland, the transmission to her of materials in relation to the SCB hearing, and responses to emails from Brown's mother; (4) the fact that Brown returned to Maryland after her temporary suspension, such that she felt the effects of Defendants' alleged misconduct in Maryland; and (5) the transmission of allegedly defamatory information into Maryland.

Because a determination of whether these alleged contacts are sufficient to establish personal jurisdiction requires consideration of whether they constitute purposeful availment and whether the claims arise out of these contacts, the Court will consider the first two factors together in evaluating the various categories of contacts.

### 1.    Individual Defendants

At the outset, the Court notes that the vast majority of the contacts identified by Brown involve little or no purposeful availment with Maryland by any of the 12 individual Defendants ("the Individual Defendants"). The only identified instances of participation by Individual Defendants in the alleged contacts with Maryland consist of (1) Wild's email transmission of the November 10, 2022 letter to Brown that listed her Maryland address; (2) the participation by Hudson, Wendler-Modde, and Walsh in the SCB hearing sessions by Zoom in which Brown participated from Maryland; (3) the testimony by Gore, Angela Smith, and Peggie Smith during

16

those hearing sessions; (4) the unspecified email responses by either Wild or Walsh to Brown's mother; and (5) the email transmission to Brown of a July 27, 2023 financial aid offer letter by Defendant Carrie Burns, Director of Financial Aid and Student Life at WashU School of Law, that listed Brown's Maryland address. Thus, other than pursuant to the theory of personal jurisdiction based on a conspiracy discussed below, *see infra* part II.B.5, the claim of personal jurisdiction over any of these Individual Defendants is based only on these limited, discrete contacts, and there are no contacts upon which to base a finding of personal jurisdiction over Defendants Davis, Katz, Russell Osgood, or Mark Kamimura-Jimenez.

### 2.    University Contacts

As to the first two categories of alleged contacts, although Brown makes no allegations in the Complaint on this point, as discussed above, Brown alleges in her briefing on the Motion that WashU receives "billions of dollars" in funding and contracts from Maryland universities and Maryland-based government agencies such as NIH and NASA, and that it has dual degree programs with four Maryland universities. Opp'n at 19. Although it is not clear from the submitted materials whether WashU initiated these contacts or whether they are sufficient to establish purposeful availment generally, they cannot support a finding of personal jurisdiction in this case because Brown has not provided any basis to establish the second prong, that her claims arose out of these general contacts, where none of these contacts have anything do with WashU Law School generally or any program in which she participated specifically. *See Perdue Foods LLC*, 814 F.3d at 189; *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 541 (3d Cir. 1985) (in a wrongful death case filed in Pennsylvania against a medical school in Grenada, considering visits by the medical school's leaders to Pennsylvania and a joint international program with a Pennsylvania college only as to general jurisdiction, not specific jurisdiction, and concluding that

17

they did not support personal jurisdiction); *Ramirez-Fort v. Marshall*, 456 F. Supp. 3d 361, 369 (D.P.R. 2020) (in a discrimination case filed in Puerto Rico by a Puerto Rican student against a South Carolina medical school, concluding that the medical school's general research activities in Puerto Rico and collaboration with the Puerto Rican government did not support personal jurisdiction because those activities were not related to the claims).

More specifically, Brown also alleges that WashU "continuously recruits students, including Plaintiff, to attend their undergraduate and graduate programs from the state of Maryland," but she provides no specific facts relating to any recruitment of her. Am. Compl. ¶ 4. She also asserts that she applied to WashU Law School from Maryland and was interviewed as part of the application process while she was in Maryland, that she conveyed her intention to return there after law school, that she received her acceptance materials and offer of a scholarship in Maryland, and that she received billing statements sent to her in Maryland.

Courts addressing claims against universities filed in a student's home state, however, typically find that these kinds of contacts are insufficient to establish personal jurisdiction. For example, in *Gehling*, in which a wrongful death lawsuit arising from the death of student at a medical school in Grenada was filed in his home state of Pennsylvania, the United States Court of Appeals for the Third Circuit held that it lacked personal jurisdiction over the negligence and breach of contract claims, even though the medical school had solicited students through newspaper advertisements circulated in Pennsylvania, six percent of its students came from Pennsylvania and paid tuition from there, the student had applied for admission from Pennsylvania, and the school had mailed a letter of acceptance and other related materials to the student in Pennsylvania. *Gehling*, 773 F.2d at 542–44. Noting that "[a]dvanced educational institutions typically draw their student body from numerous states," the court found that even if the mailings

18

were construed as a contract, where any contract was to be performed in Grenada and any breach occurred there, it would not be a "permissible result" to have the medical school "be amenable to suit for breach of contract . . . in each state in which successful applicants resided at the time of their acceptance." *Id.* at 542, 544 (separately finding personal jurisdiction over fraudulent misrepresentation and intentional infliction of emotional distress claims because they were based on statements made in Pennsylvania by a doctor while delivering the decedent's body to his family).

Similarly, in *Hardnett v. Duquesne University*, 897 F. Supp. 920 (D. Md. 1995), in which a student at a Pennsylvania university was injured while on campus and filed suit in his home state of Maryland, the court, relying on *Gehling*, held that it lacked personal jurisdiction over the university even though it had mailed literature to the student in Maryland, he had applied for admission from Maryland, the university had mailed a letter of acceptance including a partial scholarship to him in Maryland, and the university sent representatives to college fairs in Maryland. *Id.* at 921, 923–24. *See also Vilchis v. Miami Univ. of Ohio*, 99 F. App'x 743, 744 (7th Cir. 2004) (finding no personal jurisdiction pursuant to the state long-arm statute over a negligence claim filed in Illinois arising from an injury to a member of an Ohio university's diving team even though the plaintiff had been recruited while she was a high school student in Illinois and received an athletic scholarship while in Illinois).

Courts have frequently taken the same approach in cases involving claims arising from alleged contracts or agreements relating to the student's enrollment at the university, including in relation to scholarships. For example, in *Ramirez-Fort*, the court found no personal jurisdiction in Puerto Rico over a South Carolina medical school for a student's claims of race discrimination, sex discrimination, retaliation, breach of contract, defamation, and intentional infliction of

19

emotional distress where the alleged acts had largely occurred in South Carolina, even though the plaintiff was a citizen of Puerto Rico when she signed two residency contracts with the medical school and had stated her intention to return to Puerto Rico during the contract formation. *Ramirez-Fort*, 456 F. Supp. 3d at 365, 369; *see also Khalil v. Chatham Coll.*, 391 F. Supp. 2d 588, 590, 593–94 (S.D. Tex. 2005) (finding no personal jurisdiction in Texas over a Pennsylvania college for a breach of contract claim arising from the plaintiff's dismissal from the physician's assistant program even though the plaintiff's application was mailed from Texas and she had engaged in electronic communications with the college and its professors while she was Texas, because the performance on the contract—attendance at college—occurred in Pennsylvania); *Scherer v. Curators of Univ. of Missouri*, 152 F. Supp. 2d 1278, 1279–80, 1284–85 (D. Kan. 2001) (finding no personal jurisdiction in Kansas over a Missouri law school for a claim by a Kansas applicant based on his rejection for admission, even though the plaintiff had mailed his application from Kansas and had received multiple electronic communications from the law school relating to the application process while he was in Kansas); *Cassell v. Loyola Univ.*, 294 F. Supp. 622, 624 (E.D. Tenn. 1968) (finding no personal jurisdiction over a Louisiana university in Tennessee for a breach of contract claim based on the revocation of an athletic scholarship even though the recruited student was known to be a citizen of Tennessee and the allegedly breached contract was signed in Tennessee, where no performance was contemplated to occur in Tennessee); *Liam Lefebvre v. Washington Univ.*, No. 20 C 4928, 2021 WL 197388, at \*1–2 (N.D. Ill., Jan. 20, 2021) (finding no personal jurisdiction in Illinois over WashU for a breach of contract claim based on a failure to award a diploma even though the plaintiff was actively recruited and offered financial incentives while in Illinois, WashU sent his acceptance letter to Illinois, and he conducted many classes remotely from Illinois during the COVID-19 pandemic).

20

To the extent that courts have not found personal jurisdiction in such situations, they have relied on facts involving more extensive and specific student recruitment efforts in the state than have been alleged here. *See, e.g.*, *Hahn v. Vermont Law School*, 698 F.2d 48, 50–52 (1st Cir. 1983) (finding personal jurisdiction over Vermont Law School in Massachusetts based in part on the finding that its recruitment efforts into Massachusetts were part of targeted efforts to serve the market for legal education in Massachusetts and had resulted in Massachusetts students constituting approximately 10 percent of the law school class); *see also Matos v. Seton Hall*, 102 F. Supp. 3d 375, 380 (D. Mass. 2015) (citing *Hahn*). No such allegations have been asserted here. Thus, even assuming that, as generally alleged, Brown was the subject of unspecified recruitment efforts, the fact that she applied to WashU Law School from Maryland and received her acceptance letter and scholarship in Maryland, and that she received ordinary correspondence such as tuition bills at her Maryland address, is insufficient to constitute purposeful availment as required for specific personal jurisdiction.

Finally, the fact that Brown moved back to Maryland after her temporary suspension and attended classes remotely, and resided there during her third year of law school at Georgetown, does not alter this conclusion. All of the conduct underlying this case that occurred prior to the temporary suspension and initiation of disciplinary proceedings, including Defendants' notification of Brown of her suspension on November 2, 2022, occurred in Missouri while Brown was an on-campus student. Though Brown repeatedly alleges that Defendants "forced" her to move to Maryland, Brown has provided no specific facts demonstrating that WashU purposefully required her to reside there during her temporary suspension. Am. Compl. at 1. The fact that she relocated to Maryland, even with Defendants' knowledge, was a unilateral action by Brown that does not constitute purposeful availment by Defendants. *See Helicopteros*, 466 U.S. at 416–17

(finding that the fact that a contractual payment to the defendant for services rendered in Colombia was sent by a Texas-based joint venture from a Texas bank account did not establish contacts sufficient to support personal jurisdiction because "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State"); *Walden*, 571 U.S. at 284 (holding that for purposes of personal jurisdiction, the relationship with the forum State "must arise out of contacts that the 'defendant *himself*' creates with the forum State" (citation omitted)); *cf. Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 449–50, 451–52 (4th Cir. 2000) (finding that the fact that a Virginia company communicated with its own personnel while performing a contract with an Ohio company was not a contact supporting personal jurisdiction over the Ohio company in Virginia, because it was "unilateral activity" by the plaintiff).

In an analogous context, the Fourth Circuit upheld a district court ruling that a defendant's knowledge that an employee resides in the forum state and is conducting work from that location does not constitute purposeful availment. *See Fields v. Sickle Cell Disease Ass'n of Am., Inc.*, 376 F. Supp. 3d 647, 650, 652–53 (E.D.N.C. 2018) (finding a lack of personal jurisdiction over a Maryland employer in North Carolina where it entered into an employment contract with a North Carolina resident that did not specify the location of work, but the employee negotiated for the ability to telecommute from North Carolina, because the decision work from North Carolina was a "unilateral decision" that the employer merely "accommodated"), *aff'd*, 770 F. App'x 77 (4th Cir. 2019). Similarly, other courts have found that correspondence courses and remote educational programs generally, without specific recruitment and initiation on the part of the university or college, do not create sufficient minimum contacts for the educational institution with the student's

22

home state. *See Martinez v. N. Ariz. Univ.*, 553 F. Supp. 3d 908, 919 (D.N.M. 2021) (collecting cases).

For all of these reasons, these contacts fail to establish purposeful availment sufficient to support personal jurisdiction.

### 3. Additional Electronic Contacts

Beyond these standard contacts by a university, Brown points to certain more specific contacts which she alleges to demonstrate purposeful availment, including that her mother sent emails protesting her treatment from Maryland to WashU Law School officials and that she participated in the SCB hearing from Maryland, which necessitated the sending of multiple emails with information and documents relevant to the hearing. As to these alleged contacts, Brown relies on *ALS Scans, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002), in which the Fourth Circuit held that a court can exercise personal jurisdiction over an out-of-state defendant if the defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 712, 714.

As to the emails from Brown's mother to WashU Law School, those cannot be deemed to constitute electronic activity directed into Maryland; only responses sent by WashU Law School personnel could so qualify. Brown, however, has provided no specific information on the nature of those communications other than to acknowledge that Defendants instructed her to stop sending the emails. Pl.'s Supp. Brf. at 5, ECF No. 58. Whether limited to such communications or not, the responses to the emails sent by Defendants to Brown's mother do not exhibit an intention to engage in business or other interactions within Maryland. *See Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134, 136–37 (4th Cir. 1996) (holding that in a case involving alleged violations of

23

the Fair Credit Reporting Act, the New York-based defendant company did not conduct meaningful activity in Maryland so as to establish presence as needed for personal jurisdiction when its only contacts were making phone calls to an investigation firm in Maryland to retain it to conduct work relating to the plaintiff and others).

Similarly, the hosting of the SCB hearing from Missouri, even with the knowledge that Brown would be participating from Missouri and with the sending of materials to Brown in advance of or in relation to the SCB hearing, likewise does not "manifest[] [the] intent of engaging in business or other interactions within the State," *ALS Scans, Inc.*, 293 F.3d at 714, because there was never any plan for Defendants or any WashU personnel to do anything other than communicate electronically with Brown from Missouri. *See Stover*, 84 F.3d at 136–37. Moreover, where there is no allegation that Brown was directed to participate only from Maryland, the fact that Brown chose to participate from that state was a unilateral action on her part that cannot demonstrate purposeful availment by Defendants to target Maryland. *See Helicopteros*, 466 U.S. at 416–17; *Walden*, 571 U.S. at 284; *cf. Diamond*, 229 F.3d at 452.

More broadly, where the educational activities underlying the relationship between WashU Law School and Brown were undisputedly contemplated to occur in Missouri, these limited electronic contacts relating to the SCB hearing and the emails from Brown's mother do not demonstrate purposeful availment. In *Diamond*, in which a Virginia company entered into a contract with an Ohio company to perform services primarily in Ohio, the fact that there were certain "phone calls, letters, and fax communications" between the companies in the two states, and that the Ohio company mailed occasional payments and financial information to Virginia, did not support a finding of personal jurisdiction over the Ohio company in Virginia. *Diamond*, 229 F.3d at 449–52. Likewise, the fact that certain Defendants, while present in Missouri,

24

communicated with Brown or her mother while they were in Maryland on these limited occasions does not support an exercise of personal jurisdiction in Maryland.

For all of these reasons, the more specific electronic contacts between Defendants and Maryland relating to the SCB and the emails by Brown's mother do not demonstrate purposeful availment as required to establish personal jurisdiction.

### 4.    Effects of Tortious Conduct

Brown further argues that personal jurisdiction can be established based on certain arguably tortious conduct that was either directed at Maryland or had effects in Maryland, which she alleges to have required her to seek public benefits and work additional jobs to support herself during law school and to have had an adverse effect on her employment opportunities.

Generally, "a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident." *Carefirst*, 334 F.3d at 397–98 (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).  Under this "effects test" for personal jurisdiction, a plaintiff can establish specific jurisdiction by showing: "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity."  *Id.* at 398 n.7.  This effects test, however, is subject to limitations. The effects of the tortious act must create a connection to the forum itself, "not just to parties who happen to live there."  *Khashoggi v. NSO Grp. Techs., Ltd.*, 138 F.4th 152, 160 (4th Cir. 2025) (quoting *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230 (4th Cir. 2019)).  Moreover, this connection must be "substantial," because "a person cannot be haled into the forum simply

because he knew that his conduct would have incidental effects there." *Id.* (quoting *Walden*, 571 U.S. at 284). Lastly, the conduct must be "expressly aimed" at the forum such that the forum must be the "focal point" of the conduct. *Id.* (citations omitted). Notably, because "[t]he effects test does not supplant the minimum contacts analysis, but rather informs it," any effects felt in the forum state "must ultimately be accompanied by the defendant's own contacts with the state." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280–81 (4th Cir. 2009).

Brown alleges four tort claims that caused harm to her in Maryland consisting of fraud, negligence, intentional infliction of emotional distress, and defamation. According to Brown, "[m]ost harm that occurred to Plaintiff was and has been while she was and is domiciled and living in the State of Maryland," such that she claims that Maryland was the focal point of the harm. Pl.'s Supp. Brf. at 4–5. Regardless of whether Maryland was such a focal point, however, Brown has not established that Defendants either engaged in tortious conduct in Maryland or that they expressly aimed their conduct into the state of Maryland, as required to establish personal jurisdiction based on the effects test.

Brown's intentional infliction of emotional distress claim is based on the alleged acts of discrimination and retaliation, including the Title IX proceedings relating to sexual harassment, the allegedly discriminatory temporary suspension, alleged misconduct relating to the SCB hearing, and the alleged stealing of a financial aid refund, all of which consisted of conduct allegedly taken by Defendants in Missouri. Likewise, the fraud claim is based on Defendants' alleged doctoring of emails, misconduct in relation to the SCB hearing, conspiring with Brown's attorneys, and revoking of her scholarship, none of which occurred in Maryland. Even if the claim of negligence, which is not an intentional tort, could apply here, it relates to the failure to address

26

properly her race and sex discrimination complaints and the subsequent retaliatory suspension, which also occurred in Missouri rather than Maryland.

To the extent that these or any of the other claims resulted in adverse effects on Brown while she was in Maryland during and after her temporary suspension, the allegations do not support the conclusion that Defendants expressly aimed their conduct into the state of Maryland. *See Carefirst*, 334 F.3d at 398 n.7. In particular, there is no basis to conclude that the filing of the formal complaint against Brown, the conduct of the SCB hearing, or the revocation of her scholarship were "expressly aimed" at Maryland. *See Consulting Eng'rs,* 561 F.3d at 280 (finding that despite the plaintiff suffering economic injury in Virginia arising from a breach of contract, the defendant, a Colorado company, did not "aim" tortious conduct at the forum when its Virginia contacts were limited to engaging in phone calls and emails with the Virginia-based plaintiff, the allegedly improper hiring of the plaintiff's employee took place in India, and the contract was to be performed in India). Rather, to the extent that the harm was felt in Maryland, whether emotional or financial harm, it was the result of Brown's unilateral decision to relocate there. *See Helicopteros*, 466 U.S. at 416–17; *Walden*, 571 U.S. at 284.

As for the defamation claim, although Brown references "a pattern of spreading false and defamatory statements labeling Plaintiff a threat and harassing to Defendant University," Am. Compl. ¶ 170, her allegations are mostly nonspecific and refer to numerous recipients outside of Maryland, including the American Bar Association, other bar associations, and the U.S. Department of Education. Although she does not directly identify a specific Maryland recipient of such defamatory statements in the Complaint, in her briefs Brown refers to alleged defamatory statements sent to the "Maryland Bar Association," presumably a reference to the Maryland State Board of Law Examiners ("the Maryland Bar"). Opp'n at 17. Even if this allegation could be

27

considered, Brown has provided insufficient facts to permit the Court to analyze fully the question of whether these unspecified statements could be deemed to have been expressly aimed at Maryland. In any event, the Court need not resolve that issue because, as discussed below, such a transmission cannot support a finding of personal jurisdiction in Maryland because it does not meet the requirements of the Maryland long-arm statute. *See infra* part III. Thus, Brown has not demonstrated personal jurisdiction over Defendants based on her claim that she felt the effects of Defendants' tortious conduct in Maryland.

### 5.     Conspiracy Theory of Jurisdiction

Lastly, Brown argues that a conspiracy theory of personal jurisdiction applies under which Defendants are imputed with constitutionally sufficient contacts with Maryland through the actions of their alleged co-conspirators. To succeed under such a theory, a plaintiff must make a plausible claim that (1) a conspiracy existed; (2) the defendants participated in the conspiracy; and (3) a co-conspirator's activities in furtherance of the conspiracy had sufficient contacts with Maryland to subject the conspirator to jurisdiction in Maryland. *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). Plaintiffs arguing under a conspiracy theory of jurisdiction must plead with particularity and cannot rely on "bare allegations." *Id.* (quoting *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005)).

Here, Brown argues that Defendants conspired to retaliate against her and revoke her scholarship, and she lists 16 actions that she contends establish personal jurisdiction based on this conspiracy theory:

> (1)     Defendant Katz directing Defendant Osgood and Defendant Walsh to harm Plaintiff as a result of her complaints of racial discrimination in Defendant Katz's class[;]
>
> (2)     Defendants refusing to investigate Plaintiff's Title IX claims against Richard O;

(3)     Defendant Pegg[ie] Smith telling Plaintiff not to complain of racism, or she would be expelled;

(4)     Defendant Angela Smith, Defendant Osgood, and Defendant Kamimura-Jimenez ignoring Plaintiff's complaints in the Bias Reporting System regarding Defendant Katz and Defendant Davis;

(5)     Defendant Davis yelling that she is the Klan in the middle of class, lying about her behavior, and complaining to Defendant Walsh to get Plaintiff suspended;

(6)     Defendants Walsh, Wild, and Gore threatening Plaintiff with arrest in Missouri if she were to participate in any on campus or off campus activities, forcing Plaintiff to relocate for her safety to her home state of Maryland;

(7)     Defendant Hudson refusing to hold the SCB [hearing] in person, in Missouri, after Plaintiff's request to do so (holding the SCBH virtually via zoom because it was "more convenient");

(8)     Defendants Wendler-Modde, Hudson, and Gore enforcing the kangaroo-court restrictions at the SCB [hearing] in violation of Plaintiff's 5th and 14th Amendment rights;

(9)     Defendants Wendler-Modde, Hudson, and Gore refusing to admit any evidence of any classes of Plaintiff, including Defendant Davis's behavior or evidence of Richard O's sexual harassment of Plaintiff;

(10)    Defendant Walsh refusing to furnish Plaintiff with recordings of her classes;

(11)    Defendant Burns and Defendant Walsh unilaterally revoking Plaintiff's scholarship after Defendants were aware that Plaintiff relocated back to the state of Maryland, matriculated into Georgetown University, and impoverishing Plaintiff so that she was forced to apply for SNAP benefits from the state of Maryland;

(12)    Defendants interfering with Plaintiff's clerkship/employment contracts to be performed in Maryland and Washington D.C.;

(13)    Defendants furnishing false statements to the Maryland Bar Association;

(14)    Defendants initiating collections actions against Plaintiff and continuously sending billing documents to Plaintiff in Maryland;

(15)   Defendant Burns and Defendant Walsh acting to defraud and intentionally impoverish Plaintiff through the unilateral, intentional and retaliatory revocation of Plaintiff's scholarship after she had relocated to Maryland; and

(16)   Defendants refusing to correspond with the Pennsylvania Bar on behalf of Plaintiff, a Maryland citizen's application.

Opp'n at 16–17. Even assuming that Brown has pleaded sufficient facts to show that there was some kind of a conspiracy, the vast majority of these identified acts or omissions do not involve contacts with Maryland, and to the extent that some involve or arguably involve such contacts, the Court has already concluded that they do not demonstrate purposeful availment relating to Brown's claims so as to support personal jurisdiction over Defendants. *See supra* part II.B.1-4. Where there is no alleged co-conspirator who is subject to personal jurisdiction based on these contacts, no other defendant can be deemed to be subject to personal jurisdiction under this theory. *See Unspam Techs.,* 716 F.3d at 329.

Thus, framing Brown's argument in terms of the conspiracy theory does not alter the Court's conclusion that Brown has not established the requirements for personal jurisdiction over Defendants under the Due Process Clause of the Fourteenth Amendment. Where the Court more broadly finds that Brown has not satisfied the first two prongs of the requirements for specific jurisdiction, it need not address the third prong of whether the exercise of jurisdiction is constitutionally reasonable. *See Perdue Foods,* 814 F.3d at 189.

**III.   Maryland Long-Arm Statute**

The Court also finds that it lacks personal jurisdiction over Brown's claims because the allegations are insufficient to bring Defendants under the ambit of the Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6–103 (West 2020). As relevant here, the Maryland long-arm statute authorizes jurisdiction over a party that, "directly or by an agent" "[t]ransacts any business

30

or performs any character of work or service in the State," *id.* § 6–103(b)(1); "[c]auses tortious injury in the State by an act or omission in the State," *id.* § 6–103(b)(3); or "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State, *id.* § 6–103(b)(4). If jurisdiction is based on the long-arm statute, the defendant "may only be sued on a cause of action arising from" one of the acts "enumerated in this section." *Id.* § 6–103(a).

As to section 6–103(b)(1), the only alleged conduct that arguably constitute the transacting of business or the performance of work within Maryland consists of WashU's general activities relating to contracts with Maryland universities or federal government agencies. As discussed above, however, Brown's claim do not arise from these contacts, *see supra* part II.B.2, so they cannot satisfy the requirements of the long-arm statute. *See* Md. Code. Ann., Cts. & Jud. Proc. § 6–103(a).

Section 6–103(b)(3) likewise does not apply because it requires that Defendants engaged in an act in Maryland. The only contacts with Maryland related to Brown's claims consist of communications, whether by mail or electronically, sent into Maryland. Such contacts do not qualify as "an act or omission in the State" for purposes of section 6–103(b)(3). *Zinz v. Evans & Mitchell Indus.*, 324 A.2d 140, 144–45 (Md. Ct. Spec. App. 1974), *cert. denied*, 272 Md. 751 (1974); *Lewin v. Columbia Univ.*, 822 F.2d 55, 1987 WL 37810, at *3 (4th Cir. 1987) (unpublished table decision); *Dring v. Sullivan*, 423 F. Supp. 2d 540, 546 (D. Md. 2006).

To the extent that Brown asserts that her claims fall under section 6–103(b)(4), the primary out-of-state conduct that could arguably have caused tortious injury in Maryland is the alleged

31

transmission of unspecified false or defamatory statements to the Maryland Bar.  Case law, however, demonstrates that this allegedly defamatory communication is insufficient to meet the requirements of section 6–103(b)(4) under the present record.  In *Lewin*, the Fourth Circuit found a lack of personal jurisdiction over Columbia University in Maryland as to defamation and intentional infliction of emotional distress claims based on a letter sent by a Columbia official in New York to a Maryland student's high school criticizing the fact that she had accepted admissions offers from two different universities.  *Lewin*, 1987 WL 37810, at *1.  The court concluded that the claim did not fall within section 6–103(b)(3) because the sending of a letter from out-of-state into Maryland is not an "act or omission in the State," and that it did not fall within section 6–103(b)(4) because the letter did not demonstrate that Columbia "regularly does or solicits business" in Maryland or "engages in any other persistent course of conduct in the State."  *Id.* at *4.  It reached this conclusion even though Columbia accepts applications from Maryland and has students from Maryland, its admission officers visit Maryland high schools, it sends fundraising letters and alumni magazines into the state, and there is an independent Columbia alumni club in Maryland.  *Id.* at *4–5.  In so ruling, the court also favorably cited *Gehling*, noted that the Grenadan medical school's newspaper advertisements in Pennsylvania, the fact that six percent of the medical school's students were from Pennsylvania, the visits of the school's leaders to Pennsylvania to "gain exposure," and the school's joint international program with a Pennsylvania college were insufficient to establish personal jurisdiction.  *Id.* at *4 (quoting *Gehling*, 773 F.2d at 541–42).

Other cases similarly demonstrate that a limited number of allegedly defamatory communications sent from out-of-state into Maryland is insufficient to meet the requirements of section 6–103(b)(4) even when the defendant has some additional contacts with Maryland.  *See*

32

*Pandit v. Pandit*, 808 F. App'x 179, 186–87 (4th Cir. 2020) (finding no personal jurisdiction over defendants under section 6–103(b)(3) or 6–103(b)(4) even though the defendants collectively sent approximately 14 letters or emails, including at least two defamatory ones, into Maryland and also had engaged in multiple in-person visits to Maryland); *Dring*, 423 F. Supp. 2d at 543, 546–48 (finding that an allegedly defamatory email about a taekwondo referee sent into Maryland did not meet the requirements of section 6–103(b)(3) or 6–103(b)(4), even though the defendant had worked as a referee in Maryland in the past).

Based on *Lewin*, the Court finds that to the extent that the Complaint can be read to allege that a defamatory communication was sent to the Maryland Bar, that communication, even when considered along with the other limited electronic contacts discussed above, *see supra* part II.B.3, does not satisfy the requirements of section 6–103(b)(4) particularly where, as discussed above, WashU's additional contacts with Maryland are comparable to those referenced in *Lewin* as insufficient to establish to demonstrate regular business or a "persistent course of conduct" with Maryland. *See Lewin*, 1987 WL 37810, at *4–5.

Accordingly, where Brown has not established the requirements for personal jurisdiction over Defendants under either the Due Process Clause of the Fourteenth Amendment or the Maryland long-arm statute, the Court finds that this case is subject to dismissal for a lack of personal jurisdiction over Defendants. The Court therefore need not and will not address Defendants' other arguments for dismissal.

## IV.    Jurisdictional Discovery

Although Brown requests jurisdictional discovery, she has already obtained and submitted numerous exhibits arguably relevant to this issue, and she has not referenced any particular evidence, generally or specifically, that could alter the Court's determination on personal

33

jurisdiction. To the extent that she requests anything in particular, Brown references the events that transpired in the November 2, 2022 Race and the Law Class, which would not provide evidence relevant to personal jurisdiction. Where the requesting party has the burden to establish a need for jurisdictional discovery, *see Carefirst*, 334 F.3d at 402–03, Brown has failed to meet that burden. The Court will therefore deny the request for jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 33, will be GRANTED. Unless Brown requests a transfer of this case to the United States District Court for the Eastern District of Missouri, the Complaint will be DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction. A separate Order shall issue.

Date:   August 1, 2025

THEODORE D. CHUANG
United States District Judge